[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 18-14671

_____

JIMMY DAVIS, JR.,

Petitioner-Appellant,

*versus*

COMMISSIONER, ALABAMA DEPARTMENT OF
CORRECTIONS,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 1:07-cv-00518-CLS

_____

Before ROSENBAUM, BRANCH, and GRANT, Circuit Judges.

BRANCH, J., Circuit Judge:

Jimmy Davis, Jr., an Alabama prisoner sentenced to death for the 1993 murder of Johnny Hazle during a gas station robbery, appeals the district court's denial of his 28 U.S.C. § 2254 federal habeas petition. Before us are Davis's arguments that the state court unreasonably applied *Strickland v. Washington*, 466 U.S. 668 (1984), in denying his claim that trial counsel rendered ineffective assistance in the penalty phase of his capital trial by (1) failing to investigate and present mitigating evidence of childhood abuse; and (2) failing to investigate and present mitigating evidence of the circumstances of his prior conviction for third-degree robbery.[1] After careful consideration and with the benefit of oral argument, we affirm the denial of Davis's habeas petition.

---

[1] Davis sought a certificate of appealability ("COA") in this Court on several issues. We granted Davis a COA on only the two issues specified above. Importantly, in his § 2254 petition, Davis raised claims that his trial counsel rendered constitutionally ineffective assistance in the penalty phase by failing to secure mental health testimony and to obtain mitigation evidence relating to mental and psychological dysfunction and brain damage. The district court denied these claims on the merits and denied a COA. And Davis did not seek a COA on these claims in this Court. Yet in his brief, he discusses the mental health and brain damage evidence at length. As this testimony is unrelated to the claims upon which we granted a COA and beyond the scope of the COA, we do not consider it. *See Murray v. United States*, 145 F.3d 1249, 1251 (11th Cir. 1998) (explaining that "appellate review is limited to the issues specified in the COA").

## I.    Background

### *A.  The Crime and Guilt Phase of Trial*

Following the March 1993 murder of Johnny Hazle during a gas station robbery in Anniston, Alabama, an Alabama grand jury indicted Davis for the capital offense of murder committed during a robbery in the first degree or an attempt thereof.  *See* Ala. Code § 13A-5-40(a)(2) (1975).  The trial court appointed Steve Giddens to represent Davis at trial on April 9, 1993.  Giddens had been a criminal defense solo practitioner in Alabama since 1986, but he had worked on only one capital case previously.  Giddens requested that co-counsel be appointed, and the trial court appointed Jonathan Adams.  The case went to trial eight months later in December 1993.

The Alabama Court of Criminal Appeals summarized the facts of Davis's case as follows:

> The state's evidence showed that on March 17, 1993, [Davis], Alphonso Phillips, and Terrance Phillips made plans to rob the Direct Oil Station, a gasoline service station in Anniston.  According to the plan, [Davis], who possessed a .25 caliber semiautomatic pistol, would point the pistol at the station operator, Alphonso would grab the money, and Terrance would act as a lookout.  The state's evidence support[ed] the conclusion that [Davis] was the principal actor in the conspiracy.  He conceived the idea to rob the station and he recruited the others to help him.  As the trio approached the station,

Terrance changed his mind, abandoned the conspiracy, and walked away. Alphonso and [Davis] approached the station; [Davis] confronted the operator, Johnny Hazle, in the doorway of the station, pointed the pistol at him, and said, "Give it up, fuck-n[*****]." [Davis] almost immediately fired two shots from the pistol, which struck Hazle in the chest and abdomen. Terrance testified that he was about a block from the station, walking toward his home, when he heard two or three shots fired. After the shooting, [Davis] and Alphonso ran from the scene. Hazle died from these wounds shortly thereafter. Three empty .25 caliber shell casings were recovered at the scene, and two bullets of the same caliber were recovered from Hazle's body. The pistol was subsequently recovered. The ballistics evidence showed that the two bullets recovered from Hazle's body and the three empty shell casings found at the scene had been fired from [Davis's] pistol.

*Davis v. State*, 718 So. 2d 1148, 1155 (Ala. Crim. App. 1995). Both Alphonso and Terrance pleaded guilty to conspiracy to commit robbery in the first-degree and testified against Davis.[2] *Id.* Alphonso testified that, when they reached the door of the gas station, Davis "pointed the pistol at Hazle and said, 'Give it up, fuck-n[*****]'; that Hazle . . . smiled; and that [Davis] shot Hazle when he smiled." *Id.* Similarly, although Terrance was walking

---

[2] At the time of the murder, Davis was 22 years old, Terrance was 16, and Alphonso was 17.

18-14671                Opinion of the Court                5

home when the robbery occurred, Terrance testified that Davis told him after the robbery that:

> he had told [Hazle], Give it up, fuck-n[*****].  And then he said the man had smiled or something at him, laughed or something.  And then he said he had shot and the man had kicked the door.  And then he shot again. . . .  And then he said they ran.

Id. (quotations omitted).  Other individuals similarly testified that Davis relayed similar information and told them that he had robbed the gas station and shot someone.  Id.

"[Davis's] defense strategy consisted mainly of trying to discredit or to cast doubt upon the testimony of the state's witnesses through cross-examination and arguments to the jury and to the trial court."  Id. at 1156.  Specifically,

> he attempted to exploit differences as to some details in their testimony, attempted to persuade the jury that under the facts it was more likely that Alphonso did the shooting, argued to the jury and to the trial court that the facts surrounding the commission of the crime better fit the elements of the lesser included offense of felony-murder rather than with the offense of capital murder, and attempted to cast doubt upon the veracity of Alphonso, Terrance, and [another witness] (who was involved with the authorities in an unrelated case) by emphasizing the deals they had made with the state for lenient treatment in return for their testimony.

*Id.* at 1156. The jury found Davis guilty of murder committed during a robbery in the first-degree as charged.

### B. The Penalty Phase

Following the guilty verdict, the court took an approximately 50-minute recess prior to the start of the penalty phase.[3] The State offered two statutory aggravating circumstances: (1) that the murder was committed during the commission of a robbery, and (2) that Davis had a prior conviction involving the use or threat of violence to a person—a 1992 conviction for Alabama

---

[3] When a defendant is convicted of a capital offense in Alabama, the trial court is required to conduct a separate sentencing hearing "as soon as practicable after the defendant is convicted" to determine whether the defendant should be sentenced to life imprisonment without parole or to death. Ala. Code § 13A-5-45(a). During the hearing, the parties may present evidence of the existence of any aggravating or mitigating circumstances. *Id.* § 13A-5-45(c). After deliberation, the jury weighs the aggravating and mitigating circumstances. *Id.* § 13A-5-46(e). At the time of Davis's trial, Alabama law provided that if the jury determined that no statutory aggravating circumstances existed or that one or more aggravating circumstances existed but did not outweigh the mitigating circumstances, the jury "shall return an advisory verdict recommending to the trial court that the penalty be life imprisonment without parole." *Id.* § 13A-5-46(e)(1)–(2) (1993). If the jury determined that one or more statutory aggravating circumstances outweighed the mitigating circumstances, it "shall return an advisory verdict recommending to the trial court that the penalty be death." *Id.* § 13A-5-46(e)(3) (1993). Importantly, "[t]he decision of the jury to return an advisory verdict recommending a sentence of life imprisonment without parole [had to] be based on a vote of a majority of the jurors. The decision of the jury to recommend a sentence of death [had to be] based on a vote of at least 10 jurors." *Id.* § 13A-5-46(f) (1993).

18-14671                    Opinion of the Court                           7

third-degree robbery.[4]  The State introduced a certified copy of
Davis's 1992 robbery conviction.  The defense then stipulated that
Davis was convicted of third-degree robbery in 1992, and he
received a sentence of a year and a day.  The State then rested.

---

[4] At the time of Davis's sentencing, the following constituted statutory
aggravating circumstances in Alabama:

> (1) The capital offense was committed by a person under
> sentence of imprisonment;
>
> (2) The defendant was previously convicted of another capital
> offense or a felony involving the use or threat of violence to
> the person;
>
> (3) The defendant knowingly created a great risk of death to
> many persons;
>
> (4) The capital offense was committed while the defendant
> was engaged or was an accomplice in the commission of, or an
> attempt to commit, or flight after committing, or attempting
> to commit, rape, robbery, burglary or kidnapping;
>
> (5) The capital offense was committed for the purpose of
> avoiding or preventing a lawful arrest or effecting an escape
> from custody;
>
> (6) The capital offense was committed for pecuniary gain;
>
> (7) The capital offense was committed to disrupt or hinder the
> lawful exercise of any governmental function or the
> enforcement of laws; or
>
> (8) The capital offense was especially heinous, atrocious or
> cruel compared to other capital offenses.

Ala. Code § 13A-5-49 (1994).

8                    Opinion of the Court                    18-14671

The defense urged the jury to recognize that third-degree robbery was "the lowest level of robbery" in Alabama and requested that the jury members "keep [their] minds open" in recommending a sentence. Davis called three witnesses during the penalty phase: his mother Lillie Davis, his cousin Andre Sigler, and a counselor and school psychometrist,[5] Annie Storey. Adams handled the questioning of Lillie and Sigler, and Giddens handled the questioning of Storey.

Davis's mother, Lillie, testified that she had six children, Mary Nell, Davis, Hortense, Patricia Ann, Linda, and Angie. Lillie stated that she and Davis's father were married, but they separated when Davis was about a year old. Lillie raised Davis and her other children by herself—there was never a father in the home.

Lillie "started having a little difficulty problem" with Davis when he was nine. When Davis was 15 years old, she sent Davis to live with his father in Detroit to keep him away from a "bad crowd" at school. However, Davis's father died unexpectedly only a couple of months after Davis moved there, and Davis returned to Alabama. Lillie explained that when Davis returned home, he would say that he wished he was with his dad or that he wished she and his dad had been together. Lillie told the jury that she raised Davis with "[t]he best of the knowledge [she] could," and she

---

[5] A psychometrist is someone who "administers intelligence and diagnostic educational tests to individuals between the ages of two and adult."

pleaded with the jury to show mercy and give Davis life without parole.

On cross-examination, when asked to describe what kind of problems Davis started exhibiting around the age of nine, Lillie explained that he had "[b]ehavior problems" at school and home. She elaborated, stating:

> Just like he [would] do something in school and he get suspended or go in the in-house. And then I would have parents—parent conference with the teachers. And then at home, when I say, "Jimmy, clean the yard," or either, "Don't go nowhere," or either, "Don't do things," sometimes he do and then sometimes he don't. And then just sneak away from the house sometime. And I had problems with him.

She confirmed that Davis's problems were behavioral and that he did not always obey her. Lillie stated that she "punish[ed] him," but she did not elaborate on the methods or frequency of punishment.

Between the ages of 15 and 19, she had issues with Davis "stealing things," "[s]taying out all night," or being gone for days at a time, but never any violent behavior. Davis dropped out of school at 16 and, once he turned 17, Lillie stated that she could not control him anymore because she "couldn't discipline him" at that age. Davis moved out at 19, but he visited Lillie weekly. Lillie confirmed that she never observed Davis with a gun.

Next, Davis's cousin, Andre Sigler, testified that he is five years older than Davis, that he and Davis were "close friends," and that they saw each other almost daily until Sigler enlisted in the army after he graduated high school. He lost contact with Davis while he was in the army. Sigler denied any knowledge of Davis getting into trouble before the instant case, and he did not realize until the day of trial that Davis was charged with a capital offense. Sigler did not know about Davis's prior third-degree robbery conviction from 1992.

Sigler agreed that Davis must be punished for the murder, but he pleaded with the jury to "spare [Davis's] life" because

> life in prison is punishment enough for any crime. And also, I think that [Davis] wasn't given the opportunities that a lot of people are given coming up. And who knows, maybe in prison he can learn to adjust, adapt, and get the proper counseling and things he need[s]. . . . I think [Davis] was missing a lot as he was coming up. People to rely on, people to talk to, people who could understand him and try and help him out. A lot of things that we all have had, more successful people have had.

Sigler confirmed that, after Davis's father died, there was a "noticeable difference" in Davis—his appearance and attitude changed, "he wasn't home very much," and "[t]here were times when his mother had . . . problems with him." Sigler attributed his own successful path in life—graduating high school, joining the military, and being honorably discharged four years later—to the

fact that he was raised by both of his supportive grandparents. He attributed Davis's path in life to the fact that Davis was raised by a single parent and did not have a father figure in his life. Sigler stated he was "sure it would have been different" for Davis if he had "had better circumstances."

Finally, the defense presented the testimony of Annie Storey, a certified school psychometrist, who was employed at the Calhoun-Cleburne Mental Health Center and at a local high school as a counselor. Storey possessed three master's degrees and a "double-A certificate in the area of education, school psychometry, guidance and counseling." At the time of Davis's trial, Storey had practiced in her field for seven and a half years, had conducted "[h]undreds" of intelligence and diagnostic educational tests, and had testified in court about those tests.

She testified that she spent about an hour and fifteen minutes administering the Weschler Adult Intelligence Scale Revised ("WAIS-R") and the Wide Range Achievement Test ("WRAT") to Davis. On the WAIS-R (an IQ test), Davis achieved a verbal score of 82 and a performance scale of 70, resulting in an overall IQ score of 77. The standard deviation for the test was 15 points. Davis's IQ score of 77 placed him in the bottom sixth percentile (with the national average IQ being between 85 and 115), meaning Davis was "within the borderline range of intelligence." Storey explained that Davis was functioning between "an individual who is mentally retarded and one who is low average." She used the WRAT test to determine Davis's

academic functionality, and the results revealed that he functioned at a fifth-grade level. Storey concluded that Davis's cumulative testing results demonstrated that:

> He is borderline in intelligence. He would probably experience a lot of difficulty performing any task that required a lot of intellectual performance. His fund of information is very limited. He does not seem to be able to determine a lot about social intelligence, social type responses that he's supposed to make in his environment. He's easily distracted. [And h]is visual perceptual motor skills are very limited.

Storey noted that, on a personal level, Davis recognized one of Storey's sons from a photograph in her office and identified him as someone Davis knew at one time. Storey told Davis that her son graduated from West Point, and "at that point [she] could see some remorse in [Davis]. Sort of like, if you were alluding to the fact that if [he] could have done something else with [his] life, maybe it would have been a different route." Storey also administered "the MMPI," which was a personality assessment, but the results were not yet available.

On cross-examination, Storey testified that Davis's lowest scores on the WAIS-R test were on the subtests that measured social intelligence. Based on these results, Davis's ability to know "when to appropriately handle himself or how to appropriately handle himself in his environment" would be impaired, but she could not opine based on the tests administered whether or not Davis knew right from wrong. Storey confirmed that she did not

discuss with Davis any details related to his prior third-degree robbery conviction because she "did not conduct a social history on him. It was strictly intelligence. That type of thing would come up in a social history, which [she] did not perform" because it "wasn't requested."

In closing arguments, the State emphasized that Davis was released on the 1992 third-degree robbery conviction only three short months before the present murder. The State expressed sympathy and compassion for Lillie, stating that she "has done all that she can do and did all that she [could] do with [Davis]." Nevertheless, the State argued that, despite her pleas for mercy, the jury had "to look at the serious nature of the crime," and that the aggravating circumstances outweighed the mitigating circumstances.

Defense counsel Adams argued for mercy and urged the jury to recommend life imprisonment without the possibility of parole. He emphasized that:

> [W]e put Lillie Davis up here to show you that Jimmy Davis didn't have a typical home that some of us might have. Not to use as an excuse. Lillie Davis did the best she could for her minor children. . . . She raised [Davis] the best she could without a father.
>
> And when he got up to a certain age that she really couldn't control him so much, she sent him to his father. He didn't have a father up till that time. Not somebody in the home that probably could really discipline him and give him exactly what he needed

14                    Opinion of the Court                    18-14671

when he needed it.  But he stayed with his father two months and some odd days when his father died.  And he comes back.  And he starts living with his mother again.

And you heard, he stayed in trouble.  She didn't deny it.  See, it started out little and didn't get much better; did it?  Until he finally caught a felony, robbery in the third degree.  And then it didn't get better; did it?  Until ultimately it caused the death of another individual . . . .

The defense argued that, contrary to the State's position, the "ultimate punishment" would be life imprisonment.  Turning to Davis's cousin, Sigler, the defense emphasized:

isn't it amazing how two individuals growing up could turn out so differently?  How [Sigler] could go on and finish school, get in the military and get out.  And [Davis] can't even finish [school].

See, [Sigler] had the backing that he needed.  Maybe [Davis] didn't.  Maybe [Davis] needs to spend the rest of his life in prison to think about this mistake that he made.  Maybe that is the ultimate punishment in this case. . . .

So please think about that when you go back.  Think about it.  Don't get caught up that he just had [the third-degree robbery] case in December and he gets [this robbery] case in March.  That sounds bad, I know

18-14671                Opinion of the Court                15

> it sounds real bad.   But reckon why [Davis] travels
> down that road?

Defense counsel Giddens followed Adams and urged the jury to consider Storey's testimony concerning Davis's low intelligence along with the other testimony presented.

The jury deliberated approximately an hour and returned an 11 to 1 advisory recommendation in favor of the death penalty.[6]

At the sentencing hearing,[7] the trial court found that two statutory aggravating circumstances existed—(1) Davis murdered Hazle during the commission of a robbery, and (2) Davis had a prior conviction involving the use or threat of violence to a person—his 1992 conviction for third-degree robbery.   It also determined that Davis's age (23) constituted a statutory mitigating circumstance.[8]     The trial court then determined that the

---

[6] About 40 minutes into deliberation, the jury submitted the following question to the trial court: "Can you accept seven for death and five for life? If not, what procedure should we go by?"  The trial court responded, "No. There must be ten votes for a recommendation of death sentence.  There must be at least seven votes for a recommendation of life without parole.  Keep deliberating."

[7] Davis refused to cooperate in the preparation of his presentence investigation report.  Instead, his mother provided a detailed history for the report.

[8] At the time of Davis's sentencing, the following constituted statutory mitigating circumstances in Alabama:

> (1) The defendant has no significant history of prior criminal
> activity;

16                  Opinion of the Court                  18-14671

aggravating circumstances "significantly outweigh[ed]" the mitigating circumstances, and it sentenced Davis to death.

_____

> (2) The capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance;
>
> (3) The victim was a participant in the defendant's conduct or consented to it;
>
> (4) The defendant was an accomplice in the capital offense committed by another person and his participation was relatively minor;
>
> (5) The defendant acted under extreme duress or under the substantial domination of another person;
>
> (6) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired; and
>
> (7) The age of the defendant at the time of the crime.

Ala. Code § 13A-5-51 (1994). Further, in addition to the statutory mitigating circumstances enumerated in § 13A-5-51, the Alabama Code provided for consideration of non-statutory mitigating circumstances, which included:

> any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death, and any other relevant mitigating circumstance which the defendant offers as a basis for a sentence of life imprisonment without parole instead of death.

Id. § 13A-5-52.

### C.  Direct Appeal

The Alabama Court of Criminal Appeals affirmed Davis's conviction and sentence on direct appeal.  *Davis*, 718 So. 2d at 1148. Davis petitioned for a writ of certiorari in the Alabama Supreme Court, which was granted on grounds not relevant to the present appeal.  The Alabama Supreme Court affirmed.  *Ex parte Davis*, 718 So. 2d 1166, 1178 (Ala. 1998).  The United States Supreme Court denied Davis's petition for a writ of certiorari.  *See Davis v. Alabama*, 525 U.S. 1179 (1999).

### D.  State Postconviction Proceedings

Davis, through counsel, filed a state postconviction petition, pursuant to Alabama Rule of Criminal Procedure 32, raising numerous claims of ineffective assistance of counsel and trial court error.   But we focus on only the two claims that are the subject of Davis's COA.  First, Davis argued that his trial attorneys were ineffective during the penalty phase for failing to obtain readily available mitigating evidence, which would have showed that "Davis had been exposed to . . . extensive physical, psychological and sexual abuse, domestic violence, rejection and abandonment by [his] mother and father . . . ."  Second, Davis asserted that his trial attorneys were ineffective for failing to investigate the circumstances of his 1992 third-degree robbery conviction, which would have revealed that the robbery involved a pizza delivery man, that Davis was a minor participant, and that no weapon was involved.

18                    Opinion of the Court                    18-14671

i.    *Rule 32 Evidentiary Hearing*

The trial court held a four-day evidentiary hearing on the Rule 32 petition, during which Davis presented evidence and testimony from the following witnesses in support of his ineffective-assistance claims: (1) Steve Giddens—one of Davis's trial counsel; (2) several social workers from the Calhoun County Department of Human Resources; (3) Cynthia and Betty Jacobs—family friends; (4) Andre Sigler—Davis's cousin who testified at his trial; (5) Mary Davis and Hortense Davis—two of Davis's sisters; (6) Geneva Davis—Davis's paternal aunt; (7) John Mays—an expert in capital defense; (8) Jan Vogelsang—a social worker and expert in conducting social histories; and (9) Jadie Boozer—Davis's counsel in the pizza robbery case. We discuss each of these witnesses' testimony in turn.

Trial counsel Giddens testified that, at the time of his appointment in April 1993 to Davis's case, he had worked on at least one other capital murder case. Giddens met with Davis outside of court proceedings twice before the trial—once in June and once in November 1993—for about an hour each time.[9]

---

[9] Notably, when asked about the substance of Davis's conversations with Giddens, Giddens stated that he could not discuss the substance of the conversations unless Davis waived attorney-client privilege, which Davis declined to do. In fact, the issue of attorney-client privilege came up repeatedly throughout Giddens's testimony. The State argued extensively that Davis was using the privilege as a sword and a shield because "[t]he analysis of whether or not an attorney is reasonable is largely dependent upon

18-14671                Opinion of the Court                19

Giddens did not recall whether he and Adams requested funds for a private investigator.  He "[did] not believe" he had ever requested such funds in prior cases, but he stated that he and Adams "did a lot of preparation" and "a good bit of investigation" themselves.[10]

Giddens recorded 141.55 hours of work on Davis's case, which included 49.2 hours of "out of court time" preparing for both phases of trial and 24.5 out-of-court hours during trial and preparing for the post-trial sentencing hearing before the judge. Giddens explained that his time sheet was an accurate reflection of "any significant amount of time" he spent working on the case but

what was told to him by the defendant."  In response, Davis argued that there was no legal authority that required him to waive privilege and that the State had to find another way to defend against the ineffective-assistance claims. During Giddens's cross-examination, the district court ruled that Davis needed to make a decision regarding waiver, and his postconviction counsel raised a continuing objection and requested that the court consider the issue of waiver of attorney-client privilege on a question-by-question basis, and the district court agreed to proceed on that basis.  Davis only waived privilege as to one conversation that is unrelated to the claims before this Court.

[10] The record establishes that the defense did not hire a private investigator in this case, and the dissent makes much of this point.  But this fact is irrelevant to our analysis in this majority opinion because, as we explain further, Davis failed to show that the state court's determination that he did not suffer prejudice was an unreasonable application of, or contrary to, federal law.  And failure to establish either *Strickland* prong is fatal to his claim.  *Kokal v. Sec'y, Dep't of Corr.*, 623 F.3d 1331, 1344 (11th Cir. 2010).  For further discussion concerning counsel's failure to hire a private investigator and how that relates to the deficient performance prong of Davis's ineffective-assistance claim, *see* Concurring Op. at 3 n.2.

that there may have been other five- or ten-minute tasks that he did not record.  The bulk of the hours were recorded in the two weeks prior to the start of the trial.

Davis did not call his other trial counsel, Jonathan Adams, to testify at the Rule 32 evidentiary hearing.  However, the State stipulated to the admission of Adams's time sheets, which reflected that he recorded approximately 152.85 hours spent on Davis's case, which included 65 hours of "out of court time" preparing for both phases of trial and an additional 24.5 out-of-court hours during trial and preparing for the post-trial sentencing hearing before the judge.[11]  Giddens testified that he did not believe that he and Adams

---

[11] During oral argument, the parties disputed the extent of the State's stipulation.  Davis argued that it was the State's idea to enter the stipulation, and that the State stipulated "to what Adams's testimony would be," and that what he did was the same as Giddens.  Davis's argument is belied by the record.  Specifically, during the Rule 32 evidentiary hearing, the following colloquy occurred:

> [Davis's counsel Langford]:  In an effort to try to speed this along and not put cumulative evidence on, we're weighing the thought of not calling Mr. Adams.  And I spoke to [the State] about whether—if we were willing not to call Mr. Adams if [the State] would stipulate to the admission of Mr. Adams's time sheets.  And [the State] told me [it] had no problem doing that if I would make a phone call to Mr. Adams and inquire as to whether it was his recollection he did any other work that was not recorded on the time sheets.
>
> And I did make that phone call.  And Mr. Adams reported to me that there was no significant time spent that was not

18-14671                Opinion of the Court                21

"ever had any discussion of who was lead counsel." Instead, they both "got in there and both worked and both tried it." Indeed, although Giddens often referred to himself and Adams as "we" during his evidentiary hearing testimony, he emphasized repeatedly that he and Adams did some things together and some things independently.

Giddens testified that it was his practice to prepare mitigation for the sentencing phase from the beginning of the case because "[y]ou have to be prepared" for what will happen if the

> recorded on his attorney's fee declaration, which I believe that statement would be consistent. . . .
>
> [The State]:    The state would stipulate that [Adams's] testimony would have been in this regard as to the time sheet the same as Mr. Giddens, in that there may have been some small five or three minute things that he didn't write down. But if he did anything of substance or anything that was significant and took up a lot of time, it was on that time sheet.
>
> The Court:  All right.  So stipulated.

Thus, the record confirms that one of Davis's postconviction counsel brought up the stipulation suggestion, not the State. Furthermore, the State stipulated to the veracity of Adams's time sheet and that Adams's time sheet—like Giddens's—was an accurate representation of the substantive time he spent on the case. In other words, the State stipulated that there was no significant time spent on the case that was not reflected in the time sheets. However, this stipulation does not mean that the State stipulated that the work Adams did was identical to that of Giddens or that Adams agreed with Giddens's testimony about what was done or not done. Nor would such a stipulation make any logical sense given that Adams's time sheet indicates that he recorded more out of court time preparing for trial (65 hours) than Giddens (49.2 hours), which establishes that Adams did work that Giddens did not.

jury returns a guilty verdict.  As part of the preparation for sentencing, the defense interviewed Davis's mother and obtained a court order for Davis's mental evaluation.  When presented with a brief outline of notes from the defense's interview with Davis's mother, Giddens confirmed that the handwriting was Adams's, but stated that he did not know what Adams meant by many of the notes.  Giddens explained that he was "not a note taker," it was not his practice to take notes, and that he did not "recall making any notes" of witness interviews in Davis's case.

Giddens knew that Davis had several siblings, but he did not recall attempting to interview any of Davis's other family members other than Davis's mother.  Giddens did not recall trying to obtain Davis's school records, but he testified that he did not typically request such records, even in capital cases.  Similarly, it was not his practice to get records from social services, and he did not consider doing that in Davis's case.

Giddens explained that, at the sentencing hearing, it was the defense's job to put forth "virtually anything" that could serve as mitigation, which frequently included putting family members on the stand to ask for mercy and provide positive testimony to paint "a picture of the defendant" that the jury may not have seen. Giddens emphasized that each case is different and no checklist or "cookie cutter" approach can be used for mitigation.  He acknowledged that "a plea for mercy," like that made in Davis's penalty phase, "doesn't take a lot of preparation."

Giddens stated that during his approximately 13 years defending criminal cases, he never put forth evidence of a defendant's abuse as a child as mitigation evidence—although he acknowledged that such evidence was admissible. Furthermore, Giddens denied knowing that Davis was abused as a child, noting that neither Davis nor his mother mentioned anything about abuse. Giddens explained that he did not ask about abuse because he had no reason to suspect it. He acknowledged that information about abuse Davis may have suffered as a child "might" have affected the jury in mitigation if he had known about it.

Giddens confirmed that the only social history he had came from Davis's mother. Giddens explained that he did not recall doing any investigation into Davis's friends because to the best of Giddens's knowledge all of Davis's friends were in legal trouble and would not have been able to provide helpful mitigation. He did not attempt to speak with any of Davis's teachers or past employers. Giddens did not recall when he met Davis's cousin, Sigler, or whether Giddens himself or Adams interviewed Sigler. He acknowledged it may have been on the day of the penalty phase.

As for Davis's prior robbery conviction, Giddens testified that he knew of the conviction and reviewed the conviction record, but he did not attempt to contact anyone involved with the robbery case. Giddens explained that he did not do any investigation into the circumstances of the robbery conviction because "[t]he [S]tate offered simply a certified copy of the

conviction. Which we don't object to, because you don't want them to have to put on a witness to bring out the facts."

Next, Davis presented testimony from three social workers from Alabama's Calhoun County Department of Human Resources ("DHR"), and several other witnesses in support of his claim that he suffered physical abuse as a child. The social workers testified that DHR came into contact with Lillie Davis in 1981 after a local medical clinic made a suspected child abuse complaint after the clinic observed some "marks from a whipping" on Davis's back during a routine medical exam. The DHR report also stated that during this same medical visit another staff member observed Davis's mother "backhanding him in the face." And during a prior visit to the health care facility, Davis's mother had left an infant child in the hallway in a carrier unattended, and a staff member had to take care of the child.

Davis, who was 10 years old at the time of the report, admitted to DHR that he had wet the bed and his mother had disciplined him with a switch. Social worker Theresa Peebles observed "25 to 35" marks on Davis's back, and Peebles opined at the evidentiary hearing that she had "never seen a back that looked worse than [Davis's] did." Lillie never admitted that she made the marks. The abuse complaint was deemed "founded." As a result, DHR offered various services for both Lillie and Davis, including counseling. Lillie declined most of the services, but she agreed to mental health counseling for herself and Davis.

Social worker Beverly Boggs testified that she visited Lillie's home multiple times and observed that Davis and his siblings "seemed to [be] overly quiet. I wouldn't want to say scared, but I would say maybe overly disciplined. They were just too good to be children of their age." Boggs discussed alternative forms of discipline with Lillie, but Lillie told Boggs, "I'm going to whip and chastise my children. I just won't do it as hard, as severe." DHR did not remove Davis from the home, but Boggs opined at the evidentiary hearing that DHR "probably should have removed" him.[12] The 1981 DHR report was the only documented report of abuse involving Davis that was introduced.[13]

Two of Davis's sisters, Mary and Hortense,[14] testified that their mother beat them frequently with extension cords, switches, and belts (including the belt buckle).[15] These beatings would last

[12] Similarly, Jan Vogelsang, a clinical social worker who conducted a biopsychosocial assessment of Davis in preparation for the evidentiary hearing, testified that the incident involving Davis's back was one of the worst cases of abuse she had ever seen and stated that Davis should have been removed from the home. Notably, notwithstanding the DHR records, Davis's mother denied any contact with DHR to Vogelsang.

[13] Vogelsang testified that, when Davis was two years old, a DHR report was made suggesting that Davis and Mary had been molested after a doctor observed that Davis's "penis was bleeding and was swollen." However, the alleged molestation was only briefly investigated by DHR and later dropped.

[14] Both Mary and Hortense testified that Davis's trial counsel did not contact them, but that they would have testified on his behalf if contacted.

[15] We note that during oral argument Davis's counsel referenced testimony

15 to 20 minutes and would often leave "whelp . . . marks that had blood oozing from them. And they would be so bad . . . they couldn't take baths." These marks would be on "[t]heir backs, their face, their chest, their legs, their butt. Basically all over." One time, Lillie beat Mary with a broom and broke her arm, but Mary lied at the emergency room and said she fell off her bike.

His sisters further testified that, when Davis was in the second grade, their mother beat him "with a broom handle across his head" and this "dented" and "warped his head."[16] However, Davis's mother did not take him to the doctor. Instead, Davis "put a skullcap over his head" "until his head reshaped." They also testified that Lillie often whipped Davis for bedwetting and the whippings continued until he was 14 or 15 years old. Davis never fought back, and they never told anyone about the beatings.

According to his sisters, Lillie started "put[ting] [Davis] out of the house a lot" at age 15, because she was afraid the landlord would discover she had six children, instead of the three she had reported. Hortense and Davis went to live with their father for a

_____

about incidents in Davis's childhood home that the State objected to during the Rule 32 hearing, and which were excluded by the trial court. We are bound by the state court record. *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (holding that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits"). Therefore, because the state court did not consider these incidents, we do not either.

[16] Mary stated that the next morning, Davis's "head was swollen and his ear was severed."

few months when Davis was 15, and while there, they had a much better life. But after their father died unexpectedly, they returned to live with their mother in Alabama.

His sisters also testified that Davis looked up to Bill Jacobs (the father of three of Davis's sisters—Patricia, Linda, and Angela) and the two were "close" and had a "good," "positive relationship." But Bill died shortly after Davis's father died, and after that Davis seemed "withdrawn" and "he started to be more out on the streets then."

Geneva, Davis's paternal aunt, testified that she saw Davis during two periods of his life—once when he was around two years old and lived near her in Hayneville, Alabama, and again when he was 15 after his father's death. Once, when Davis was a toddler, Geneva witnessed Lillie beat Davis with a switch because he wet the bed. According to Geneva, after a beating, Davis went into a "spasm" and would "shake for days." She said that, when her brother (Davis's father) lived in the home, he would try to protect the kids by taking them and leaving for a while, but he never made any report to social services. Geneva feared Lillie and did not take any action either. She first learned of Davis's murder conviction a few weeks before the Rule 32 evidentiary hearing—approximately 8 years after Davis's conviction.

Cynthia Jacobs, a family friend, testified that her uncle was Bill Jacobs, who was the father of Davis's three younger sisters. Cynthia and Davis were "like . . . cousin[s]." Cynthia testified that she never observed Lillie show Davis "any kind of love." On one

occasion, Davis, who was "[p]robably 12 or 13," showed up to Cynthia's house "crying and fidgety," and she observed welt marks on his arms and legs from "a whooping." She thought a "switch" made the marks because the welt marks were "like bleeding sores on him." She observed Davis in a similar state probably "eight or nine times," and each time, Davis would stay at Bill's house for a few days before going back home.

Cynthia's mother, Betty, testified that she saw Davis regularly because typically he stayed several days a week with Bill, and Betty and Bill lived in the same duplex. Although Betty never personally witnessed any abuse, on several occasions, Davis had red welts on his body that looked "like he had been whipped with either an extension cord or switch." Betty explained that Lillie's abuse of the children upset Bill and he told Betty one time that he intended to take the children away from Lillie because "she was really abusing them." Betty spoke with Lillie once about the alleged abuse, and Lillie told her "[y]ou take care of your children and I'll take care of mine." Betty "threatened several times" to go to the authorities, but she never did.

Davis's cousin Sigler—who testified during the penalty phase—testified at the evidentiary hearing that he and Davis saw each other almost daily, and they grew up in a poor neighborhood where a lot of drinking, gambling, fights, shootings, and stabbings occurred. Sigler stated that he witnessed Lillie treat Davis "[a]t times pretty bad. At times good. You know, she—I felt like she loved him as all her kids. She always was working and did things,

but she was a little extreme with her discipline. She was pretty hard." Sigler observed Davis receive "real bad whippings" from Lillie with switches, extension cords, and belts. He estimated that some of Davis's "whippings lasted over five minutes," and often left open scars and "tears of the skin" on Davis's back, butt, legs, and arms that would take "a week or so" to heal. Sigler told his grandmother about Davis's whippings, but he never told anyone outside the family. Sigler witnessed Lillie insult Davis, calling him "stupid," "stupid fool," and "tall, lanky bastard." Davis was always shy, timid, and scared—he ran from fights and got upset when people engaged in roughhousing.

Sigler admitted that he too was whipped "weekly" with belts, switches, and extension cords. Yet, despite this rough upbringing, Sigler graduated high school and joined the army. Sigler (who was several years older than Davis) lost touch with Davis after joining the army. When Sigler came back to visit, Lillie stated that Davis was out of control, staying out late, and she could not "do nothing with him."

Sigler learned of Davis's trial when Lillie called him and asked him to come to the trial for support. He spoke to Davis's attorneys for the first time during a trial recess, and they asked Sigler if he would be willing to help Davis at sentencing to avoid the death penalty. He never discussed his potential testimony with Davis's counsel and did not know what they planned to ask him. No one told him that family history might be relevant or helpful to Davis. Had Sigler known that Davis's background and family

history could have helped, he would have told the jury the information because "[e]verybody needs to know" the truth.

Finally, with regard to his ineffective-assistance claim related to the failure to investigate the circumstances of Davis's prior third-degree robbery conviction, Davis called Jadie Boozer, his court appointed counsel in the robbery case. Boozer testified that Davis and three other men ordered a pizza and then robbed the delivery man of six pizzas and $32 when he arrived. In her opinion, Davis was not the leader and was merely a follower in the incident. No weapon was involved—although one of the robbers had his hand in his pocket "as if he . . . had a gun." The victim said that "there really was never a threat made to him." Boozer was not contacted by Giddens or Adams, but she would have cooperated if they had contacted her.

After Davis rested at the evidentiary hearing, the State called one witness, Dr. Glen King, an expert in forensic psychology, who evaluated Davis. Davis provided a self-reported social history to King, in which he stated that: (1) he remembered going hungry between the ages of 11 and 12, but no other details; (2) he got "good grades" in school; (3) he dropped out in the ninth grade because he "got tired of it" and "hung around with the wrong crowd and was clowning around too much"; (4) he earned his GED through Job Corps; (5) he was arrested for the first time at 13 and several more times as a juvenile for theft-of-property offenses; (6) he held a job off and on; and (7) he had romantic relationships but nothing serious. Davis conveyed to Dr. King that he felt that his trial

attorneys had not investigated enough, complaining that counsel "only talked to my mother and two sisters" and that counsel "could have found out a whole lot of stuff" regarding his family history and background. Yet, despite his apparent dissatisfaction with the investigation conducted by trial counsel and the mitigation evidence produced, Dr. King testified that Davis "was not too forthcoming" about his background. Although Dr. King asked "a number of questions" about Davis's background and his mother's discipline of him, Davis reported only that his childhood "wasn't rosy," that his mother disciplined him with a switch, and that sometimes he felt he was disciplined "too much." At no time during the interview did Davis report being hit in the head with a broom handle or that such an action caused his head to be misshapen.

### ii.  *Trial Court Denies Rule 32 Petition*

Following the evidentiary hearing, the Alabama postconviction court ("Rule 32 court") denied Davis's Rule 32 petition on the merits. Although the court found that Davis was abused and that this information was relevant mitigation evidence, the court concluded that Davis's trial counsel did not perform deficiently by not presenting it in the penalty phase. The court emphasized that neither Davis, his mother, Sigler, or the two unnamed siblings (that, per Davis, spoke with his counsel before the penalty phase) ever mentioned anything about the abuse, despite having opportunities to do so. Rather, the court concluded that it was clear from the Rule 32 testimony that the family

engaged in "a conspiracy of silence" about the abuse. The court further noted that it was "difficult" to evaluate counsel's preparation at the time of trial when Davis—who bore the burden of proof—did not call as witnesses at the evidentiary hearing either co-counsel Adams, Davis's mother, or Davis's two unnamed siblings who spoke with trial counsel at the time of trial.

The Rule 32 court concluded that Davis and his family—particularly his mother—deliberately misled trial counsel, and, based on the information counsel had, counsel was not on notice of any abuse and acted reasonably. The court rejected the contention that counsel was deficient in failing to obtain the DHR records, emphasizing that there was "absolutely no evidence . . . that reasonably competent counsel would have been on notice that such records existed," there are "no constitutionally required checklists for mitigation investigations," and counsel cannot be expected to expend limited resources and time to look for records "just in case."

The court further found that Davis was not prejudiced by counsel's failure to present this mitigation evidence because it did "not change the fact that the facts of this crime and the two aggravating circumstances proven by the State far outweighed the one statutory mitigating factor and these non-statutory mitigating factors." In addition, the court observed that some of the mitigation evidence presented could have been a double-edged sword—noting that the evidence showed that Davis had some good role models in his life. Further, the court observed that

Davis's violent behavior did not begin until shortly before his 1992 robbery offense, several years after the abuse stopped and he had moved out of his mother's house, indicating that some other factor other than his upbringing led to his behavior.

Finally, the court determined that counsel was not ineffective for failing to investigate the circumstances of Davis's third-degree robbery conviction, because the conviction qualified as an aggravating circumstance under Alabama law regardless of the underlying facts.

### iii.    *Davis Appeals to Alabama Court of Criminal Appeals*

In 2008, the Alabama Court of Criminal Appeals affirmed the denial of Davis's Rule 32 petition. *Davis v. State*, 9 So. 3d 539, 570 (Ala. Crim. App. 2008). Adopting the trial court's findings and quoting extensively from the trial court's opinion, the Alabama Court of Criminal Appeals denied Davis's ineffective-assistance claims on the merits.[17] *Id.* at 553–70. Specifically, with regard to

---

[17] Initially, the Alabama Court of Criminal Appeals *sua sponte* dismissed Davis's ineffective-assistance claims as procedurally defaulted because they were not raised in a motion for new trial by Davis's new counsel appointed after his sentencing. *Davis v. State*, 9 So. 3d 514, 521–22 (Ala. Crim. App. 2006). Nevertheless, the Alabama Court of Criminal Appeals noted that the mitigation evidence Davis presented was "powerful" and were the issue not procedurally barred, it "would be compelled to grant relief and order a new sentencing hearing." *Id.* at 522.

Later, the Alabama Supreme Court reversed and remanded the case to the Alabama Court of Criminal Appeals in light of its decision in *Ex parte Clemons*, 55 So. 3d 348, 355–56 (Ala. 2007), which held that procedural bars to

34                    Opinion of the Court                    18-14671

the mitigation evidence related to childhood abuse, the court concluded that:

> Based on the unusual circumstances presented in this case and the fact that we [do] not know the extent of cocounsel's investigation because Adams was not called to testify, we cannot say that counsel was ineffective for failing to discredit the statements of Davis, his mother, and two of his siblings, and to conduct yet more investigations. Thus, we conclude that the circuit court did not abuse its discretion in finding that the investigation conducted by Davis's attorneys was reasonable.

*Id.* at 566. The court further noted that "[e]vidence of childhood abuse has been described as a double-edged sword." *Id.*

As for Davis's ineffective-assistance claim related to the failure to investigate his prior robbery conviction, the court concluded that Davis's case was different from that of *Rompilla v. Beard*, 545 U.S. 374 (2005), in that Davis's counsel reviewed the prior conviction file and "tried to minimize the prior conviction" by making the jury aware that it was the lowest degree of robbery in Alabama. *Id.* at 569.

Finally, after analyzing each claim of ineffective assistance during the penalty phase, the Alabama Court of Criminal Appeals

---

postconviction relief were not jurisdictional and could be waived. *Ex Parte Davis*, 9 So. 3d 537, 538–39 (Ala. 2007). On remand, however, the Court of Criminal Appeals concluded that its prior comments were "dicta" and denied Davis's claims on the merits. *Davis*, 9 So. 3d at 553.

18-14671 Opinion of the Court 35

addressed prejudice in a separate section. *Id.* at 569–70. It concluded that, "even if we were to find that counsel's performance was deficient in the penalty phase of Davis's trial, we would find no prejudice." *Id.* Applying the *Strickland* prejudice standard, it explained that it had

> reweighed the alleged omitted mitigation evidence against the aggravating circumstances that existed in this case. We agree with the [trial] court that death was the appropriate sentence in this case and that the fact that certain potential mitigation evidence was not presented would have had no affect on the outcome.

*Id.* at 570. Davis appealed, and the Alabama Supreme Court denied his petition for a writ of certiorari. *Ex parte Davis*, 9 So. 3d 571 (Ala. 2008).

### E. Federal Habeas Proceedings

In 2009, Davis, through counsel, filed the underlying amended federal habeas petition under 28 U.S.C. § 2254. The district court denied the § 2254 petition on the merits, concluding that the state court did not unreasonably apply Supreme Court precedent or base its decision on an unreasonable determination of the facts when it denied the two ineffective-assistance claims at issue. The district court then denied a COA. We granted Davis a COA on whether the state court unreasonably applied *Strickland* in denying Davis's claim that counsel rendered ineffective assistance by (1) failing to investigate and present mitigating evidence of childhood abuse; and (2) failing to investigate and present

36                    Opinion of the Court                    18-14671

mitigating evidence of the circumstances of Davis's 1992 robbery conviction.

## II.    Standard of Review

We review the district court's denial of a § 2254 habeas petition *de novo*. *Ward v. Hall*, 592 F.3d 1144, 1155 (11th Cir. 2010). That said, central to our review is the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which establishes a "highly deferential standard for evaluating state-court rulings, [and] demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). Thus, under AEDPA, a federal court's review of a final state habeas decision is greatly circumscribed, and a federal habeas court cannot grant a state petitioner habeas relief on any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2).

"'Clearly established Federal law' means 'the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the

time of the relevant state-court decision.'"  *Gavin v. Comm'r, Ala. Dep't of Corr.*, 40 F.4th 1247, 1262 (11th Cir. 2022) (alterations adopted) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000) (hereinafter *Terry Williams*)), *cert. denied sub nom. Gavin v. Hamm*, 143 S. Ct. 2438 (2023).  "[T]o be 'contrary to' clearly established federal law, the state court must either (1) apply a rule that contradicts the governing law set forth by Supreme Court case law, or (2) reach a different result from the Supreme Court when faced with materially indistinguishable facts."  *Ward*, 592 F.3d at 1155 (quotations omitted); *see also Bell v. Cone*, 535 U.S. 685, 694 (2002).

An "unreasonable application" of federal law occurs "if the state court correctly identifies the governing legal principle from [the Supreme Court's] decisions but unreasonably applies it to the facts of the particular case."  *Bell*, 535 U.S. at 694.  "To meet [the unreasonable application] standard, a prisoner must show far more than that the state court's decision was merely wrong or even clear error."  *Shinn v. Kayer*, 592 U.S. 111, 118 (2020) (quotations omitted); *Renico v. Lett*, 559 U.S. 766, 773 (2010) ("Indeed, 'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" (quoting *Terry Williams*, 529 U.S. at 411)).  Rather, the state court's application of federal law "must be objectively unreasonable," *Renico*, 559 U.S. at 773 (quotations omitted), meaning that "the state court's decision is so obviously wrong that its error lies beyond any possibility for fairminded disagreement," *Shinn*, 592 U.S. at 118 (quotations omitted).

"[W]hen the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion . . . a federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable." *Wilson v. Sellers*, 584 U.S. 122, 126 (2018). However, we are not limited by the particular justifications the state court provided for its decision, and we may consider additional rationales that support the state court's determination. *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1036 (11th Cir. 2022) (*en banc*).

Importantly, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). Rather, a petitioner must show that the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103. In other words, where AEDPA deference applies, we are precluded from granting federal habeas relief "so long as fairminded jurists could disagree on the correctness of the state court's decision." *Pye*, 50 F.4th at 1034 (*en banc*) (quoting *Harrington*, 562 U.S. at 101).

Finally, under AEDPA "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

18-14671                Opinion of the Court                39

### III.    Discussion

Both claims before us involve allegations of ineffective assistance of counsel.  To succeed on an ineffective-assistance-of-counsel claim, a petitioner must prove two elements—(1) deficient performance by his counsel and (2) prejudice to the defense as a result of the deficient performance.  *Strickland*, 466 U.S. at 687.

Under *Strickland*'s performance prong, review of counsel's actions is "highly deferential" and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  Additionally, "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.*

*Strickland*'s prejudice prong asks whether there is a reasonable probability that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  "When a defendant challenges a death sentence . . . the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695.  "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112.  In determining whether there is a reasonable probability of a different result, a court must "consider

'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding'—and 'reweig[h] it against the evidence in aggravation.'" *Porter v. McCollum*, 558 U.S. 30, 41 (2009) (quoting *Terry Williams*, 529 U.S. at 397–98).

Failure to establish either prong is fatal to the petitioner's claim. *Kokal v. Sec'y, Dep't of Corr.*, 623 F.3d 1331, 1344 (11th Cir. 2010). And "[s]urmounting *Strickland*'s high bar is never an easy task." *Harrington*, 562 U.S. at 105 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)).[18] Applying AEDPA's deferential lens to the state court's prejudice determination, the question before us is whether every fairminded jurist would conclude that prejudice has been established. *See Brown v. Davenport*, 596 U.S. 118, 136 (2022) (explaining that "AEPDA asks whether *every* fairminded jurist would agree that an error was prejudicial"); *Williamson v. Fla. Dep't*

---

[18] Indeed, as the Supreme Court explained in *Harrington*, "[e]stablishing that a state court's application of *Strickland* was unreasonable under [AEDPA] is all the more difficult" because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." 562 U.S. at 105 (internal citations omitted). The dissent states that double deference does not apply to the state courts' resolution of the prejudice prong, citing a separate concurring opinion in *Evans v. Sec'y, Dep't of Corr.*, 703 F.3d 1316, 1334 (11th Cir. 2013) (*en banc*) (Jordan, J., concurring). We note that other circuit courts disagree, *id.* at 1335, and this Court has not yet resolved this issue in a published opinion. Here the parties have not briefed the double deference split related to the prejudice prong, and we need not decide that issue in order to resolve this case. Therefore, for the purpose of this opinion, we do not apply double deference to the state court's resolution of the prejudice prong.

*of Corr.*, 805 F.3d 1009, 1016 (11th Cir. 2015) ("To establish prejudice [where AEDPA applies, a petitioner] has to show that every fair-minded jurist would conclude that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (quotations omitted)).  With these principles in mind, we turn to the merits of Davis's claims.

Davis argues that Giddens and Adams rendered constitutionally deficient performance in two ways—(1) by failing to investigate and uncover significant evidence of Davis's childhood abuse, and (2) by failing to investigate the circumstances surrounding Davis's prior robbery conviction, which the State relied on as an aggravating factor.

The state court determined that counsel's investigation into Davis's childhood and his prior robbery was not deficient and that, in any event, Davis could not establish prejudice.  Ultimately, we need not decide whether the state court's decision on the performance prong involved an unreasonable application of *Strickland* because Davis failed to show that the state court's determination that he did not suffer prejudice was an unreasonable application of, or contrary to, federal law.[19]  *See Jennings v. Sec'y, Fla.*

---

[19] Davis argued for the first time at oral argument that the state court made no prejudice finding on his claim that counsel was ineffective during the penalty phase for failing to investigate and present the circumstances of his prior robbery conviction, and he urges us to review prejudice *de novo*. Although the dissent embraces Davis's belated argument at least with regard

---

to his ineffective-assistance claim concerning his prior third-degree robbery, we do not for several reasons.

First, Davis raises this argument improperly for the first time at oral argument. *See Am. Builders Ins. Co. v. Southern-Owners Ins. Co.*, 71 F.4th 847, 861 (11th Cir. 2023) (explaining that the appellant "did not preserve the issue by waiting to raise it at oral argument"); *Hernandez v. Plastipak Packaging, Inc.*, 15 F.4th 1321, 1330 (11th Cir. 2021); *Green v. Graham*, 906 F.3d 955, 963 (11th Cir. 2018) ("We do not consider arguments not raised in a party's initial brief and made for the first time at oral argument." (alterations adopted)).

Second, the argument lacks merit. Although the state court did not expressly mention prejudice in the context of its analysis of the third-degree robbery claim, the state court noted that "there [was] no allegation that the file of Davis's prior conviction contained a plethora of mitigating evidence" and that counsel tried to minimize the prior conviction to the jury. *Davis*, 9 So. 3d at 568–69. Based on this discussion, the district court concluded that "Davis's *failure to prove prejudice* appears to have formed the primary basis of the decision of the Alabama Court of Criminal Appeals to deny relief." (emphasis added). Notably, neither Davis nor the dissent has addressed this conclusion. We agree with the district court that the state court's discussion clearly relates to the prejudice element, which requires the court to determine whether the petitioner has shown "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. By noting that there was no allegation that the third-degree robbery file contained "a plethora of mitigating evidence" and that counsel tried to minimize the prior conviction to the jury by emphasizing that it was for the lowest degree of robbery in Alabama, the state court implicitly concluded that Davis failed to show a reasonable probability of a different outcome based on counsel's alleged failure to investigate the third-degree robbery case file. While the dissent disagrees and concludes that the state court erroneously disregarded a plethora of evidence in the case file—namely, the non-violent nature of the robbery—as we discuss later in the opinion, the conviction would have qualified as an aggravating factor regardless of the underlying nature of the robbery, and the non-violent nature

18-14671                Opinion of the Court                43

*Dep't of Corr.*, 55 F.4th 1277, 1293 (11th Cir. 2022) ("Because both prongs of the *Strickland* standard must be satisfied to show a Sixth Amendment violation, a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." (quotations omitted)), *cert. denied sub nom. Jennings v. Dixon*, 144 S. Ct. 164 (2023); *see also Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

---

of the robbery could have just as easily been a double-edged sword.

Finally, even if we accepted Davis's argument that the state court failed to address prejudice with regard to his claim predicated on the prior robbery conviction, there is nonetheless a cumulative prejudice determination to which we owe deference. Specifically, as noted previously, after addressing each and every individual claim of ineffective assistance at the penalty phase, the state court in a separate section of its opinion conducted a cumulative prejudice analysis, as required in capital cases, and found prejudice lacking. *Davis*, 9 So. 3d at 569–70 ("Last, even if we were to find that counsel's performance was deficient in the penalty phase of Davis's trial, we would find no prejudice."). In doing so, the state court cited *Wiggins*, stating that "[i]n assessing prejudice, we reweigh the evidence in aggravation against the *totality of available mitigating evidence*." *Id.* at 570 (emphasis added) (quotations omitted). And the state court then affirmatively stated that "[w]e have reweighed the alleged omitted mitigation evidence against the aggravating circumstances that existed in this case. We agree with the [Rule 32 court] that death was the appropriate sentence in this case and that the fact that certain potential mitigation evidence was not presented would have had no affect on the outcome." *Id.* There is thus a prejudice determination to which we owe deference.

Davis argues that his trial counsel's failure to present any of the mitigating evidence concerning his childhood abuse left the jury with "an incomplete picture of his life." Furthermore, he asserts that, had his counsel investigated the circumstances underlying the third-degree robbery conviction, counsel would have discovered that the robbery merely involved Davis and his friends stealing six pizzas and a small sum of money from a pizza delivery man without any weapons.[20] Even though one of the men

---

[20] The dissent similarly downplays the robbery as a mere "heist" in which Davis and his friends "swiped" pizzas and took some money from a pizza delivery man without any weapons or violence. This characterization evokes images of juvenile pranks, and a "boys will be boys" attitude. But this crime was not a prank; it was a robbery, plain and simple—and not a spur of the moment crime of opportunity, but a planned robbery. Furthermore, Davis was not a juvenile—he was a 21-year-old adult. And while the group may not have had an actual gun, one of the participants pretended to have a gun in his pocket, and the pizza delivery man had no way to know that the gun was not real. While the dissent emphasizes that the crime was accomplished without actual violence or—according to Davis's public defender in the robbery case— an overt threat of violence to the pizza delivery man, the dissent overlooks the commonsense fact that most individuals do not simply hand over property in their possession unless they feel there is in fact a threat of violence to their person. Indeed, the criminal complaint and warrant issued in relation to this crime alleged that, in the course of the robbery, Davis "threaten[ed] the imminent use of force against the person of" the pizza delivery man "while [a] co-defendant was armed or [led] said [delivery man] to believe he was in possession of a deadly weapon or dangerous instrument." And the State of Alabama certainly thought this crime was much more serious than a mere pizza "heist" because it charged Davis with first-degree robbery and set Davis's bond at $2,500, only later permitting him to plead to the lesser third-degree robbery.

with Davis had made a gesture in his pocket like he had a gun, the deliveryman stated that no real threat was made to him. Thus, Davis argues, the non-violent nature of the robbery would have "obviate[ed] its status as an aggravating factor." Accordingly, he maintains that, had all of this "impactful" evidence been presented during the penalty phase, there is a reasonable probability that the jury would have recommended life imprisonment rather than a death sentence. We disagree.

"When a defendant challenges a death sentence . . . the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. To assess the reasonable probability of a different result, courts must "consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweigh it against the evidence in aggravation." *Porter*, 558 U.S. at 41 (alteration adopted) (quotations omitted).

Here, the state court explained that it "reweighed the alleged mitigation evidence against the aggravating circumstances," and determined that "death was the appropriate sentence in this case" and that the omitted mitigation evidence "would have had no effect on the outcome." *Davis*, 9 So.3d at 570. "Applying AEDPA to *Strickland*'s prejudice standard, we must decide whether the state court's conclusion that [counsel's]

performance at the sentencing phase . . . [did not] prejudice [Davis]"—[*i.e.*,] that there was no substantial likelihood of a different result—was 'so obviously wrong that its error lies beyond any possibility for fairminded disagreement.'"  *Pye*, 50 F.4th at 1041–42 (*en banc*) (quoting *Shinn*, 592 U.S. at 118).

For the reasons explained below, the state court's conclusion that Davis was not prejudiced by any of his counsels' alleged deficiencies was not "contrary to" and did not "involve[] an unreasonable application of, clearly established Federal law."  28 U.S.C. § 2254(d).  While the dissent may disagree with the state court's conclusion and would have reached a different conclusion in the first instance, the state court's decision was "not so obviously wrong that its error lies beyond any possibility for fairminded disagreement."  *Pye*, 50 F.4th at 1042 (*en banc*) (quotations omitted); *Harrington*, 562 U.S. at 101 (explaining that a state court's decision is reasonable "so long as 'fairminded jurists could disagree' on the correctness of the state court's decision"  (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).[21]

---

[21] Because we are not addressing the performance prong in this majority opinion, for purposes of the analysis that follows, we assume that counsel would have uncovered the evidence of childhood abuse with a more thorough investigation.  However, as the concurring opinion explains, the validity of this assumption is significantly undermined by the record in this case.  *See* Concurring Op. at 20–22.

Like the state court, we begin with a review of the mitigation evidence presented during the penalty phase and that produced during the Rule 32 proceedings.

At trial, the jury learned that Davis was raised by a single mother without a father in the home; that his father passed away when he was 15, which Davis struggled with; that he had behavioral problems in school and at home, which his mother struggled to control; that Davis started "staying out" all night at 15 and moved out of his mother's house at 19, but he visited weekly; and that Davis has below-average intelligence.

Had the evidence submitted during the Rule 32 proceedings been presented at the penalty phase, the jury and the sentencing judge would also have learned that Davis grew up in poverty; that he suffered verbal and physical abuse from his mother but was not removed from the home by social services; that the family members who were aware of the abuse took no action to report it or stop it; that his mother used severe forms of corporal punishment with switches, belts, or other objects that left welts and marks on Davis; that his mother had poor parenting skills; that Davis was very close with Bill Jacobs (the father of three of his younger sisters) and Bill was a positive influence in Davis's life, but he too died when Davis was 15; that there was an allegation that Davis was sexually abused at the age of two, but the allegation was later dropped; that Davis struggled in school and dropped out in the ninth grade, but later got his GED; that Davis had a criminal history of theft dating back to the age of 13; and that his prior

robbery conviction at the age of 22 was for the non-violent robbery of a pizza delivery man of six pizzas and some cash, although one of the members of the group pretended to have a gun in his pocket.

Even with all of this additional non-statutory mitigation evidence, upon considering the totality of the mitigation evidence and reweighing it against the evidence in aggravation—that the murder was committed during a robbery and that Davis had a prior conviction involving the use or threat of violence to a person—it was not objectively unreasonable for the state court to conclude that there was no reasonable probability of a different outcome. *See Porter*, 558 U.S. at 41 (explaining that to assess the reasonable probability of a different result, courts must "consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweigh it against the evidence in aggravation"  (alteration adopted) (quotations omitted)).

First, as to the evidence of childhood abuse, it was not unreasonable for the state court to conclude that the weight to be afforded the evidence of physical abuse would have been decreased by several factors—(1) the remoteness in time of the childhood physical abuse to the murder (at which time Davis was 22 years old), (2) the fact that the family concealed the physical abuse and did not report it to authorities, and (3) the fact that DHR did not remove Davis from the home. *Davis*, 9 So. 3d at 562.

Second, we also agree with the state court that some of the childhood abuse evidence could have been a double-edged sword.

*Id.* at 562–63. For instance, the evidence showed that Davis had some good role models in his life and did not become violent until later in life after he had moved out of his mother's home and was incarcerated for the pizza robbery, which suggests that his violent behavior resulted from some factor other than his abusive upbringing. Additionally, the fact that his siblings and his cousin had gone on to lead successful lives, despite experiencing the same physically abusive upbringing, may have undermined the mitigation value of the evidence of physical abuse. *See Callahan v. Campbell*, 427 F.3d 897, 937 (11th Cir. 2005) (concluding that the fact that none of the defendant's siblings had committed violent crimes "reduc[ed] the value of abuse as mitigating evidence"); *Grayson v. Thompson*, 257 F.3d 1194, 1227 (11th Cir. 2001) ("The fact that [the defendant] was the only child to commit such a heinous crime also may have undermined defense efforts to use his childhood in mitigation."); *see also Jenkins*, 963 F.3d at 1271–72 (explaining no prejudice because sibling's testimony about childhood abuse and a difficult upbringing could have been a double-edged sword—it may have made the defendant more sympathetic to the jury or it may have made the defendant look more culpable because despite the same background sibling went on to lead a successful life).

The dissent contends that, under *Rompilla*, counsels' failure to present the circumstances surrounding the prior robbery conviction alone compels a finding of prejudice. It does not. The situation in *Rompilla* is very different from the one here. Significantly, in *Rompilla*, the Supreme Court reviewed the

prejudice prong *de novo* because the state court had never reached the question of prejudice—thus, AEDPA deference was not a factor. 545 U.S. at 390. Therefore, *Rompilla* does not aid us in assessing whether the Alabama Court of Criminal Appeals unreasonably determined that prejudice was lacking in this case. *See Pinholster*, 563 U.S. at 202 (explaining that the Court "did not apply AEDPA deference to the question of prejudice" in *Rompilla* and "therefore [it] offer[s] no guidance with respect to whether a state court *unreasonably* determined that prejudice is lacking"). Moreover, in *Rompilla* it was "uncontested" that had counsel looked at the prior conviction file, "they would have found a range of mitigation leads that no other source had opened up"— including leads on Rompilla's severely deprived and abusive childhood; Rompilla's mental health issues and "red flags" pointing to a need for further mental health examinations; and IQ testing, which would have revealed that "Rompilla's IQ was in the mentally retarded range" and that he suffered brain damage and significant impairment in cognitive function. 545 U.S. at 391–93. In other words, it was not simply that counsel failed to review the file and uncover mitigation related to the prior conviction that led the Supreme Court on *de novo* review to conclude that Rompilla had established prejudice. Rather, it was the vast wealth of mitigation that counsel could have uncovered if they had reviewed the file that led to the prejudice conclusion.

Davis's case is in no way akin to the circumstances in *Rompilla*. There is no indication that reviewing Davis's prior robbery file would have uncovered a treasure trove of unrealized

18-14671                Opinion of the Court                51

mitigation as in *Rompilla*.  Thus, Davis did not suffer the same type of prejudice that Rompilla did from his counsel's failure to investigate the circumstances of the prior robbery.[22]

Notwithstanding that the mitigation information in Davis's file obviously pales in comparison to what was awaiting counsel in *Rompilla*, the dissent contends that the nonviolent nature of the pizza robbery would have lessened the weight of the statutory aggravator based on the prior conviction and certainly would not have "made [Davis] more deserving of the death penalty." (emphasis omitted).  Not necessarily.  While the jury might have viewed the facts about the pizza robbery in the manner in which the dissent contends, it is equally plausible that the facts of the pizza robbery could have pointed to an escalating pattern of violence given that it was close in time to the 1993 murder, and the 1993 murder was also committed during a robbery.  Moreover, any

---

[22] Additionally, we note that the State in Davis's case merely introduced a certified copy of the prior conviction to establish a statutory aggravating factor.  Unlike in *Rompilla*, the State did not read from the transcript of the prior proceedings or attempt to use the conviction to emphasize Davis's violent character or propensity to engage in similar acts.  Furthermore, it was undisputed that under Alabama law a conviction for robbery qualified as a felony involving the use or threat of violence to the person regardless of the underlying facts.  *Bush v. State*, 695 So. 2d 70, 91 (Ala. Crim. App. 1995); *see also Shaw v. State*, 207 So. 3d 79, 121 (Ala. Crim. App. 2014) ("Robbery in the third degree, by its statutory definition . . . involves the use or threat of force.  Thus, proof of these convictions, by itself, was sufficient to prove the aggravating circumstances set out in []§ 13A-5-49(2).").  Accordingly, even if Giddens had presented the details of the crime during the penalty phase, it would not have, as Davis alleges, "obviate[ed] its status as an aggravating factor."

appeal to the allegedly nonviolent nature of the pizza robbery would have potentially opened the door for the State to introduce as rebuttal evidence Davis's violent behavior during his incarceration for the pizza robbery. *See Davis*, 9 So. 3d at 563 (highlighting that "[o]ne of Davis's own witnesses [at the Rule 32 hearing] noted that [Davis's] violent behavior did not begin until the commission of [the pizza robbery] offense" and that after that robbery Davis "began fighting in jail and became aggressive and disrespectful"). The dissent asserts that the facts related to the pizza robbery "would have gone only to the weight (if any) that the jury should apply to the state's prior-violent-conviction aggravator" and that it would not have opened the door to "irrelevant" character evidence. The dissent's position is contrary to Alabama law. While the facts related to the pizza robbery may directly relate to the weight afforded the statutory aggravator, they also tend to show that Davis did not have a violent nature and was not a "ringleader" as he had been accused of being during the guilt phase. After all, as the dissent asserts, "[w]ho would think that a nonviolent [pizza] robbery of this nature made [Davis] more deserving of the death penalty?" (emphasis omitted). Had the defense offered this information, the State would have been permitted to introduce rebuttal evidence to show that, despite the nonviolent nature of the pizza robbery, Davis did in fact have a violent nature and was a leader.[23]  *See* Ala. Code. § 13A-5-45(d)

---

[23] The dissent asserts that the prosecution never argued future dangerousness during the penalty phase, and, therefore, the State would not have been

(1975) ("Any evidence which has probative value and is relevant to sentence shall be received at the sentence hearing regardless of its admissibility under the exclusionary rules of evidence . . . ."); *Lindsay v. State*, 326 So. 3d 1, 53 (Ala. Crim. App. 2019) ("As previously stated . . . , § 13A-5-45(d), Ala. Code 1975, allows for the broad admission of evidence at the penalty phase of a capital-murder trial.　Indeed, any evidence that has probative value towards sentencing, regardless of its admissibility under the Alabama Rules of Evidence, is admissible."); *Whatley v. State*, 146 So. 3d 437, 481–82 (Ala. Crim. App. 2010) (explaining that "any evidence which has probative value and is relevant to the sentence" may be presented at sentencing and holding that evidence of the defendant's "conduct in jail and the statement he made concerning harming other inmates were relevant to rebut evidence that [the defendant] presented in mitigation").　And such evidence was certainly available, as Vogelsang testified at the evidentiary hearing

---

permitted to introduce rebuttal evidence of Davis's violent nature in prison because it would have been irrelevant.　But that assertion is based on the flawed premise that the circumstances surrounding the pizza robbery exist in a vacuum and would be probative of only the weight afforded the statutory aggravating factor.　The same evidence that allegedly shows the mitigating nature of the prior robbery also tends to establish—whether explicitly argued or implied—that Davis had a non-violent nature and was not a ringleader as he had been accused of being in the guilt phase by the State.　In other words, because these same facts are probative of more than just the weight afforded the statutory aggravator and pass upon Davis's character and worthiness of the death penalty, their presentation would have opened the door to rebuttal evidence from the State that tended to demonstrate that Davis had a violent nature as well as an argument that Davis posed a future dangerousness risk.

that Davis's jail records related to the pizza robbery indicated that Davis engaged in fighting with other inmates, exhibited violent behavior, and was "written up frequently for aggressive behavior, profanity or disrespect."

So while the dissent may be correct that the facts of the pizza robbery would have "severely undermined the factor's usefulness as an aggravating one warranting the death penalty," it is equally plausible that the evidence could have had the opposite effect and demonstrated an escalating pattern of violence or otherwise opened the door for the introduction of further aggravating evidence, which would not have aided Davis in his quest to demonstrate the death penalty was not appropriate in his case.

Under similar circumstances, both the Supreme Court and this Court have upheld state court findings that the defendant could not establish prejudice when evidence offered in mitigation was a double-edged sword or would have opened the door to harmful rebuttal evidence. *See, e.g.*, *Pinholster*, 563 U.S. at 200–03; *Wong v. Belmontes*, 558 U.S. 15, 22–28 (2009); *Jenkins*, 963 F.3d at 1270–73; *Evans*, 703 F.3d at 1327; *Ponticelli v. Sec'y, Fla. Dep't of Corr.*, 690 F.3d 1271, 1296 (11th Cir. 2012) ("[B]oth the Supreme Court and this Court have consistently rejected [the] prejudice argument [ ] where mitigation evidence was a two-edged sword or would have opened the door to damaging evidence." (second and third alterations in original) (quotations omitted)).

Thus, given the facts of this case, it was not necessarily objectively unreasonable for the state court to conclude, after

reweighing the totality of the mitigating evidence against the aggravating circumstances, that the mitigating evidence would not have outweighed the aggravating circumstances present in this case. Davis has certainly not shown that every fairminded jurist would conclude that prejudice has been established. *Williamson*, 805 F.3d at 1016; *Nance v. Warden, Ga. Diagnostic Prison*, 922 F.3d 1298, 1301 (11th Cir. 2019) ("[I]f some fairminded jurists could agree with the state court's decision, although others might disagree, federal habeas relief must be denied." (alteration in original) (quotations omitted)).

The primary cases on which Davis relies—*DeBruce v. Comm'r, Ala. Dep't of Corr.*, 758 F.3d 1263 (11th Cir. 2014), and *Williams v. Allen*, 542 F.3d 1326 (11th Cir. 2008) (hereinafter *Herbert Williams*)—do not compel a different conclusion.

The mitigation evidence in *DeBruce* was far stronger than that in Davis's case. *See DeBruce*, 758 F.3d at 1270–72. It included that (1) "DeBruce witnessed stabbings, shootings, and other violence in the housing projects where he grew up, and that [he] was frequently attacked by gangs"; (2) his older brother (to whom DeBruce was very close) was incarcerated when DeBruce was eight, and DeBruce's father was an alcoholic and verbally abusive to DeBruce and his siblings; (3) DeBruce's older sister, who was primarily responsible for raising him, beat him daily and withheld meals, threatened him at times with a knife, and placed him in a closet for hours after the beatings; (4) DeBruce suffered from brain damage and had only a seventh grade education and borderline

range intelligence; (5) DeBruce suffered from blackout episodes consistent with seizures and accompanied by memory loss; (6) DeBruce had a history of alcohol and marijuana abuse; and (7) by the age of 20, DeBruce had attempted suicide four times. *Id.* at 1270–72. Given the significant differences between *DeBruce* and this case, *DeBruce* cannot compel a finding of prejudice.[24]

And Davis's case is not analogous to *Herbert Williams* because, in that case, AEDPA deference did not apply to the state court's prejudice determination and we reviewed prejudice *de novo*. 542 F.3d at 1344–45 (holding that no AEDPA deference was due to the state court's prejudice determination because the state court failed to apply the correct legal standard when making its prejudice determination). Thus, because *Herbert Williams* lacks the critical AEDPA deference, it cannot compel a finding of prejudice in this case.

Finally, we note that the dissent declares the state court's prejudice decision unreasonable in part because the state court failed to consider in its analysis that early on in the one-hour total

---

[24] Additionally, in reaching our decision in *DeBruce*, we hinged our decision on the Supreme Court's decisions in *Wiggins*, *Rompilla*, and *Terry Williams*. *DeBruce*, 758 F.3d at 1277–79. But the Supreme Court did not apply AEDPA deference to the question of prejudice in those cases. *Wiggins*, 539 U.S. at 534 (reviewing prejudice *de novo* because state court never reached the prejudice prong); *Pinholster*, 563 U.S. at 202 (explaining that it did not apply AEDPA deference to the question of prejudice in *Terry Williams* or *Rompilla*). Therefore, those cases "offer no guidance with respect to whether a state court has *unreasonably* determined that prejudice is lacking." *Pinholster*, 563 U.S. at 202 (emphasis in original).

jury deliberation, the jury indicated once that at least five jurors favored life without parole, and the final jury verdict was still not unanimous (it was 11 to 1 in favor of the death penalty), noting that when this Court "[has] evaluated prejudice, we [and several of our sister circuits] have frequently considered the circumstances of the jury's decision to assess whether there is 'a reasonable probability that at least one juror would have struck a different balance,'" citing *Sears v. Warden GDCP*, 73 F.4th 1269, 1299 (11th Cir. 2023). But regardless of whether this Court and our sister circuits have considered the circumstances of the jury's decision when assessing whether there is a reasonable probability of a different outcome, the state court's failure to do so does not render its decision objectively unreasonable under AEDPA. Unreasonableness under AEDPA turns on whether the state court's decision is contrary to, or an unreasonable application of, clearly established federal law as established by the Supreme Court, not the circuit courts. 28 U.S.C. §2254(d)(1); *Gavin*, 40 F.4th at 1262 ("'Clearly established Federal law' means 'the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision.'" (alterations adopted) (quoting *Terry Williams*, 529 U.S. at 412)). And the Supreme Court has never held that a jury's hesitation in reaching a verdict is necessarily an indicator of prejudice or that such a factor must be considered or should weigh more heavily in the prejudice analysis under *Strickland*.[25]

---

[25] Even if circuit case law was relevant to our analysis, we note that the

---

majority of the cases the dissent relies on for the principle that juror splits are relevant to the prejudice analysis are pre-AEDPA cases—meaning that our review was *de novo* and AEDPA's highly deferential framework did not apply to our evaluation of the state court's decision. *See Hardwick v. Sec'y, Fla. Dep't of Corr.*, 803 F.3d 541, 549 (11th Cir. 2015); *Cave v. Singletary*, 971 F.2d 1513 (11th Cir. 1992); *Blanco v. Singletary*, 943 F.2d 1477 (11th Cir. 1991); *Sanders v. Davis*, 23 F.4th 966, 970 (9th Cir. 2022); *Stankewitz v. Wong*, 698 F.3d 1163, 1167 (9th Cir. 2012). Thus, these cases have no bearing on our analysis as we—like the district court—agree that AEDPA deference applies. And, the remaining post-AEDPA cases on which the dissent relies are factually distinguishable from the circumstances here for a number of reasons.

For instance, our decision in *Sears v. Warden GDCP*, is distinguishable because it did not involve a prejudice analysis under *Strickland*. 73 F.4th at 1296. Rather, it involved a prejudice analysis under *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *Id*. And we took care to note that "the *Strickland* prejudice standard imposes a higher burden on the defendant than does the *Brecht* standard," and, therefore, "the *Strickland* standard is distinct from our analysis under the *Brecht* standard." *Id*. (quotations omitted). Thus, our prejudice discussion in *Sears* has no bearing on this case. But even if it did, the circumstances in *Sears* are a far cry from those here. In *Sears*, the jury sent out *multiple* notes indicating that it was deadlocked and could not reach a unanimous verdict; the trial court gave the jury multiple instructions to continue deliberations; the deliberations spanned multiple days; and one of the jurors later testified at the petitioner's evidentiary hearing that other jurors yelled and cursed at her, and she felt coerced into changing her vote. *Id*. at 1293–95. Davis's case bears no resemblance to *Sears*. Davis's case was not a case in which the jury seemed hopelessly deadlocked or in which deliberations dragged on for an extended period of time. The jury deliberated a total of one hour before returning its 11 to 1 advisory verdict in favor of the death penalty. The short length of deliberations undermines the dissent's contention that, in determining whether Davis was prejudiced, great weight or significance should be afforded to the fact that the jury sent a note initially asking whether the trial court could accept seven votes for death and five for life.

18-14671                Opinion of the Court                59

Under the framework of § 2254, we must remember that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Terry Williams*, 529 U.S. at 410 (emphasis in original). To grant federal habeas relief, the state court's application of clearly established federal law, as established by the Supreme Court, must be "'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." *White v. Woodall*, 572 U.S. 415, 419 (2014) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)). We must observe this distinction and are not at liberty to "substitute[] [our] own judgment for that of the state court." *Woodford*, 537 U.S. at 25. Thus, even if we might have reached a different conclusion as an initial matter in this case, "it was not an unreasonable application of [*Strickland* or its progeny] for the [state

---

Similarly, the Fourth Circuit's decision in *Williams v. Stirling* is distinguishable because the mitigation evidence was more powerful than that here. There was evidence not only that the petitioner had a troubled childhood, but also that he suffered from fetal alcohol syndrome that impaired his judgment and his ability to control his impulses and to understand the consequences of his actions—and the Fourth Circuit believed the evidence of fetal alcohol syndrome would have been particularly compelling because it "could have provided the jury evidence of a neurological defect that *caused* [the petitioner's] criminal behavior." 914 F.3d 302, 307–308, 318 (4th Cir. 2019). And the jury deliberations in *Williams* were clearly more deadlocked than here—the deliberations spanned over two days, the jury reported being deadlocked, the petitioner moved for a mistrial, and the trial court gave an *Allen* charge to the jury—whereas Davis's jury deliberated for approximately an hour. *Id.* at 308. In other words, Davis's case bears no resemblance to *Williams* either.

60                    Opinion of the Court                    18-14671

court] to conclude that [Davis] did not establish prejudice." *Pinholster*, 563 U.S. at 203.

Accordingly, we affirm the district court's denial of Davis's § 2254 federal habeas petition.

**AFFIRMED.**

18-14671                 BRANCH, J., Concurring                         1

BRANCH, J., Circuit Judge, Concurring:

As explained in the majority opinion, the district court's judgment is due to be affirmed because Jimmy Davis cannot demonstrate that the Alabama Court of Criminal Appeals' determination that he failed to show prejudice from his counsels' alleged deficient performance was contrary to, or an unreasonable application of, clearly established federal law as required for federal habeas relief under 28 U.S.C. § 2254(d)(1). I write separately to respond to the dissent's contentions regarding counsel's alleged deficient performance. Applying the doubly deferential standards of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") and *Strickland*[1] to the facts of this case, the state court's determination that counsels' performance was not constitutionally deficient was not contrary to, or an unreasonable application of, clearly established federal law. Accordingly, I would also affirm on that basis as well.

## I.    Background

Jimmy Davis, Jr., is on death row for the 1993 murder of Johnny Hazle during the robbery of a gas station. Davis's mother, Lillie Bell Davis, and his cousin, Andre Sigler, both testified at the penalty phase of Davis's trial. They provided testimony concerning Davis's background and personality—including that Davis's parents divorced when he was a baby; that he and his five siblings were raised by Lillie as a single mother with no father

---

[1] *Strickland v. Washington*, 466 U.S. 668 (1984).

figure in the home; that Lillie sent Davis to live with his father when he was 15 because he was hanging out with "a bad crowd," but his father died unexpectedly shortly thereafter and Davis returned to his mother's home; that Davis struggled with his father's death; that Davis had behavioral issues in his teens, would not obey Lillie, and would stay out all night or be gone for days at a time; however, he was never violent; and that Davis dropped out of school. Both Lillie and Sigler begged the jury to show mercy.

Additionally, Dr. Annie Storey provided testimony concerning IQ-related assessments that she administered to Davis. These results indicated that Davis was "borderline in intelligence" and that his ability to know "when to appropriately handle himself or how to appropriately handle himself in his environment" would be impaired. The jury returned an 11 to 1 advisory recommendation in favor of the death penalty, which the trial court ultimately imposed.

Following his direct appeal, Davis pursued state postconviction relief under Alabama Rule of Criminal Procedure 32, asserting, as relevant here, that his trial counsel was ineffective during the penalty phase for failing to obtain readily available mitigating evidence of childhood abuse, and failing to investigate the circumstances of his 1992 Alabama third-degree robbery conviction.

As recounted in the majority opinion, Davis was represented at trial by appointed counsel Steve Giddens and Jonathan Adams, both of whom were available to testify at the Rule 32 evidentiary

18-14671                BRANCH, J., Concurring                3

hearing.    Yet, Davis only called Giddens as a witness and
introduced copies of Giddens's and Adams's time sheets as
evidence of the work that they did in this case.  Giddens recorded
141.55 hours of work on Davis's case, which included 49.2 hours of
"out of court time" preparing for both phases of trial and 24.5 out-
of-court hours during trial and preparing for the post-trial
sentencing hearing before the judge.    Adams recorded
approximately 152.85 hours on Davis's case, which included 65
hours of "out of court time" preparing for both phases of trial and
an additional 24.5 out-of-court hours during trial and preparing for
the post-trial sentencing hearing before the judge.  The bulk of the
hours for both were recorded in the two weeks leading up to the
trial.

Although Giddens and Adams did not hire a private
investigator to assist with the case,[2] Giddens testified that he and

---

[2] Giddens testified that he "[did] not believe" he had ever requested such funds
[for an investigator] in prior cases."   The dissent makes much of this fact
because counsel acknowledged the value of an investigator in his subsequent
work as a prosecutor during the late 1990s and early 2000s.  As a prosecutor,
however, he bore the burden of proof.   With that burden, prosecutors
necessarily must employ and rely on the work of investigators.

Moreover, as the Rule 32 trial court noted, the approach to investigators and
their involvement in cases has changed significantly in the last several decades
since Davis's trial.  As acknowledged by the Rule 32 court, at the time of
Davis's 1993 trial, such investigators were not commonplace, and it "was not
clear cut that an investigator would be appointed just because one was
requested."  Indeed, the trial court found that Davis had "made no showing
that trial counsel had sufficient grounds to request the assistance of an

4                    Branch, J., Concurring                    18-14671

Adams "did a lot of preparation" and "a good bit of investigation" themselves.  Neither one acted as lead counsel.  Instead, Giddens explained that they both "got in there and both worked and both tried it"—doing some things together and others independently.[3]

As part of the preparation for sentencing, counsel interviewed Davis's mother and obtained a court order for Davis's mental evaluation.  Giddens, however, was "not a note taker" and did not have any notes of his interview with Davis's mother.  Giddens knew that Davis had several siblings, but he did not recall attempting to interview any of Davis's other family members other than Davis's mother.  He did not recall doing any investigation into Davis's friends because, to the best of Giddens's knowledge, all of Davis's friends were in legal trouble and would not have been able to provide helpful mitigation.  Giddens did not recall trying to obtain Davis's school records, but he testified that he did not typically request such records, even in capital cases.[4]  Similarly, it

---

investigator."  And the Alabama Court of Criminal Appeals agreed.  *See Davis v. State*, 9 So. 3d 539, 556–57 (Ala. Crim. App. 2008).  That determination is not challenged in this appeal.  Thus, the dissent's emphasis on the lack of an investigator is a red herring at best.

[3] The time sheets corroborate this assertion given that Adams recorded more out-of-court time preparing for the trial (65 hours) than Giddens (49.2 hours), which confirms that Adams did some work that Giddens did not.

[4] However, I note that the record contains a copy of a subpoena filed by Giddens to the "Custodian of Records of Anniston High School" requesting "any and all records of Jimmy Davis."  Thus, it appears that counsel did in fact attempt to secure some of Davis's school records.

18-14671                BRANCH, J., Concurring                5

was not his practice to get records from social services, and he did not consider doing that in Davis's case. Rather, the defense had only the social history from Davis's mother.

Neither Davis nor his mother mentioned anything about abuse to Giddens, and Giddens was unaware of any abuse. Giddens explained that he did not ask about abuse because he had no reason to suspect it. He acknowledged that information about abuse Davis may have suffered as a child "might" have affected the jury in mitigation if he had known about it. Giddens admitted, however, that during his 13 years as a criminal defense attorney (from 1986–1999), he had never put forth evidence of childhood abuse as mitigation.

As for Davis's prior robbery conviction, Giddens testified that he knew of the conviction and reviewed the conviction record, but he did not attempt to contact anyone involved with the robbery case. Giddens explained that he did not do any investigation into the circumstances of the robbery conviction because "[t]he [S]tate offered simply a certified copy of the conviction. Which we don't object to, because you don't want them to have to put on a witness to bring out the facts."

Following Giddens's testimony, Davis presented testimony about abuse that he suffered at the hands of his mother as a child. Specifically, he presented the testimony of several social workers concerning a single 1981 social services complaint involving 25 to 35 switch marks from "a whipping" on Davis's back when he was 10 years' old. The complaint was deemed founded by social

6                    Branch, J., Concurring                    18-14671

services; social services offered services and counseling to Davis's mother Lillie and to Davis; and Davis was not removed from the home.[5]  Notably, in 1981, Lillie never admitted to making the marks on Davis's back, and over twenty years later, she denied ever having any contact with social services to Jan Vogelsang, a clinical social worker who assisted Davis's postconviction team with the postconviction investigation in preparation for the Rule 32 proceedings.

Davis also called his paternal aunt, a cousin, two family friends, and two of his sisters, Mary and Hortense, as witnesses at the evidentiary hearing, all of whom testified to other instances of abuse that were not documented in social services records.  His sisters provided the bulk of this testimony, testifying at length that their mother beat them frequently with extension cords, switches, and belts (including the belt buckle) "all over" their bodies; that the whippings lasted for extended periods of time; and that the whippings left them with bloody "whelp . . . marks."  They explained that their mother whipped Davis for bedwetting until he was 14 or 15 years' old.  On one occasion, when Davis was in the second grade, their mother beat him "with a broom handle across his head" and this "dented" and "warped his head," and Davis had to wear "a skullcap over his head" until it reshaped.

None of these witnesses ever told anyone about the beatings or otherwise reported the abuse to authorities.  Indeed, Davis's

---

[5] Social worker Beverly Boggs testified that in hindsight, Davis "probably should have [been] removed" from the home based on the 1981 incident.

18-14671                    BRANCH, J., Concurring                    7

older sister Mary admitted during the Rule 32 evidentiary hearing that, even when Davis's postconviction team contacted her, she shared just "the basics" about the abuse with them and not the specific details she testified to during the evidentiary hearing. And when Davis's younger sister Hortense was asked at the Rule 32 evidentiary hearing if she would have testified to the abuse if called as a witness at trial, she stated only that she "probably would have."

Although Davis did not testify at the Rule 32 evidentiary hearing, the State's expert, Dr. Glen King, spoke with Davis as part of his evaluation. Dr. King testified that Davis "was not too forthcoming" about his childhood. Indeed, Dr. King asked "a number of questions" about Davis's background and his mother's discipline of him, but Davis reported only that his childhood "wasn't rosy," that his mother disciplined him with a switch, and that sometimes he felt he was disciplined "too much." At no time during the interview did Davis report being hit in the head with a broom handle or report any of the other instances of abuse detailed by his other witnesses. Davis also told Dr. King that his trial counsel had "talked to [his] mother and two [of his] sisters" at the time of trial.[6]

---

[6] Although we do not know to which of Davis's five sisters Dr. King referred, the state court found this testimony credible and made a factual determination consistent with Dr. King's testimony. In his reply brief, Davis for the first time takes issue with the state court's finding that trial counsel spoke with two of Davis's siblings, alleging that the occurrence of such an interview is "highly unlikely," "improbable," and unsupported by the record. The dissent also

8                    Branch, J., Concurring                    18-14671

Finally, with regard to his ineffective-assistance claim related to counsel's alleged failure to investigate the circumstances of Davis's prior third-degree robbery conviction, Davis called Jadie Boozer, his court appointed counsel in the robbery case.  Boozer

---

expresses skepticism as to whether such an interview occurred, citing the fact that "counsel's complete file includes no notes of such interviews."  As an initial matter, Davis abandoned any challenge to this factual finding by failing to raise this argument in his initial brief. *See Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1343 (11th Cir. 2005) ("As we repeatedly have admonished, arguments raised for the first time in a reply brief are not properly before a reviewing court." (alteration adopted) (quotations omitted)).  But even if not abandoned, Davis has not rebutted by clear and convincing evidence the presumption of correctness that AEDPA affords to state-court determinations of fact. *See* 28 U.S.C. § 2254(e)(1).  Instead, he merely quarrels with the finding, arguing that given the circumstances, it is "highly unlikely" and "improbable" that such an interview occurred.  Davis's speculation that such an interview did not occur is not clear and convincing evidence.  Dr. King testified that Davis reported that trial counsel spoke with two of his siblings and his mother.  Davis has five sisters.  At the time of trial, both Mary and Hortense had moved out of their mother's home, and they confirmed at the Rule 32 hearing that they did not speak with Davis's trial counsel.  In light of Dr. King's testimony, it was not unreasonable for the state court to conclude that counsel spoke with two of Davis's three younger sisters, who were ages 16, 15, and 13, at the time of the trial.  Davis has not proffered any clear and convincing evidence to overcome this factual determination, so we are bound to defer to it. *See Nejad v. Att'y, Gen., State of Ga.*, 830 F.3d 1280, 1292 (11th Cir. 2016) ("Determining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review. . . . [I]n the absence of *clear and convincing evidence*, we have no power on federal habeas review to revisit the state court's credibility determinations." (quotations and internal citations omitted)); *see also* 28 U.S.C. § 2254(e)(1) (providing that state court's factual findings are presumed to be correct and the petitioner must present clear and convincing evidence to overcome that presumption).

testified that Davis and three other men ordered a pizza and then robbed the delivery man of six pizzas and $32 when he arrived.  In her opinion, Davis was not the leader and was merely a follower in the incident.  No weapon was involved—although one of the robbers had his hand in his pocket "as if he . . . had a gun."  The victim said that "there really was never a threat made to him."

Following the evidentiary hearing, the trial court and the Alabama Court of Criminal Appeals ("ACCA") denied Davis's claims on the merits, concluding that counsel's performance was not deficient with regard to the investigation of Davis's childhood or the investigation of Davis's prior robbery conviction.  *Davis v. State*, 9 So. 3d 539, 566, 569 (Ala. Crim. App. 2008), *cert. denied sub nom. Ex parte Davis*, 9 So. 3d 571 (Ala. 2008).

After exhausting his state postconviction remedies, Davis filed the underlying federal habeas petition under 28 U.S.C. § 2254.  The district court denied the § 2254 petition on the merits and the related COA request, concluding that the state court did not unreasonably apply Supreme Court precedent or base its decision on an unreasonable determination of the facts.  We then granted a COA on the two ineffective-assistance claims at issue in this appeal.

## II.    The Governing Framework

We review the district court's denial of a § 2254 habeas petition *de novo*.  *Ward v. Hall*, 592 F.3d 1144, 1155 (11th Cir. 2010).  Under AEDPA, however, we can only grant habeas relief with respect to a claim adjudicated on the merits by the state court if the state court's decision "resulted in a decision that was contrary to,

or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2). "[W]hen the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion . . . a federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable." *Wilson v. Sellers*, 584 U.S. 122, 126 (2018).

Davis argues only that the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law under § 2254(d)(1). "To meet that standard, [he] must show far more than that the state court's decision was 'merely wrong' or 'even clear error.' [He] must show that the state court's decision is so obviously wrong that its error lies beyond any possibility for fairminded disagreement." *Shinn v. Kayer*, 592 U.S. 111, 118 (2020) (quotations omitted); *Woods v. Etherton*, 578 U.S. 113, 116–17 (2016) ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." (quotations omitted)). "If this standard is difficult to meet—and it is—that is because it was meant to be." *Burt v. Titlow*, 571 U.S. 12, 20 (2013) (quotations omitted).

To establish that counsel rendered ineffective assistance in violation of one's Sixth Amendment right to counsel, a petitioner

must show *both* that his "counsel's performance was deficient" and that counsel's deficient performance resulted in prejudice. *Strickland*, 466 U.S. at 687. Because the majority opinion addresses the prejudice prong, I focus solely on the deficient performance prong.

To prove counsel performed deficiently, a petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness" measured by "prevailing professional norms" and "considering all the circumstances." *Id*. at 688. The Supreme Court has repeatedly and emphatically instructed that review of counsel's performance is "highly deferential" and requires "indulg[ing] a strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance." *Id*. at 689; *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009); *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011). In other words, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Critically, "the burden to show that counsel's performance was deficient rests squarely [and at all times] on the defendant." *Titlow*, 571 U.S. at 22–23 (quotations omitted).

In evaluating counsel's performance, the reviewing court must make "every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from *counsel's perspective at the time*. *Strickland*, 466 U.S. at 689 (emphasis added). "And because

counsel's conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take." *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (*en banc*). In other words, "[t]he challenger's burden is to show that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment." *Harrington v. Richter*, 562 U.S. 86, 105 (2011).

Importantly, "[t]he purpose of ineffectiveness review is not to grade counsel's performance." *Chandler*, 218 F.3d at 1313. "To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. But the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'" *Id.* (quoting *Burger v. Kemp*, 483 U.S. 776 (1987)); *Bates v. Sec'y, Fla. Dep't of Corr.*, 768 F.3d 1278, 1295 (11th Cir. 2014) (explaining that *Strickland*'s reasonableness test "has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." (quotations omitted)). Moreover, when we review counsel's performance, we keep in mind that "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Strickland*, 466 U.S. at 691. "Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the

18-14671                BRANCH, J., Concurring                13

defendant." *Id.* "In particular, what investigation decisions are reasonable depends critically on such information." *Id.*

As is clear from the discussion of *Strickland*'s highly deferential standard, "[s]urmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). And critically, where, as here, "§ 2254(d) applies, the question is not whether counsel's actions were reasonable" under *Strickland*. *Harrington*, 562 U.S. at 105. Instead, the question is whether "the state court's determination under the *Strickland* standard . . . was unreasonable—a substantially higher threshold." *Knowles*, 556 U.S. at 123 (quotations omitted).

Consequently, "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult" because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential' and when the two apply in tandem, review is 'doubly' so." *Harrington*, 562 U.S. at 105 (internal citations omitted). Under this doubly deferential standard, "federal courts are to afford 'both the state court and the defense attorney the benefit of the doubt.'" *Woods*, 578 U.S. at 117 (quoting *Titlow*, 571 U.S. at 15).

Adherence to these deferential principles "serves important interests of federalism and comity," and federal habeas courts reviewing a state court's decision must remember that "[f]ederal habeas review . . . exists as a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Woods v. Donald*, 575 U.S. 312,

14                    Branch, J., Concurring                    18-14671

316 (2015) (quotations omitted).  Accordingly, "it is a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding." *Nance v. Warden, Ga. Diagnostic Prison*, 922 F.3d 1298, 1303 (11th Cir. 2019) (quotations omitted).

My dissenting colleague acknowledges these deferential principles but resolves this case in a manner fundamentally inconsistent with AEDPA.  Instead of focusing on whether the state court's decision is so obviously wrong that its error lies beyond any possibility for fairminded disagreement, the dissent applies "a de novo-masquerading-as-deference approach that the Supreme Court has repeatedly condemned." *Shinn*, 592 U.S. at 117 (quotations omitted).  Although the dissent claims to apply deference, the dissent in fact evaluates the merits of Davis's *Strickland* claims *de novo*, concludes that counsels' performance was deficient, that Davis suffered prejudice, and then uses that conclusion to assert that the state court's decision was unreasonable.  "In other words, it . . . treat[s] the unreasonableness question as a test of its confidence in the result it would reach under *de novo* review." *Id.* at 523 (quotations omitted).

Applying the proper framework, I explain why the state court's determination that Davis's counsels' performance was not deficient was an objectively reasonable determination.  I begin with counsel's alleged failure to investigate and present mitigating evidence of childhood abuse, and then I turn to the alleged failure

to investigate the circumstances surrounding Davis's prior robbery conviction.

### III.    Evidence of Childhood Abuse

Davis argues that Giddens and Adams "did virtually nothing" to prepare for the penalty phase and failed to investigate and uncover significant evidence of Davis's childhood abuse, which could have been offered as non-statutory mitigation during the penalty phase.  He maintains that the state court's conclusion that counsel performed reasonably was an unreasonable application of *Strickland* and contrary to clearly established federal law.  I disagree.

"*Strickland* require[s] that [counsel] make a reasonable investigation into possible mitigating factors and make a reasonable effort to present mitigating evidence to the sentencing court." *Anderson v. Sec'y, Fla. Dep't of Corr.*, 752 F.3d 881, 904 (11th Cir. 2014) (quotation omitted) (alteration adopted).  Evidence of childhood abuse can constitute a mitigating circumstance in a capital sentencing proceeding.  *Puiatti v. Sec'y, Fla. Dep't of Corrs.*, 732 F.3d 1255, 1287 (11th Cir. 2013).  Thus, defense counsel's failure to undertake reasonable efforts to obtain mitigation evidence of abuse may constitute ineffective assistance of counsel in some cases.  Even so, as "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. The Supreme Court has never held that counsel is constitutionally required to investigate specific areas of mitigation.  *See Hannon v.*

*Sec'y, Dep't of Corr.*, 562 F.3d 1146, 1155 (11th Cir. 2009).  With these principles in mind, I turn to counsel's investigation in this case.

The ACCA concluded that Davis failed to demonstrate that counsel rendered constitutionally deficient performance with regard to counsels' investigation of Davis's childhood abuse.  *Davis v. State*, 9 So. 3d 539, 553–67 (Ala. Crim. App. 2008).  In reaching this decision, the ACCA quoted extensively from the Rule 32 trial court's order denying this claim, highlighting the failure of Davis to call one of his attorneys to testify and of Davis and his family to disclose the childhood abuse to his counsel:

> In this claim, Davis has alleged that his trial counsel were ineffective in regard to the penalty phase of his trial.  Quite simply, this claim can only be described as bizarre, based on the fact that [Davis's] own family seems to have concealed important information from trial counsel.  Having considered the petition, having carefully reviewed the evidence presented at this hearing, as well as at the trial, and following the law governing Sixth Amendment claims—including the recent decision in *Wiggins v. Smith*, [539 U.S. 510] (2003)—the court finds that this claim is due to be denied.
>
> This finding is not meant to imply that the Court did not find compelling some of the mitigation evidence presented by [Davis] during the evidentiary hearing.  Much of the evidence presented at the Rule 32 hearing focused on abuse inflicted on Davis by his mother, Lillie Bell–Davis.  The Court finds that Davis

was abused by his mother to an extent that would have rendered it relevant to the issue of the appropriate penalty determination in this case under existing law. . . .

The Court's major concern, however, is that if this Court used this evidence to find the existence of deficient performance the Court would be engaging in the inappropriate activity of judging the performance of trial counsel through the use of hindsight. Further, the Court would be passing judgment on Attorney Adams without the benefit of his testimony. Even worse, this Court would be inappropriately shifting the blame for the inexcusable actions of Davis's family, particularly his mother, to his trial counsel. This Court must judge trial counsel's performance through their perspective at the time. That being the case, the Court does not find that trial counsel's performance was deficient.

To the contrary, Jimmy Davis's family—and to a very large extent his mother—bears a heavy burden in this case for their role in this matter. Because Adams did not testify, this Court does not know what Adams did or did not do in preparation for this case. The Court presumes, however, that Adams acted reasonably in the questions he asked his client and his client's mother and in preparing for the penalty phase. Further, the testimony of Giddens establishes that at no time did Davis ever mention to his attorneys the abuse suffered at the hands of his mother or the

intervention of DHR [the State Department of Human Resources] in the Davis home.

. . .

Looking at Giddens's testimony and the trial testimony of Lillie Bell–Davis, much of the background information given by Davis's family was true, but given with Ms. Davis's personal 'spin' on it, omitting the important portions of Davis's life in which he was beaten by a belt or switch. The information concerning Davis's participation in the job corps, obtaining his GED at Tuskegee, the death of his father, his parents' marital difficulties, are all items that Lillie Bell told counsel about and was willing to testify about. Thus, trial counsel did obtain much of this information through the most obvious source: Davis's mother.

Although Davis faults trial counsel for not subpoenaing his DHR records, there is absolutely no evidence before this Court that reasonably competent counsel would have been on notice that such records existed. There are no constitutionally required checklists for mitigation investigations. Trial counsel are faced with the realities of limited time and limited resources. Those resources have to be managed in an efficient manner. Thus, this Court does not find that attorneys are expected to subpoena agency records just in case. Had Lillie Bell–Davis, Davis's siblings, or Davis himself told his trial counsel that this issue needed to be investigated—that DHR had been involved in the Davis home—this Court would

18-14671                BRANCH, J., Concurring                19

> absolutely find ineffective assistance of counsel for
> failure to investigate, discover and/or develop this
> evidence, depending on the strategic decisions made
> by counsel following their investigation.  But that is
> not what happened here.
>
> Davis is asking this Court to declare two competent
> trial lawyers incompetent due to the fact that they
> were manipulated by Lillie Bell–Davis, the Davis
> family, and Davis himself due to the family's
> conspiracy of silence.  Quite simply, it is not trial
> counsel's fault, it is the fault of [Davis], of his mother,
> of Andre Sigler, and of the Davis family as a whole; a
> family that apparently sought collateral counsel's
> assistance in keeping these facts private, even during
> the time leading up to the evidentiary hearing in this
> matter.

*Id.* at 553–56 (alterations in original).  The ACCA concluded that
the trial court's findings were "supported by the record," and it
"adopt[ed] them as part of [its] opinion."  *Id.* at 563.

The ACCA then explained that it had reviewed the record
and found that "Adams's involvement in the case was not minor"
and the court was "troubled" that Adams was not called to testify
given that it was clear that "he had a significant role in preparing
for Davis's trial."  *Id.* at 564.  Accordingly, the ACCA held that,

> [b]ased on the unusual circumstances presented in
> this case and the fact that we do not know the extent
> of cocounsel's investigation because Adams was not
> called to testify, we cannot say that counsel was

> ineffective for failing to discredit the statements of Davis, his mother, and two of his siblings, and to conduct yet more investigations.

*Id.* at 566. Given the record in this case, the state court's conclusion that counsel did not perform deficiently was not an unreasonable application of Supreme Court precedent.

As an initial matter, although the majority opinion assumes arguendo that a more thorough investigation would have uncovered evidence of Davis's childhood abuse (because the majority focused on the prejudice prong), that assumption is not necessarily true. There was a single 1981 report of confirmed child abuse by social services that involved Davis, but Davis's mother was provided with some services and Davis was not removed from the home. There were no other documented incidents of abuse involving Davis that trial counsel would have discovered through more investigation.[7]

---

[7] The dissent disagrees, citing the "343 pages of DHR records" introduced by postconviction counsel—in other words, according to the dissent, if counsel had only looked, he would have found a plethora of mitigation in the DHR records. The dissent's reference to the volume of records alone without context is misleading and makes it appear as though there was far greater documentation of abuse than actually existed. When examined, the vast majority of the DHR records consist of correspondence and documentation concerning public assistance benefits that Lillie applied for or received, not allegations of child abuse. Further, approximately 70 of those pages concern public assistance benefits and parenting issues of Davis's older sister Mary regarding her own children, not about Davis's mother. The dissent's reference to "a 1981 report [that] noted several other incidents of abuse,

18-14671                BRANCH, J., Concurring                21

Furthermore, Davis and his family exhibited a pattern of denial concerning the abuse that was pervasive throughout this case, both at trial and during the postconviction hearing. Davis's mother consistently and repeatedly denied any abuse, and Davis inexplicably did not call her as a witness during the Rule 32 proceedings, despite her availability and his knowledge that the abuse inflicted by her was key to his mitigation case.

Likewise, Davis himself has consistently and repeatedly declined to discuss his childhood. For instance, the record reveals that during the trial proceedings, he refused to cooperate with the presentence investigation—indeed, when approached about assisting with background for the presentence investigation, Davis used vulgar expletives, dropped his pants and exposed his underwear, "stat[ing] his absolute refusal in no uncertain terms to cooperate with [the] [c]ourt or in [the] investigation in any regard, and walked out." And during his Rule 32 proceedings, he provided

including that Lillie used a switch and a belt to whip Davis whenever he misbehaved, stretching back at least a year," is in fact part of the same 1981 complaint that I have already discussed. The dissent is correct that a 1987 report noted in passing that Lillie had kicked then-sixteen-year-old Davis out of the house; that he had returned home; and that Lillie stated that she would kick him out if he misbehaved again. However, while that passing note exists, the 1987 report did not involve abuse allegations related to Davis. Instead, the report of neglect listed then-minor Hortense as the alleged victim, and it indicated that Lillie had kicked Hortense out of the house and refused to let her return after Hortense and her older sister Mary got into a fight. It is unclear that had counsel requested DHR records for Davis that counsel would have automatically received the records related to Davis's siblings.

22                    Branch, J., Concurring                    18-14671

only deliberately evasive answers in response to questioning by Dr. King about his childhood—stating only that his childhood "wasn't rosy," that his mother disciplined him with a switch, and that sometimes he felt he was disciplined "too much"—despite knowing that the childhood abuse he suffered was a key to his claim of ineffective assistance.

Davis's family members demonstrated a similar reluctance to discuss the abuse.  For instance, when Davis's younger sister Hortense was asked at the Rule 32 evidentiary hearing if she would have testified to the abuse if called as a witness at trial, she stated only that she "probably would have."  Similarly, Davis's older sister Mary admitted during the Rule 32 evidentiary hearing that, even when Davis's postconviction team contacted her, she shared just "the basics" about the abuse with them and not the specific details she testified to during the evidentiary hearing.

In fact, every single family member and friend that testified at the evidentiary hearing stated that they never told anyone about the abuse and never reported the abuse to the authorities.  Thus, I agree with the state court that it is far from certain that a more thorough investigation by counsel would have uncovered the evidence of childhood abuse that was produced during the Rule 32 proceedings.[8]

---

[8] As the dissent notes, Davis also called as a witness capital defense expert John Mays, who opined that Giddens and Adams did not spend enough time preparing for mitigation.  However, neither the Supreme Court nor this Court

Regardless, the biggest problem for Davis is that he failed to present a thorough and complete record of counsels' performance. *Strickland* commands that courts presume that counsel acted reasonably, and Davis bears the burden of overcoming that presumption. *Strickland*, 466 U.S. at 688–89. Here, the record is incomplete as to Adams's preparation for the penalty phase because Davis did not call Adams as a witness at the evidentiary hearing or submit other evidence about the nature of Adams's involvement in the case, such as an affidavit from Adams.

Davis argues that he did not need to present such evidence because the State stipulated to Adams's time sheet, which reflected the work he did in the case. But the time sheet only underscores the importance of Adams's testimony. Specifically, Adams recorded more hours of out-of-court time in this case than Giddens, and Adams listed "interviewed witnesses" several times in the description of time spent. However, we do not know who these

---

has ever held that counsel must spend a certain amount of time preparing for trial in order to provide constitutionally effective assistance. *Jenkins v. Comm'r, Ala. Dep't of Corr.*, 963 F.3d 1248, 1266 (11th Cir. 2020). Furthermore, what the dissent fails to acknowledge is that Mays's testimony has little relevance to the question of whether Davis's counsel performed deficiently. *See Newland v. Hall*, 527 F.3d 1162, 1208 (11th Cir. 2008) ("[S]tatements from other attorneys are not dispositive; indeed, they have little weight in our analysis."); *Provenzano v. Singletary*, 148 F.3d 1327, 1332 (11th Cir. 1998) (explaining that the reasonableness of counsel's actions "is a question of law to be decided by the . . . courts" and, thus, "it would not matter if a petitioner could assemble affidavits from a dozen attorneys swearing that the strategy used at his trial was unreasonable").

24                    Branch, J., Concurring                    18-14671

witnesses were or whether they related to preparation for the guilt phase, the penalty phase, or both.[9]    And Giddens emphasized

---

[9] The dissent contends that Adams's time sheet on its face shows that Adams did not interview witnesses or meaningfully prepare for the penalty phase, and the state court unreasonably applied *Strickland* in affording Adams a presumption of reasonable performance.  In support, the dissent points to the fact that both Giddens's and Adams's time sheets have a 12.5 hour entry for December 3, 1993, with almost the same description—"communication with co-counsel; trip to Channel 40; Anniston Star; interviewed witnesses; trip to crime scen[]e; communication with Judge; reviewed evidence at Anniston City Jail; reviewed video statements of co-defendant; conference with D.A.; trial preparation."  Thus, the dissent concludes counsel must have been together on that date and done the same activities, and therefore it necessarily follows that the reference to "interviewed witnesses" in this billing entry must have related to only guilt-phase witnesses because Giddens did not recall interviewing any other mitigation witnesses.

But even if we assume that the dissent is correct that counsel were together on December 3 and did the same activities, Adams also had two additional billing entries for December 1 and 2 that referred to the investigation and interviewing of witnesses, which totaled an additional 21.5 hours—entries that did not match Giddens's time sheet.  The dissent surmises that (1) "the most reasonable way" to interpret the December 1 entry is that Adams must have been working on the guilt phase of the trial based on the other tasks recorded in his billing entries, and (2) the most reasonable way to interpret the December 2 entry is that, given Adams's other tasks listed in that same 10-hour block Adams must "not have spent a significant amount [of time] investigating witnesses."  These assumptions are pure speculation and certainly do not rise to the level of overcoming the presumption of reasonable performance that is afforded counsel under *Strickland*.  *Strickland*, 466 U.S. at 690 ("[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.").

18-14671                BRANCH, J., Concurring                25

repeatedly during the Rule 32 evidentiary hearing that both he and Adams participated in the preparation and investigation of the case, and that they did some things independently and some things together. In fact, at times Giddens said that he could not recall certain information, and deferred to Adams's recollection, but we have no information about Adams's recollection. In other words, the nature and extent of counsel's pretrial investigation in this case is simply incomplete without Adams's testimony or other evidence such as a sworn affidavit attesting to his involvement in this case.

In short, as the state court found, "Adams's involvement in the case was not minor." *Davis*, 9 So. 3d at 564. The record confirms that Adams played a very active role during all phases of the trial—he made the opening and closing statements at trial, he cross-examined many of the State's key witnesses, he handled the majority of the defense's objections and motions at trial, and he

---

Moreover, the dissent's assumption that there was line drawing between counsels' preparation for the guilt phase and the penalty phase is undermined by Giddens's testimony that the defense began preparing mitigation simultaneously with the guilt phase because "you have to be prepared" for what will happen if the jury returns a guilty verdict.

In any event, while the dissent may believe that the state court got the answer wrong on the deficiency prong, that belief is not a sufficient basis for granting federal habeas relief under § 2254(d). *See Shinn*, 592 U.S. at 118 (explaining that to overcome AEDPA's hurdles, the state "prisoner must show far more than that the state court's decision was merely wrong or even clear error" (quotations omitted)). Rather, Davis must show "that the state court's decision is so obviously wrong that its error lies beyond any possibility for fairminded disagreement." *Id.* (quotations omitted). And he has not done so.

conducted the questioning of Davis's mother and cousin during the penalty phase.  Yet the record is silent, or at best ambiguous, as to Adams's actions, and the Supreme Court has stated repeatedly that "the absence of evidence cannot overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance." *Titlow*, 571 U.S. at 23 (alteration adopted) (quotations omitted); *Chandler*, 218 F.3d at 1314 n.15 ("An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption."); *see also Dunn v. Reeves*, 594 U.S. 731, 739–41 (2021) (explaining that, although it is case dependent, the defendant's failure to call his attorneys to testify can be fatal to his ineffective-assistance claim); *Jenkins*, 963 F.3d at 1265–67 (explaining, in the context of an ineffective-assistance claim based on counsel's failure to discover evidence of childhood abuse, that because the petitioner failed to present testimony or an affidavit from one of his counsel, "we must assume counsel carried out his professional responsibility and discussed mitigation with his client").  Thus, without a fully developed record, it is impossible for Davis to overcome the "strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689, and impossible for this Court to say—as it must in order to grant relief under § 2254—that the state court's

18-14671               BRANCH, J., Concurring               27

application of *Strickland* was "objectively unreasonable."[10] *Renico v. Lett*, 559 U.S. 766, 773 (2010).

Even putting aside the absence of evidence related to Adams's involvement in the case, there is still Giddens's testimony at the evidentiary hearing that he was unaware of any abuse and that—critically—neither Davis nor his mother mentioned any abuse. "[T]he reasonableness of a trial counsel's acts, including lack of investigation or excluding . . . witnesses from the sentencing phase, depends 'critically' upon what information the client communicated to counsel." *Chandler*, 218 F.3d at 1324 (quoting *Strickland*, 466 U.S. at 691). Davis and his mother provided Giddens with detailed information about Davis's background— that his parents divorced when he was a baby; that he was raised by a single mother without a father figure in the home; that he had

---

[10] Davis argues that our decision in *DeBruce v. Commissioner, Alabama Department of Corrections*, 758 F.3d 1263 (11th Cir. 2014), makes clear that the testimony of only one counsel can be sufficient to establish deficient performance. Davis is correct, in part. There may be some instances where the testimony of only one counsel is needed—which was certainly the case in *DeBruce* where the absent counsel "played only a minor role in the investigation, preparation and presentation of [the] case," and the testifying counsel discussed actions that he and his non-testifying co-counsel took or did not take and the reasons why. *Id.* at 1272–73. But Davis's case is very different from the circumstances in *DeBruce*. Here, Adams's involvement in the case was not minor, and Giddens repeatedly stated that he and Adams did many things independently. Further, Giddens could not recall a great deal of information and stated that he would defer to Adams's recollection. Thus, Giddens's testimony alone was not sufficient to provide a complete picture of counsels' performance in this case.

28　　　　　　　　Branch, J., Concurring　　　　　　　18-14671

five siblings; that his father died when Davis was a teen and that he struggled with his father's death; that Davis did not listen to his mother and acted out as a teen; and that Davis dropped out of high school but later got his GED—but neither Davis nor his mother gave any indication that there was a history of abuse in Davis's childhood.　As this Court has previously emphasized, "because information about childhood abuse supplied by a defendant is extremely important in determining reasonable performance, when a petitioner does not mention a history of physical abuse, a lawyer is not ineffective for failing to discover or to offer evidence of abuse as mitigation." *Newland*, 527 F.3d at 1202 (alterations adopted) (quotations omitted).　Given this record, Davis has not shown that no fairminded jurist could have concluded, as the ACCA did, that Davis failed to carry his burden of proving deficient performance.

Davis disputes that he had any obligation to disclose the abuse, arguing that any reasonable counsel would have essentially put in a blind request for records with social services just in case records of abuse existed.　I disagree.　As the state court explained, there are "no constitutionally required checklists for mitigation investigations," and counsel cannot be expected to expend limited resources and time to look for records "just in case." *Davis*, 9 So. 3d at 556.　To be clear, "[t]he Constitution imposes no burden on counsel to scour a defendant's background for potential abuse

18-14671              BRANCH, J., Concurring                    29

given the defendant's . . . failure to mention the abuse."[11]  *Stewart v. Sec'y, Dep't of Corr.*, 476 F.3d 1193, 1211 (11th Cir. 2007).

---

[11] The dissent responds that the facts in *Stewart* and *Newland* do not resemble Davis's case, and, therefore, those cases do not support the conclusion that Davis's counsel was not deficient for failing to uncover the unknown, primarily undocumented, and closely held secrets of abuse that existed in Davis's background.  No matter the factual differences, however, the overarching principle from *Stewart* and *Newland* that counsel is not *constitutionally* required to go on a fishing expedition and scour a defendant's background to look for potential abuse when the defendant fails to mention such abuse to counsel is well-established and regularly invoked.  *See Williams v. Head*, 185 F.3d 1223, 1237–38 (11th Cir. 1999) (holding counsel did not render constitutionally ineffective assistance when he spoke with the defendant and the defendant's mother but neither gave counsel any reason to suspect abuse); *Callahan v. Campbell*, 427 F.3d 897, 934 (11th Cir. 2005) ("Especially when it comes to childhood abuse, information supplied by a petitioner is extremely important in determining whether a lawyer's performance is constitutionally adequate.  This Court has already stated in no uncertain terms: An attorney does not render ineffective assistance by failing to discover and develop evidence of childhood abuse that his client does not mention to him." (alteration adopted) (quotations omitted)).  Perhaps counsel here could have done more and explicitly asked Davis and his mother whether there was childhood abuse in his background—although all evidence points toward the high likelihood that both of them would have denied the existence of any abuse if asked—but what matters is that counsel was not constitutionally required to do so.  I also note that, as a 23-year-old adult, Davis was fully capable of apprising counsel of his background, but he failed to do so.  *See Blankenship v. Hall*, 542 F.3d 1253, 1276 ("[T]he petitioner is often in the best position to inform his counsel of salient facts relevant to his defense, such as his background.").  Regardless, as I have explained repeatedly, the question at this stage of the proceedings is not whether counsel's actions were reasonable; rather, the question is whether the state court's determination was an objectively unreasonable application of *Strickland*.  *Harrington*, 562 U.S. at

30                    Branch, J., Concurring                    18-14671

Davis and the dissent argue that the ABA Guidelines in effect at the time of his trial as well as Alabama's Capital Defense Trial Manual establish that counsels' failure to seek out publicly available records violated the applicable professional norms. The argument is unpersuasive for two reasons. First, as noted previously, the question before this Court at this stage "is not whether counsel's actions were reasonable." *Harrington*, 562 U.S. at 105. Instead, the question is whether "the state court's determination under the *Strickland* standard . . . was unreasonable—a substantially higher threshold." *Knowles*, 556 U.S. at 123 (quotations omitted). Second, the Supreme Court has cautioned that these types of professional guidelines are "only guides"—not binding standards—to be considered in determining whether counsel's conduct was reasonable. *Strickland*, 466 U.S. at 688 ("Prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable, but they are only guides."); *see also Pinholster*, 563 U.S. at 195 ("Beyond the general requirement of reasonableness, specific guidelines are not appropriate." (quotations omitted)); *Bobby v. Van Hook*, 558 U.S. 4, 8–9 (2009) (reversing the Sixth Circuit's grant of relief on petitioner's ineffective assistance claim and admonishing the circuit court for treating the ABA Guidelines as "inexorable commands with which all capital defense counsel must fully comply" (quotations omitted)).

---

105.   Those two questions are *critically* different, despite the dissent's contentions to the contrary.

18-14671                BRANCH, J., Concurring                    31

In other words,

> our deferential review . . . does not ask whether counsel could possibly or ideally have been more effective. The test . . . is not whether counsel could have done more. We do not ask whether an attorney's representation deviated from best practices or common custom, and we should resist the temptation to second-guess an attorney with the benefit of our hindsight.

*Jenkins*, 963 F.3d at 1269–70 (quotations and internal citations omitted). Thus, rather than blindly applying ABA Guidelines or similar state standards and determining whether counsel "measured up" to those standards, we assess counsel's actions "for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 1267 (quotation omitted); *Van Hook*, 558 U.S. at 9 ("American Bar Association standards and the like are only guides to what reasonableness means, not its definition. . . . [T]he Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices." (quotations omitted) (internal citations omitted)). Under that rubric and in light of the unique factual circumstances in this case, Davis has not shown that "*every* fairminded jurist would agree that every reasonable lawyer would have made a different decision" than his counsel made in this case regarding an investigation into potential abuse. *Reeves*, 594 U.S. at 740 (emphasis in original) (alteration adopted) (quotations omitted). Absent such a showing,

the Supreme Court has been unequivocally clear that we cannot grant habeas relief. *Id.*

The dissent contends that the state court's decision that counsel's performance was not deficient was contrary to clearly established Supreme Court case law in *Wiggins v. Smith*, 539 U.S. 510 (2003). I disagree. The evidence in *Wiggins* established that trial counsel's investigation into records concerning Wiggins's life placed counsel on notice of significant issues in Wiggins's childhood, yet counsel conducted no further investigation. *Id.* at 518. The dissent contends that much like the counsel in *Wiggins*, Giddens and Adams were on notice that they needed to investigate more of Davis's background because Dr. Storey, who administered IQ-related tests to Davis prior to trial, stated in passing in her written report of the testing results that Davis's performance on some of the subtests indicated that he "may be . . . maladjusted, and emotionally unstable," and that "[a]n emotional disturbance [was] suggested." But the passing reference by Dr. Storey in two lone sentences of a five-page intellectual assessment was not sufficient to put counsel on notice that Davis may have been physically abused by his mother as a child. After all, childhood abuse is not the only cause of suspected emotional disturbances or maladjustment. At best, this reference may have alerted counsel to potential mental health issues, but counsel is not accused of failing to discover mental health issues. Moreover, Storey's passing reference to a possible emotional disturbance and instability is a far cry from the evidence in *Wiggins* that counsel uncovered and yet failed to investigate concerning Wiggins's childhood, which

18-14671                 BRANCH, J., Concurring                 33

included Wiggins's "misery as a youth," "his description of his own background as disgusting," "recorded incidences of physical and sexual abuse, an alcoholic mother, placements in foster care, . . . borderline retardation," and "frequent, lengthy absences from school." *Id.* at 518, 523–26 (quotations omitted). Given the stark factual differences between *Wiggins* and Davis's case, it cannot be said that the state court's determination is contrary to *Wiggins*.

In sum, while Davis's counsel perhaps could have done more, "whether counsel could possibly or ideally been more effective" is not the standard for this Court's doubly deferential review under *Strickland* and AEDPA. *Jenkins*, 963 F.3d at 1269–70. What is relevant here is that Davis has not shown, in light of this record, that no fairminded jurist could have concluded, as the ACCA did, that his counsel rendered reasonably adequate performance within the meaning of the Sixth Amendment. In other words, because "fairminded jurists could reasonably disagree about the reasonableness of counsel's performance, . . . habeas relief is due to be denied." *Id.* at 1270 (quotations omitted); *see also Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1034 (11th Cir. 2022) (*en banc*) (same). Accordingly, I would also affirm the state court's determination that counsel's performance was not deficient for failing to investigate and present evidence of Davis's childhood abuse in mitigation.

## IV.    The Prior Robbery File

Next, Davis argues that his trial counsels' failure to investigate and present evidence of the facts surrounding his prior

34                     Branch, J., Concurring                 18-14671

1992 third-degree robbery conviction, which was a statutory aggravating factor, constituted deficient performance.    He maintains that had his counsel investigated the circumstances of the prior robbery, the non-violent nature of this crime would have been revealed, which could have portrayed him in a different light to the jury and perhaps lessened the weight afforded this statutory aggravating factor.  I disagree.

In *Rompilla v. Beard*, 545 U.S. 374, 377 (2005), the Supreme Court held that a "lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial."  Accordingly, the Supreme Court held Rompilla's counsel ineffective for failing to examine a court file concerning the defendant's prior conviction, despite knowing that the prosecution intended to use it as an aggravating factor at sentencing and also intended to "emphasize [Rompilla's] violent character by introducing a transcript of the rape victim's testimony given in that earlier trial." *Id.* at 383.  Thus, the Supreme Court explained that

> it is difficult to see how counsel could have failed to realize that without examining the readily available file they were seriously compromising their opportunity to respond to a case for aggravation. *The prosecution was going to use the dramatic facts* of a similar prior offense, and Rompilla's counsel had a duty to make all reasonable efforts to learn what they could about the offense.  Reasonable efforts certainly included obtaining the Commonwealth's own readily available file on the prior conviction to learn what the

Commonwealth knew about the crime, to discover any mitigating evidence the Commonwealth would downplay, and to anticipate the details of the aggravating evidence the Commonwealth would emphasize. Without making reasonable efforts to review the file, defense counsel could have had no hope of knowing whether the prosecution was quoting selectively from the transcript, or whether there were circumstances extenuating the behavior described by the victim. The obligation to get the file was particularly pressing here owing to the similarity of the violent prior offense to the crime charged and Rompilla's sentencing strategy stressing residual doubt. Without making efforts to learn the details and rebut the relevance of the earlier crime, a convincing argument for residual doubt was certainly beyond any hope.

*Id.* at 385–86 (footnote omitted). In so holding, although the Supreme Court cited the ABA's Standards for Criminal Justice in effect at the time of Rompilla's trial, which advised counsel to "explore all avenues leading to facts relevant to . . . the penalty," including information in the possession of "the prosecution and law enforcement authorities," the Supreme Court took care to note that it was not adopting a "per se rule" requiring counsel to completely review every prior conviction file in all cases, and that the unreasonableness of counsel's investigation in Rompilla's case was dependent on the facts of the case. *Id.* at 387, 389–90 (quotations omitted); *see also id.* at 393–96 (O'Connor, J., concurring); *Hannon*, 562 F.3d at 1155 (explaining that *Rompilla's*

36                    Branch, J., Concurring                    18-14671

"directive does not require a particular level of investigation in every case").[12]

It is undisputed that Davis's counsel knew that the State intended to present Davis's third-degree robbery conviction as a statutory aggravating factor—namely, that Davis had a prior conviction that involved the use or threat of violence. Unlike in *Rompilla*, however, the State did not introduce the facts of Davis's prior conviction or read from any transcripts related to the prior conviction. Instead, the State simply produced a certified copy of the prior conviction.

At the Rule 32 evidentiary hearing, Giddens testified that he "was aware of" Davis's prior robbery conviction because he "had gotten those records so [he] was aware of that through the criminal justice system." Giddens confirmed that he did not "speak to anyone involved in [the robbery] case." However, he reiterated that he "reviewed the record on that and saw what [Davis] was convicted of. And [he thought Davis] actually served time on it." Giddens stated that he "[did not] remember the exact facts" of the

---

[12] Davis's 1993 trial occurred pre-*Rompilla*, so counsel did not have the benefit of the *Rompilla* decision that would issue over a decade later. Nevertheless, because *Rompilla* existed at the time of the ACCA's decision here, we must examine whether the ACCA's decision was contrary to, or an unreasonable application of, *Rompilla*. *See Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003) (holding that the phrase "clearly established federal law" in 28 U.S.C. § 2254(d)(1) means "the governing legal principle or principles set forth by the Supreme Court" at "the time of the relevant state-court decision").

18-14671                BRANCH, J., Concurring                37

robbery. "[He] just remember[ed] it was a robbery that [Davis] had—was convicted of and it was offered in the sentenc[ing] hearing." When asked whether he did any investigation to learn of the circumstances of the robbery itself, Giddens stated, "[w]ell, the only thing that is admissible is the conviction itself, not the facts of it. . . . The state offered simply a certified copy of the conviction. Which we don't object to, because you don't want them to have to put on a witness to bring out the facts."

In light of Giddens's testimony, the ACCA found that Davis's case was distinguishable from *Rompilla* because unlike in *Rompilla* where "the attorney testified that she had not looked at the file of Rompilla's prior rape conviction[,] . . . . Giddens testified that *he did examine the file* on Davis's prior conviction but had not spoken to anyone about the prior case." *Davis*, 9 So. 3d at 569 (emphasis added). "More importantly," the ACCA noted, "the jury in [Davis's] case was aware that Davis had previously been convicted of the *lowest* degree of robbery. Counsel tried to minimize the prior conviction. Thus, we do not believe that *Rompilla* mandates that we reverse Davis's sentence on this issue." *Id.*[13] Thus, the state court concluded that "we cannot say that

---

[13] The dissent faults the Rule 32 trial court for misunderstanding Davis's ineffective-assistance argument concerning the investigation of his prior robbery conviction. Instead of making factual findings regarding what investigation, if any, counsel conducted regarding the prior robbery conviction, the trial court held that the claim lacked merit because, regardless of the circumstances, the prior conviction qualified as a statutory aggravating factor—"[t]here [was] no explaining it away"—and noted that Davis could not

counsel was ineffective for failing to conduct a more detailed investigation into Davis's prior conviction for robbery in the third degree." *Id.* I agree.

The ACCA was entitled to credit Giddens's testimony and, whether or not it is the best reading, the state court's interpretation of Giddens's testimony as establishing that he reviewed the file from Davis's prior conviction was not clearly and convincingly

use his Rule 32 petition to collaterally attack his prior conviction. The trial court's analysis is not surprising because the Rule 32 trial court issued its decision denying Davis's Rule 32 petition in August 2004 well *before* the June 2005 *Rompilla* decision—indeed, before even the grant of *certiorari* in *Rompilla*. *See Rompilla v. Beard*, 542 U.S. 966 (2004) (granting certiorari). Consequently, the Rule 32 trial court did not have the benefit of the *Rompilla* decision to define the contours of Davis's claim—nor did Davis refer to any specific cases, any ABA standards, or other similar state guidelines in his Rule 32 petition in support of this claim. Rather, Davis placed *Rompilla* on the state court's radar and framed his claim expressly in terms of *Rompilla* for the first time in his reply brief during his collateral appeal proceedings before the ACCA. Thus, given this unique procedural context and lack of supporting authority proffered by Davis, it is not shocking that the Rule 32 trial court did not precisely understand the contours of Davis's claim or anticipate the Supreme Court's decision in *Rompilla*. But in any event, the Rule 32 trial court's decision is not what is before us for review, and the dissent's discussion of its failure "to make any findings relevant to the *Rompilla* issue" is an attempt to muddy the waters and distract from what is to be our main focus—the thorough and well-reasoned decision of the ACCA. *See Wilson*, 584 U.S. at 125 (explaining that under AEDPA a federal habeas court reviews the reasoned decision from "the last state court to decide a prisoner's federal claim"). In short, much like how our job under *Strickland* is not to grade counsel's performance, we should not embark on a mission to grade the performance of the state courts—particularly when, as here, no party has asserted that the state trial court failed in its duties.

erroneous.[14]  Further, the ACCA acknowledged that Giddens did not further investigate the underlying circumstances surrounding the robbery.  But even under *Rompilla*, that failure does not *per se*

---

[14] Instead of giving Giddens and the state court the benefit of the doubt, as required by the doubly deferential lens of AEDPA and *Strickland*, the dissent reads Giddens's testimony differently from the ACCA and independently concludes that Giddens did not review the prior conviction file.  Specifically—despite the fact that Davis does not directly challenge the ACCA's finding that Giddens *"did examine the file"*—the dissent concludes upon an independent examination of the record that the "file" Giddens and the ACCA must have been referring to was nothing more than the Alabama State Action Summary sheet.  The dissent justifies its conclusion by pointing out that the district court reached the same conclusion.  True.  The district court also rejected the ACCA's factual finding that Giddens examined the file, but much like the dissent, the district court's rejection of the state court's factual findings was erroneous.  Section 2254(e)(1) provides that a state court's factual findings "shall be presumed to be correct" and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).  Davis provided no evidence to rebut the state court's findings, and thus neither the district court nor the dissent should have rejected the state court's factual findings related to the deficiency determination.  *Pye*, 50 F.4th at 1034–35; *see also Putman v. Head*, 268 F.3d 1223, 1233 n.5 (11th Cir. 2001) ("In accordance with 28 U.S.C. § 2254(e)(1), we presume the factual findings of the state habeas court are correct, since Appellant has not presented clear and convincing evidence to the contrary.").  The fact that the district court and the dissent read the record differently and would have reached a different conclusion than the state court is irrelevant under AEDPA.  *Titlow*, 571 U.S. at 18 (explaining that "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance" (quotation omitted)); *Rice v. Collins*, 546 U.S. 333, 341–42 (2006) ("[If] [r]easonable minds reviewing the record might disagree about" the state court factfinding in question, "on habeas review that does not suffice to supersede" the state court's factual determination.).

establish deficient performance. The *Rompilla* Court expressly stated that it was not creating "a 'rigid *per se*' rule that requires defense counsel to do *a complete review* of the file on any prior conviction introduced." 545 U.S. at 389 (emphasis added). Indeed, the Court noted that "[o]ther situations, where a defense lawyer is not charged with knowledge that the prosecutor intends to use a prior conviction *in this way*, might warrant a different assessment." *Id.* at 390 (emphasis added).

The situation in *Rompilla* is very different from the one here. Significantly, in *Rompilla*, the prosecution introduced Rompilla's prior conviction as an aggravating factor not merely by entering a notice of conviction into evidence—as was done here—but by emphasizing Rompilla's violent character by reading into evidence extensive portions of the rape victim's testimony from the prior case. *Id.* at 385, 389. Here, in contrast, the State merely introduced a certified copy of Davis's prior conviction to establish a statutory aggravating factor. It did not read from the transcript of the prior proceedings or attempt to use the conviction to emphasize Davis's violent character or propensity to engage in similar acts. Further, as the majority notes, it was undisputed that under Alabama law a conviction for robbery qualified as a felony involving the use or threat of violence to the person regardless of the underlying facts. *Bush v. State*, 695 So. 2d 70, 91 (Ala. Crim. App. 1995). Thus, because Giddens knew (1) that the State intended to introduce a certified copy of the prior conviction but not use the underlying facts, and (2) the conviction would qualify as an aggravator regardless of the underlying facts, it was not necessarily objectively

unreasonable for Giddens not to investigate the facts surrounding the pizza robbery and instead focus on minimizing the weight afforded the prior violent felony aggravator by emphasizing that the conviction was for the lowest degree of robbery in Alabama—particularly in light of the heavy measure of deference to be afforded counsel's judgments. *See Rompilla*, 545 U.S. at 383 ("[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste.").

The Supreme Court has told us time and time again that "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Shinn*, 592 U.S. at 119 (quoting *Knowles*, 556 U.S. at 123); *Sexton v. Beaudreaux*, 585 U.S. 961, 968 (2018); *Renico*, 559 U.S. at 776 ("Because AEDPA authorizes federal courts to grant relief only when state courts act *unreasonably*, it follows that the more general the rule at issue—and thus the greater the potential for reasoned disagreement among fair-minded judges—the more leeway state courts have in reaching outcomes in case-by-case determinations." (alterations adopted) (quotations omitted)). Based on this record and the double deference afforded the state court's determination as to the performance prong under *Strickland* and AEDPA, Davis has not shown that the state court's conclusion was objectively unreasonable—*i.e.*, "so obviously wrong that its error lies beyond any possibility for fairminded disagreement," *Shinn*, 592 U.S. at 118 (quotations omitted); *Virginia v. LeBlanc*, 582 U.S. 91, 94 (2017) ("In order for a state court's decision to be an unreasonable application

of this Court's case law, the ruling must be objectively unreasonable, not merely wrong; even clear error will not suffice." (quotations omitted)); *Pye*, 50 F.4th at 1034 (explaining that where AEDPA deference applies, we are precluded from granting federal habeas relief "so long as fairminded jurists could disagree on the correctness of the state court's decision." (quoting *Harrington*, 562 U.S. at 101)).

Accordingly, I would also affirm the state court's reasonable determination that Davis's counsel's performance was not constitutionally deficient.

ROSENBAUM, J., Dissenting                    18-14671

ROSENBAUM, Circuit Judge, dissenting:

Counsel made two serious errors that may well have changed the outcome of the penalty phase of Jimmy Davis, Jr.'s capital trial from life imprisonment to death. Neither error stemmed from a strategic choice. Rather, they both resulted directly from counsel's ignorance of the law and failure to investigate as a competent attorney would have. Based on Supreme Court jurisprudence on the powerful nature of the errors here—as well as the known divisions of Davis's jury over imposing the death penalty—a reasonable probability exists that, but for counsel's unprofessional errors, the result of the penalty phase would have been different. The state courts reached the opposite answer only because they unreasonably applied Supreme Court precedent. So I would grant Davis's petition to the extent that it seeks a new penalty-phase trial. And I respectfully dissent from the Majority Opinion's decision to the contrary.

Before I dive into the details of my analysis, I begin by summarizing counsel's errors. First, counsel failed to learn the underlying facts of the sole prior conviction that the State relied on as one of only two aggravating factors supporting its pursuit of the death penalty (against one mitigating factor supporting life imprisonment). The State offered a certified copy of Davis's prior conviction for third-degree robbery into evidence to establish the aggravating factor that Davis had once been convicted of a crime involving the use or threat of violence to a person.

2                    ROSENBAUM, J., Dissenting                    18-14671

As it turned out, though, the facts of that prior conviction reflected a heist that qualified for the violent-prior-conviction aggravating factor in name only. When Davis was 22, he and three of his friends ordered pizza. When the pizza deliveryman arrived, the group swiped the six pepperoni pizzas and took about $50 from him. Then they ran away with the pizzas. But the police quickly caught up with all four culprits, including Davis, who was still carrying a pizza. And though one of the four told the deliveryman to "[g]ive it up" and made a gesture in his pocket like he may have had a gun, no weapons were involved, no violence was involved, and the deliveryman said that "there really was never a threat made to him." Nor was Davis the group's ringleader.

But Davis's counsel knew none of these moderating facts. So counsel never showed the jury that the sole "violen[t]" prior conviction the State used to support its death-penalty request concerned a pizza heist; involved no weapons, no real threats, and no violence; and no one was hurt.

Instead, Davis's counsel argued only that third-degree robbery is the least serious kind of robbery. But that's like saying a particular type of cancer is the least serious kind of cancer. The term "robbery," like the term "cancer"—even when accompanied by a descriptor indicating it is the least serious type—necessarily conveys grave seriousness in the absence of any other facts. And here, that incomplete impression comprised the entire basis for the weight the jury and court gave when they found that this

18-14671          Rosenbaum, J., Dissenting          3

aggravating factor—one of only two the State raised—supported the death penalty.

Second, counsel failed to investigate Davis's background, including whether Davis had endured abuse growing up. In fact, Davis had. His own mother, Lillie Bell Davis, repeatedly and often severely beat Davis with broomsticks, extension cords, belts, and switches. When Davis was in second grade, Lillie beat him so viciously that his head became "dented," "warped," and "swollen," and his ear was partially severed. After the extreme beatings that Lillie inflicted on Davis, Davis went "into spasm[s]" and shook for days. This abuse persisted through the time Davis was at least 14 or 15 years old. And Theresa Peebles, a social worker from the Calhoun County Department of Human Resources, said she had "never seen a back that looked worse than Jimmy's" from his mother's beatings. Davis's DHR file even included photographs of his back, covered in scars, when he was ten years old.

But counsel never knew any of this. That's because counsel's entire mitigation investigation consisted of interviewing Davis *about the crime under indictment*, interviewing Lillie (Davis's abuser), and having intelligence tests administered to Davis. And even when counsel interviewed Davis and Lillie, counsel never asked about abuse. Yet the Supreme Court has recognized that evidence of things like a defendant's abuse as a child can "influence[] the jury's appraisal of [a defendant's] moral culpability." *Williams v. Taylor*, 529 U.S. 362, 398 (2000).

4                    ROSENBAUM, J., Dissenting                18-14671

Worse still, counsel's defense strategy was to put Lillie on the stand to plead for mercy for her son.[1]  Much of her testimony focused on how difficult Davis was as a child.  After she testified that she "had problems with [Davis]" from the time he was nine years old, Davis's own counsel argued that Lillie "raised him the best she could without a father."  They even said that Davis didn't have "somebody in the home that probably could really discipline him."   Of course, nothing could have been further from reality.  But counsel had no idea.  After all, they never asked.  And that is textbook ineffective performance.

Not only that, but when we consider the record here and Supreme Court jurisprudence on mitigation, it's clear that counsel's performance prejudiced Davis.  That is, a reasonable probability exists that, but for counsel's unprofessional errors, the result of the penalty phase would have been different.

First, as I've mentioned, the Supreme Court has found mistakes just like these to be material in other cases.  And we know that at one point during the deliberations, five jurors supported sentencing Davis to life in prison and opposed imposing the death

---

[1] The only other witness defense counsel presented to plead for mercy for Davis was Andre Sigler, Davis's cousin.  But in yet another demonstration of counsel's ill preparation and deficient performance, had fate not intervened on the day of the penalty-phase proceedings, counsel wouldn't have known to present Sigler, either.  Counsel did not even speak with Sigler for the first time until a brief trial recess on the day Sigler testified.  And Sigler was only at the courthouse in the first place because Lillie had asked him to come—not as part of counsel's penalty-phase strategy.

18-14671          Rosenbaum, J., Dissenting          5

penalty. Even if we look solely to the verdict, the jury ultimately voted eleven to one—not unanimously—in favor of the death penalty.[2] Put simply, significant divisions existed even without the type of mitigating evidence that competent counsel would have presented and that the Supreme Court has characterized as "powerful." *See Wiggins v. Smith*, 539 U.S. 510, 534–35 (2003). Had counsel not performed deficiently, the jury would have learned that the State supported one of its two aggravating factors solely with the pizza-heist conviction. It also would have learned that the real "difficulty" wasn't Lillie's challenge with Davis but rather Davis's "difficulty" with the severe abuse his own mother inflicted on him. On this record, there can be but one conclusion: counsel's errors prejudiced Davis.

As I show below, the state courts based their conclusion that Davis did not suffer ineffective assistance of counsel on unreasonable applications of the law. And the Majority and Concurring Opinions' reasons for concluding otherwise do not stand up to scrutiny. The Majority and Concurring Opinions discuss at length the double deference we afford state-court determinations under AEDPA and *Strickland*'s ineffective-assistance-of-counsel standard,[3] but "[e]ven in the context of

---

[2] In Alabama, at least ten members of the jury must agree to sentence a defendant to death for the jury to return a death verdict. Ala. Code § 13A-5-46(f).

[3] For a more precise discussion of that deference, *see infra* at 7–8 n.4, 47–48 n.23.

6                    ROSENBAUM, J., Dissenting                    18-14671

federal habeas, deference does not imply abandonment or abdication of judicial review." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). And review here requires relief.

I divide my discussion into two parts. In Section I, I show that the state courts unreasonably concluded that counsel did not perform deficiently. And in Section II, I describe how the state courts' conclusion that counsel's errors did not prejudice Davis was also unreasonable. Along the way, I respond to the Majority and Concurring Opinions' mistakes in their analyses.

## I.    The state courts' determination that counsel did not perform deficiently was "contrary to, [and] involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1).

I begin with a review of the standards governing the deficient-performance aspect of an ineffective-assistance-of-counsel claim. Then, in Section I.A., I apply those standards to counsel's failure to learn any information about the pizza-heist conviction that served as the State's sole support for seeking the prior-violent-conviction aggravator. I also explain why the state courts' resolution of the performance aspect of this ineffective-assistance claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1). In Section I.B., I apply the deficient-performance prong of an ineffective-assistance claim to counsel's failure to investigate

18-14671          Rosenbaum, J., Dissenting          7

Davis's background sufficiently to learn of his mother's severe abuse of him. I then show why the state courts' resolution of the deficient-performance aspect of this claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," *id.*

But first things first: the Sixth Amendment guarantees the right to effective counsel. *See Strickland v. Washington*, 466 U.S. 668, 691–92 (1984). As the Supreme Court has explained, the purpose of that right "is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding." *Id.* So to establish constitutionally ineffective assistance of counsel, a defendant must show (1) counsel performed deficiently, and (2) that deficiency prejudiced the defendant. *Wiggins*, 539 U.S. at 521.

On the performance prong, a defendant "must show that counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms." *Strickland*, 466 U.S. at 688. Because counsel must have "wide latitude . . . in making tactical decisions," and because we review counsel's performance only "to ensure that criminal defendants receive a fair trial," our "scrutiny of counsel's performance must be highly deferential."[4] *Id.* at 689.

---

[4] This is where AEDPA's double deference to state courts' resolution of ineffective assistance comes in. Because *Strickland*'s standard itself requires deference to counsel's performance, and because AEDPA, by its terms,

8                    ROSENBAUM, J., Dissenting                18-14671

Yet some absolutes in representation still exist. Among other obligations, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691. When we assess whether counsel has satisfied this standard, "we must conduct an objective review of their performance, measured for reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time." *Wiggins*, 539 U.S. at 523 (cleaned up).[5]

_____

requires deference to state-court decisions, our review of state courts' resolution of the deficient-performance prong of *Strickland*'s ineffective-assistance standard requires double deference. *Woods v. Etherton*, 578 U.S. 113, 116–17 (2016) (per curiam). The same is not true of our deference to state courts' resolution of *Strickland*'s prejudice prong. *See infra* at 47–48 n.23.

[5] The Concurring Opinion mischaracterizes this Dissent as a "de novo-masquerading-as-deference approach" because as part of my review, I evaluate the merits of the *Strickland* claims. Concurring Op. at 14. But to reiterate, *Wiggins* requires that we "conduct an objective review of [counsel's] performance" to determine whether the state courts' application of *Strickland* was objectively unreasonable. 539 U.S. at 523. So that is precisely the analysis that this Dissent engages in. The Concurring Opinion's implication that merits review means the Dissent fails to address the state courts' decisions head on is baseless. Rather, as this Dissent shows, habeas analysis of a *Strickland* claim can (and must) do both. *See, e.g.*, *infra* at 11–23, 39–46, 50–51, 56–62; *see also Harrington v. Richter*, 562 U.S. 86, 102 (2011) (explaining that habeas courts cannot conduct *de novo* review, determine how they would have decided the case, and then conclude that the state court must have been unreasonable for concluding otherwise, but not suggesting that habeas courts

18-14671            Rosenbaum, J., Dissenting              9

Here, even under the double deference that *Strickland* and AEDPA's combined standards require, the state courts unreasonably ruled that counsel's performance was not deficient.

> A. *The state courts' determination that counsel's failure to learn any information about the pizza-heist conviction besides the fact of conviction itself, when that conviction served as the State's sole support for seeking the prior-violent-conviction aggravating factor, was not deficient performance was "contrary to, [and] involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1).*

When defense counsel know that the prosecution intends to use a prior conviction as an aggravating factor justifying the death penalty, at a minimum, they must review easily accessible information about the underlying facts of that prior conviction. I can't say it any better than the Supreme Court: "There is an obvious reason that the failure to examine [the defendant's] prior conviction file fell below the level of reasonable performance.

---

refrain from assessing the merits of the underlying *Strickland* claims). After all, it's hard to evaluate the reasonableness of a court's application of federal law to the facts of the case without understanding first what federal law requires as applied to the facts of the case. The Concurring Opinion's failure to comply with this prescribed analytical framework explains some of its own deficiencies.

10                    ROSENBAUM, J., Dissenting                    18-14671

Counsel knew that the Commonwealth intended to seek the death penalty by proving [the defendant] had a significant history of felony convictions indicating the use or threat of violence, an aggravator under state law." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005).

As the Court has explained, when counsel do not learn the readily obtainable facts supporting an aggravating factor, they "seriously compromis[e] their opportunity to respond to a case for aggravation." *Id.* at 385. For instance, "[c]ounsel may . . . find extenuating circumstances that can be offered to lessen the weight of a conviction." *Id.* at 387 n.7 (quoting ABA Guidelines for the Appointment and Performance of Def. Couns. in Death Penalty Cases guideline 10.7 cmt. (rev. ed. 2003), *reprinted in* 31 Hofstra L. Rev. 913, 1027 (2003) (footnotes omitted)).[6] And more to the point, "[w]e may reasonably assume that the jury could give more relative weight to a prior violent felony aggravator where defense counsel missed an opportunity to argue that circumstances of the prior conviction were less damning than the prosecution's characterization of the conviction would suggest." *Id.* at 386 n.5.

That's so on point here that the Supreme Court could have been talking about Davis's case. So under Supreme Court

---

[6] Earlier versions of the ABA Guidelines also directed that "[c]ounsel should make efforts to secure information in the possession of the prosecution or law enforcement authorities, including police reports." ABA Guidelines for the Appointment and Performance of Couns. in Death Penalty Cases guideline 11.4.1.D.4 (1989).

jurisprudence, it is simply impossible to conclude anything but that Davis's counsel were deficient. As in *Rompilla*, counsel knew the State intended to introduce Davis's prior conviction to support an aggravating factor it was relying on to seek the death penalty. In fact, here, that aggravating factor was one of only two aggravating factors on which the State relied (in *Rompilla*, it was one of three). And as in *Rompilla*, Davis's counsel also knew that the aggravating factor was that Davis had before been convicted of a crime that involved use or threat of violence to a person. So again, as in *Rompilla*, under prevailing standards of practice, counsel had a duty to learn the underlying facts of that case because counsel "may . . . [have] f[ou]nd extenuating circumstances that c[ould have] be[en] offered to lessen the weight of [the] conviction." *Id.* at 387 n.7 (citation omitted).

Here, those "extenuating circumstances" existed. And defense counsel could easily have learned of them—the case file for the pizza heist was in the possession of the same State Attorney's Office that prosecuted this case. But counsel did not bother.

The state courts' attempts to distinguish *Rompilla*—which involves the same fact pattern as Davis's case—are both unreasonable and "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1).[7] Counsel's failure to investigate—or even to

---

[7] AEDPA, by its terms, requires us to review the state courts' decisions for "unreasonable" applications of federal law. 28 U.S.C. § 2254(d). So that's what

learn the readily available facts for—the only conviction supporting the State's proposed violent-prior-conviction aggravator was textbook deficient performance. Yet somehow the state courts concluded the opposite.

Before I explain the errors in the Court of Criminal Appeals of Alabama's legal analysis, it's important to recognize that the Alabama Rule 32 trial court made *no* factual findings as to what, if any, investigation Davis's counsel did to prepare to address the State's announced intention to rely on the violent-prior-conviction aggravator. The state Rule 32 trial court's entire discussion of the violent-prior-conviction challenge in collateral proceedings consisted of only this:

> Paragraph 65 lacks merit. This claim would have been appropriately denied under Rule 32.7(d) of the *Alabama Rules of Criminal Procedure*. Regardless of the individual facts, robbery in the third degree is an offense involving the use or threat of force against a person. There is no "explaining it away." The law is clear and does not make exceptions for "this is what really happened" defenses. Davis pleaded guilty to robbery III and that conviction involved the use or threat of force against a person *by the very definition of the offense* he pleaded guilty to. As such, this claim lacks merit

_____

this Dissent does. That said, even though I think the state courts' rulings were "unreasonable," I have no doubt that the state courts ruled in Davis's case in good faith and made their best efforts. But that, of course, is not the standard that AEDPA establishes for our review.

. . . . Furthermore, Rule 32 petitions are specific to a single conviction. It is improper to attempt to attack a prior felony collaterally in a Rule 32 proceeding dealing with a separate offense. As such, Davis cannot attack the validity of his Robbery IIII conviction in this forum.

*Davis v. Alabama*, No. CC-93-534.60, at *57 (Calhoun Cnty. Cir. Ct. Aug. 3, 2004).

As the state Rule 32 trial court's discussion lays bare, it missed the whole point. Davis did not complain that counsel rendered ineffective assistance by failing to attack the validity of his pizza-heist conviction. Nor did he argue counsel were ineffective because they did not assert that the pizza-heist conviction didn't qualify as an aggravating factor.

Rather, Davis's argument anticipated *Rompilla*. He said that counsel were ineffective because they completely failed to learn or even investigate any mitigating facts of the prior conviction that, upon presentation to the jury, would have significantly lessened the weight the jury gave the prior-felony-conviction aggravator. *See Rompilla*, 545 U.S. at 389–90. But the state Rule 32 trial court made no findings relevant to this argument. Indeed, it made no findings about what, if any, investigation counsel undertook or whether any investigation was sufficient.[8]

---

[8] The Concurring Opinion complains that I am "grad[ing] the performance of the state courts." Concurring Op. at 38 n.13. Not so. As part of our review,

14                    ROSENBAUM, J., Dissenting              18-14671

Even after *Rompilla* issued and Davis brought it to the attention of the Alabama Court of Criminal Appeals to support his argument, the court never remanded to the state Rule 32 trial court to make factual findings relevant to the *Rompilla* argument. Instead, the Alabama Court of Criminal Appeals attempted to distinguish *Rompilla* on the facts in the first instance.

In doing so, the Alabama Court of Criminal Appeals relied exclusively on Giddens's testimony during the Rule 32 hearing to determine the scope of counsel's investigation:

> [Rule 32 counsel]:  Did you make an attempt to talk to any other person within the criminal justice system that had had any dealings with [Davis]?

---

we must, of course, afford a presumption of correctness to factual findings by the state trial and appellate courts. *Bui v. Haley*, 321 F.3d 1304, 1312 (11th Cir. 2003) (citing *Sumner v. Mata*, 449 U.S. 539, 547 (1981)). Before we can do that, we must discern what they are. I show that the Rule 32 trial court clearly misunderstood Davis's argument, so it failed to make any factual findings relevant to the *Rompilla* issue. That means that the factual findings of the Alabama Court of Criminal Appeals are the only ones we have. So reviewing the state courts' factual findings doesn't "muddy the waters," as the Concurring Opinion accuses. Concurring Op. at 38 n.13. It clears them. As for the Concurring Opinion's contention that I criticize the Rule 32 trial court for failing to divine the issuance of *Rompilla*, given that its opinion predates *Rompilla*, that's wrong, too. To state the obvious, unlike the Alabama Court of Criminal Appeals, the Rule 32 trial court did not have the benefit of *Rompilla*. That said, the Rule 32 trial court did have the benefit of Davis's argument (which turned out to anticipate *Rompilla* pretty closely). But the trial court didn't address it. And that's why there are no factual findings from the trial court on the *Strickland* aggravating-factor issue.

18-14671          Rosenbaum, J., Dissenting          15

[Giddens]:  Criminal justice systems being I believe he had a robbery conviction that was offered against him.  And I was aware of that.  I mean, I had gotten those records so I was aware of that through the criminal justice system.

[Rule 32 counsel]:  *Did you speak to anyone involved in that case?*

[Giddens]:  *No.  I reviewed the record on that and saw what he was convicted of it.*  And I think he actually served time on it.

....

[Rule 32 counsel]:  *And you didn't do any investigation to find out what the circumstances of that robbery was; did you?*

[Giddens]:  *Well, the only thing that is admissible is the conviction itself, not the facts of it.*

[Rule 32 counsel]:  Even at a sentence hearing in mitigation?

[Giddens]:  The state offered simply a certified copy of the conviction. Which we don't object to, because you don't want them to have to put on a witness to bring out the facts.

*Davis v. State*, 9 So. 3d 539, 568 (Ala. Crim. App. 2008) (emphases added).  Based on this testimony, the Alabama Court of Criminal Appeals concluded that Davis's counsel were not "ineffective [under *Rompilla*] for failing to conduct a more detailed investigation into Davis's prior conviction." *Id*. at 569.

But Giddens never testified that he obtained, reviewed, or examined the pizza-heist's substantive file.  To the contrary,

16                    ROSENBAUM, J., Dissenting                    18-14671

Giddens implicitly conceded that he obtained his entire knowledge of the pizza-heist conviction from the certified Alabama State Action Summary that the State provided counsel and then used to prove the prior-violent-crime aggravating factor.[9]  And when Rule 32 counsel asked defense counsel, "[Y]ou didn't do any investigation to find out what the circumstances of that robbery was; did you?," defense counsel effectively admitted that he never obtained documents other than the Alabama State Action Summary or otherwise learned or investigated the underlying facts of prior conviction.  He said, "Well, the only thing that is admissible is the *conviction itself, not the facts of it*."  *Id.* at 568 (emphasis added).  (That statement was wrong.).

As to the one document counsel had—the Alabama State Action Summary—that document lacks any facts about the underlying robbery.  Rather, it looks like a court docket page and, as relevant here, identifies only that Davis was arrested for first-degree robbery, pled to third-degree robbery, and was sentenced to one year and one day.  So when Giddens testified that he "had gotten those records" informing him of the prior conviction, he was referring to the Alabama State Action Summary.  And when the Alabama Court of Criminal Appeals said, "Giddens testified

---

[9] Counsel's complete file on Davis's case—which is also a part of the record—independently shows that counsel never obtained the State's substantive file on the pizza heist.  In this respect, Giddens testified that he and co-counsel Jonathan Adams turned over their complete file on Davis's case to collateral counsel, who entered it into the record at the Rule 32 proceedings.  That file contains no records with information about the facts of the pizza heist.

18-14671          ROSENBAUM, J., Dissenting          17

that he did examine the file on Davis's prior conviction," *id.* at 569, it's clear that the "file" was the Alabama State Action Summary.

Plus, even during the penalty phase of Davis's trial, counsel implicitly admitted they hadn't reviewed the prior conviction's case file. Counsel argued, "Whatever set of facts those were [for the prior robbery conviction], whatever type of case it was, the charge was reduced down to robbery third." Had they reviewed the State's substantive case file on that case, they could not have missed that the case was about pizza swiping because the charging instrument and every police report in the file discussed that fact.[10] Nor could they have missed the fact that no weapons of any type were recovered, and no police reports or other documents in the file mentioned violence. But counsel were unaware of these facts. Even the Alabama courts did not conclude that counsel were aware of the facts and had made a strategic decision not to use them.

In fact, the district court recognized that Giddens did not testify that he had reviewed the substantive file on the prior conviction. *Davis v. Allen*, No. CV 07-S-518-E, 2016 WL 3014784, at *59 (N.D. Ala. May 26, 2016). Rather, Giddens testified that he

---

[10] *See, e.g.*, Indictment (noting Davis participated in "a theft of lawful United States Currency . . . ; Six (6) Large Pepperoni Pizzas, of the value of to-wit: $36.00 [and] Two (2) Insulated Pizza Carry Bags, of the value of to-wit: $50.00"); Ala. Uniform Incident/Offense Report (Bates No. 0457)) (providing a "property description" of the "stolen" items as "2 Blue in color, Insulated Pizza Carry Bags[;] 6 Large Pepperoni Pizzas[;] 1 $10.00 U.S. Currency[;] 1 $5.00 U.S. Currency[;] 35 $1.00 U.S. Currency[;] 1 Miscellaneous Change amt. unknown").

"reviewed the record and saw what [Davis] was convicted of." *Id.* As the district court observed, this testimony "suggests that Giddens was referring to the actual charge, third degree robbery, and not the underlying circumstances of the crime." *Id.* Not only that, the court noted, but "the state court did not find, and the record does not support a finding, that counsel was in fact familiar with the underlying facts of Davis's prior offense." *Id.* Exactly.

So to summarize, the record shows counsel never obtained or reviewed the case file. And while the Alabama Court of Criminal Appeals said that "Giddens testified that he did examine the file on Davis's prior conviction," it's clear that "file" refers to the Alabama State Action Summary. Plus, critically, the Alabama Court of Criminal Appeals never found that counsel were ever aware of the facts of the pizza heist. Nor did the Rule 32 trial court make any factual findings to the contrary. That is the same factual pattern that existed in *Rompilla*. But the Alabama Court of Criminal Appeals attempted to distinguish *Rompilla*, anyway.

To be sure, the Alabama Court of Criminal Appeals implicitly recognized that if *Rompilla* governed, it required the conclusion that counsel's performance was deficient. Given this dilemma, the court reasoned that Davis's case was "distinguishable from *Rompilla*" for three reasons. *Davis*, 9 So. 3d at 569. Each of those reasons unreasonably applied *Rompilla*.

First, the Alabama Court of Criminal Appeals asserted that the prosecution in *Rompilla* relied on only one aggravating circumstance (that "Rompilla had a significant history of felony

convictions indicating the use or threat of violence," *Rompilla*, 545 U.S. at 383), while here, the State invoked two aggravating circumstances (that the murder occurred during a robbery and that Davis had a prior conviction for a robbery involving the use or threat of violence to a person).

That's just wrong. In fact, *Rompilla* expressly states that "the prosecutor [there] sought to prove **three** aggravating factors to justify a death sentence," that "[t]he Commonwealth presented evidence on all **three** aggravators, and [that] **the jury found all proven**." *Id*. at 378 (emphases added). To state the obvious, three is not one.

But on top of the fact that the state courts distinguished *Rompilla* by relying on a materially false statement of *Rompilla*'s facts, the number of aggravating circumstances played no role in the Supreme Court's *Rompilla* analysis. What the Supreme Court explained in *Rompilla* applies with equal force here, where the State raised two (instead of *Rompilla*'s three) aggravating factors: "it is difficult to see how counsel could have failed to realize that without examining the readily available file they were seriously compromising their opportunity to respond to a case for aggravation," *id*. at 385.

And even if the number of aggravating factors had figured into the Court's analysis, Davis's case is *more* compelling. In *Rompilla*, in the absence of counsel's failure, the weight of two aggravating circumstances would have remained. But here, had

counsel not performed deficiently, the weight of only one would have had any continuing force.

In any case, the Court in *Rompilla* found deficient performance because "[c]ounsel knew that the Commonwealth intended to seek the death penalty by proving Rompilla had a significant history of felony convictions indicating the use or threat of violence, an aggravator under state law." *Id.* at 383. And that's precisely what happened here: counsel knew the State was pursuing the death penalty by proving Davis had a felony conviction involving the use or threat of violence, an aggravator under state law. The Alabama Court of Criminal Appeals's attempt to distinguish *Rompilla* on an objectively wrong version of *Rompilla*'s facts—especially when, even if the state court's recitation of the facts had been right, they made no difference to *Rompilla*'s analysis—was not simply wrong; it was unreasonable. And no "fairminded jurist[] could disagree." *See Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1034 (11th Cir. 2022) (en banc) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)).

Second, the Alabama Court of Criminal Appeals attempted to distinguish *Rompilla* on the basis that "the jury in [Davis's] case was aware that Davis had previously been convicted of the *lowest* degree of robbery," which it characterized as counsel's efforts to "minimize the prior conviction." *Davis*, 9 So. 3d at 569. But that doesn't excuse counsel's failure to learn the facts of Davis's prior conviction in the first place. Without knowing the facts, counsel could not—and in fact did not—make a strategic decision to

highlight that Davis was convicted of third-degree robbery instead of filling the jury in on the facts of the prior conviction.

In both *Rompilla* and here, defense counsel knew the prosecution was going to use a prior conviction as an aggravating factor, maximizing its impact either by delving into the facts or, in Davis's case, by using the title of the conviction itself to incorrectly imply extreme facts. *Rompilla*'s point was that counsel must examine the substantive file for a prior conviction when they know it will be proffered as an aggravating factor, so they can understand both the prosecution's potential arguments and any extenuating circumstances that could minimize the conviction's impact. *Rompilla*, 545 U.S. at 385–86. As the Supreme Court explained, "[T]he sentencing jury was required to weigh aggravating factors against mitigating factors. We may reasonably assume that the jury could give more relative weight to a prior violent felony aggravator where defense counsel missed an opportunity to argue that circumstances of the prior conviction were less damning than the prosecution's characterization of the conviction would suggest." *Id.* at 386 n.5.

Yet defense counsel here did exactly that: they "missed an opportunity to argue that circumstances of the prior conviction were less damning than the prosecution's characterization of the conviction would suggest"—all because, as in *Rompilla*, they failed to learn the facts of the prior conviction. When the facts of a Supreme Court case line up so perfectly with a case under review, applying that Supreme Court precedent to reach its opposite

22                    ROSENBAUM, J., Dissenting                    18-14671

answer is both unreasonable and "contrary to . . . clearly established Federal law."[11]

Third, the Alabama Court of Criminal Appeals distinguished *Rompilla* because there, "the attorney testified that she had not looked at the file of Rompilla's prior rape conviction[,] [but] [h]ere, [the court said,] [counsel] testified that [they] did examine the file

---

[11] Apparently recognizing the damning nature of the state courts' unreasonable *Rompilla* analysis, the Concurring Opinion attempts to distinguish *Rompilla* on a basis the state courts did not. It argues that *Rompilla* doesn't govern here because the *Rompilla* prosecution "emphasiz[ed] Rompilla's violent character" by quoting damaging testimony from the victim of the prior conviction, but the *Davis* prosecution "merely" entered the notice of conviction into evidence. Concurring Op. at 40 (citing *Rompilla*, 545 U.S. at 385, 389). That's a meaningless distinction. The prosecution in both cases made representations about a prior conviction, the substantive file for which was easily accessible to defense counsel. In *Rompilla*, the prosecution maximized the aggravating nature of the prior conviction by introducing particularly damaging facts. There were no particularly damaging facts underlying the pizza heist, so the *Davis* prosecution maximized the aggravating nature of the prior conviction by naming the prior conviction without introducing any facts—all of which were especially mitigating. Then, the prosecution described Davis's prior conviction as a "very, very aggravating circumstance[]." And in arguments to the court before it delivered the sentence, the prosecution characterized the prior conviction as "dangerous to human life." Like in *Rompilla*, Davis's counsel could not rebut those characterizations or even make a strategic decision *not* to rebut those characterizations because counsel failed "to make all reasonable efforts"—or in this case, *any* reasonable efforts—"to learn what they could about the offense." *Rompilla*, 545 U.S. at 385.

18-14671                    ROSENBAUM, J., Dissenting                    23

on Davis's prior conviction but had not spoken to anyone about the prior case." *Davis*, 9 So. 3d at 569.[12]

But again, the Alabama Court of Criminal Appeals identified a non-existent difference between the cases. As I've explained, the record establishes that the only file trial counsel examined was the Alabama State Action Summary, not the State's underlying substantive file on the conviction.

That factual situation is materially indistinguishable from the one that the Supreme Court found amounted to deficient performance in *Rompilla*. There, the Supreme Court noted that counsel "were aware of their client's criminal record." *Rompilla*, 545 U.S. at 382. The problem, the Court explained, was that they did not "examine the court file on Rompilla's prior conviction." *Id.* at 383. So, too, here—counsel knew of Davis's prior conviction but did not bother to learn its easily accessible facts. Thus, *Rompilla* is "clearly established Federal law," 28 U.S.C. § 2254(d)(1), on counsel's performance deficiency here. And the Alabama Court of Criminal Appeals's decision "reach[ing] a different result from the Supreme Court 'when faced with materially indistinguishable

---

[12] The Alabama Court of Criminal Appeals then extensively quoted *Davis v. State*, 928 So. 2d 1089 (Fla. 2005), because, there, the Florida Supreme Court found that counsel performed reasonably by collecting and reviewing records relevant to the penalty phase. But that case involved a different defendant named Davis, in a different state, before a different court, with no apparent connection to the events in this case. And most importantly, in any case, counsel there—unlike here—obtained and reviewed the relevant records.

24                    ROSENBAUM, J., Dissenting                    18-14671

facts'" was "'contrary to' clearly established federal law." *Ward v. Hall*, 592 F.3d 1144, 1155 (11th Cir. 2010).

> B.  The state courts' determination that counsel's failure
>      to investigate Lillie Bell Davis's long-term abuse of
>      Davis was not deficient performance was "contrary to,
>      [and] involved an unreasonable application of, clearly
>      established Federal law, as determined by the Supreme
>      Court of the United States," 28 U.S.C. § 2254(d)(1).

Counsel's failure to sufficiently investigate Davis's background, let alone conduct *any* investigation into whether he suffered childhood abuse, was deficient performance under *Wiggins*. Section I.B.i explains the clearly established federal law that governs this analysis. Section I.B.ii points out why counsel's "investigation" here was deficient under any reasonable application of clearly established federal law. And Section I.B.iii shows that the state courts' conclusion that counsel's performance was not deficient was an unreasonable application of and contrary to clearly established federal law.

> i.   *Clearly established federal law requires counsel*
>      *to make a reasonable mitigation investigation*
>      *or make a reasonable decision not to further*
>      *investigate.*

As I've mentioned, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.

18-14671          ROSENBAUM, J., Dissenting          25

We judge the reasonableness of counsel's conduct "on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690. To be sure, counsel need not "investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Wiggins*, 539 U.S. at 533. But a "decision not to investigate . . . 'must be directly assessed for reasonableness in all the circumstances.'" *Id.* (quoting *Strickland*, 466 U.S. at 691). In other words, counsel has a duty to investigate for mitigation purposes unless and until reasonably diligent counsel would "have good reason to think further investigation would be a waste." *Rompilla*, 545 U.S. at 382–83.

In other capital cases, the Supreme Court has considered common state practice and the American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases as "guides to determining what is reasonable." *See, e.g.*, *Wiggins*, 539 U.S. at 524 (citation omitted). Of course, the Supreme Court has cautioned courts not to treat these types of sources as "inexorable commands with which all capital defense counsel must fully comply." *Bobby v. Van Hook*, 558 U.S. 4, 8 (2009) (quotations omitted). But that does not detract from the Court's instructions to courts to use them as "guides to determining what is reasonable."

So I begin with those standards. The ABA Guidelines in 1993 recognized that, given the high stakes of a capital case, "[t]rial counsel should maintain close contact with the client throughout preparation of the case" and "arrange for an in-depth interview

with [the] client with an eye toward both developing the necessary trust and eliciting as many facts as [counsel] can." ABA Guidelines for the Appointment and Performance of Def. Couns. in Death Penalty Cases guidelines 11.4.2, 11.4.1 cmt. 10 (1989).

As for counsel's responsibilities related to the investigation of other sources of mitigation evidence, the Guidelines dictated "independent investigations relating to the guilt/innocence phase and to the penalty phase of a capital trial." *Id.* at guideline 11.4.1(A). Not only that, but "[b]oth investigations should begin immediately upon counsel's entry into the case and should be pursued expeditiously . . . ." *Id.* As for the scope of these investigations, the Guidelines directed that they "should comprise efforts to discover *all reasonably available mitigating evidence* and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." *Id.* at guideline 11.4.1(C) (emphasis added). For example, the Guidelines continued, key areas of mitigation evidence include, among others, physical and emotional abuse and prior offenses. *Id.* at guideline 11.8.6(B).

And the 1992 Alabama Capital Defense Trial Manual cautioned that "[t]he importance of a thorough investigation cannot be overemphasized. Even the most skillful lawyer's effectiveness can be undermined by inadequate knowledge about the facts of the case." Alabama Cap. Def. Trial Manual at 28 (2d ed. 1992).

In explaining what it meant by a "thorough investigation," the Manual continued, "[I]t is the obligation of every lawyer to find

out as much as possible about a case as soon as possible.  Speed is essential . . . .  Thoroughness is just as crucial.  Counsel can never gather too many details concerning the facts and circumstances of each case."  *Id.*  Then the Manual went on to direct counsel to appropriate sources to consider when conducting a mitigation investigation:

> The clues to a theory of mitigation may often be found in written records – doctor's records, hospital records (emergency room records can be especially helpful), school records, welfare department records, juvenile court or training school records, jail and prison records from prior convictions, employment records, marriage or divorce records, and any other piece of paper you think may exist.

*Id.*.  Ultimately, the Manual explained, "The goal of such a search is to discover the physical, social, psychological, and sexual problems with which your client has been forced to contend since his or her birth."  *Id.*

### ii.    *Counsel's mitigation "investigation" was unreasonable and deficient.*

Counsel's mitigation investigation here looked nothing like the mitigation investigations these guidelines describe.  For starters, counsel never asked Davis about his upbringing.  Giddens testified at the Rule 32 hearing that during defense counsel's limited meetings (three in all for only a few hours total), they discussed matters relating to only the guilt phase.

28                    Rosenbaum, J., Dissenting                    18-14671

Second, counsel never requested or reviewed any records from Davis's schools or the Alabama Department of Human Resources ("DHR") (which kept records associated with reports of abuse).[13]   Nor did they obtain any "doctor's records, hospital records . . . , school records, welfare department records, juvenile court or training school records, jail and prison records from prior convictions, employment records, marriage or divorce records, and any other piece of paper you think may exist." Alabama Cap. Def. Trial Manual at 28.

Third, counsel never moved for discovery from the State, though they would have been entitled to discovery within fourteen days had they sought it. So counsel did not receive any discovery from the State until November 12, 1993—about three weeks (one

---

[13] The Majority and Concurring Opinions argue that even if counsel had conducted a more thorough investigation, they may not have discovered the abuse.  Maj. Op. at 46 n.21; Concurring Op. at 20–22.  They base this contention, in part, on the false statement in *both* opinions that the record contains only one documented incident of abuse.  Maj. Op. at 24–25; Concurring. Op. at 20.  Remarkable.  Rule 32 counsel introduced about 273 pages of DHR records that included not only the photographs of a 10-year-old Davis's back heavily scarred from whippings, but reports of numerous other incidents of abuse.  For example, the 1981 report alone noted several other incidents of abuse, including that Lillie used a switch and a belt to whip Davis whenever he misbehaved, stretching back at least a year.  And a 1987 report concerning Davis's sister Hortense stated that Lillie kicked Davis out of the house and said she'd kick him out again if he misbehaved.  I can't understand how the Majority and Concurring Opinions can suggest with a straight face that these records wouldn't have put counsel on notice that they should investigate whether Davis had been abused.

18-14671             ROSENBAUM, J., Dissenting             29

of which was Thanksgiving week) before Davis's trial started. And they didn't receive the State's supplemental discovery until a week before trial began. Of course, that self-inflicted timeframe seriously limited any follow-up counsel could conduct before trial.

Fourth, though counsel moved for a psychological evaluation of Davis, they did not do so until precisely one week before trial began. And the evaluation did not occur until two days before trial started. That left no time for follow up and was too late for counsel to meaningfully consider and incorporate psychological evidence into their trial strategy.

Beyond that, the evaluation wasn't a traditional psychological evaluation. Rather, Anne M. Storey, M.Ed., a certified psychometrist,[14] merely administered the Wechsler Adult Intelligence Scale-Revised, the Wide Range Achievement Test-Revised, and the Minnesota Multiphasic Personality Inventory-2 (MMPI-2) to Davis and observed him as he took the tests. Storey determined from these tests that Davis fell "at the 6th percentile [on the IQ scale] and in the Borderline range of intelligence."

---

[14] According to the American Psychological Association, psychometrics is "the branch of psychology concerned with the quantification and measurement of mental attributes, behavior, performance, and the like, as well as with the design, analysis, and improvement of the tests, questionnaires, and other instruments used in such measurement." *Psychometrics*, APA Dictionary of Psychology, https://dictionary.apa.org/psychometrics [https://perma.cc/2SED-RSKZ].

Fifth, despite the shortcomings in the evaluation counsel requested Storey perform, Storey still noted that the tests "suggested" "[a]n emotional disturbance" and that Davis "may be . . . maladjusted, and emotionally unstable." So as in *Wiggins*, 539 U.S. at 525, Davis's counsel were on notice that they needed to further investigate Davis's background. Yet counsel did nothing to follow up on that. (Of course, because of their own delays in procuring the testing, counsel had only one day before trial began at that point.).

Sixth, despite not undertaking any of this investigation themselves, counsel never hired an investigator to look into Davis's background, either. That fact is undebatable.[15] Yet even Giddens recognized the value of an investigator in his later work as a prosecutor. Indeed, he conceded during the Rule 32 hearing that "in prosecuting [his] cases now as a District Attorney, [he] . . .

---

[15] The Majority Opinion says, "Giddens did not recall whether he and Adams requested funds for a private investigator" and that he did "not believe" he had ever requested such funds in prior cases. Maj. Op. at 19. Not exactly. Giddens testified that he did not believe he had ever requested funds for a private investigator in *any* case he was defense counsel in, including Davis's case. So while the Majority Opinion appears to suggest that there's room to believe Giddens may have hired a private investigator for Davis, there's really no question that counsel did not request funds for a private investigator in Davis's case. And there's no evidence to suggest that counsel paid for a private investigator on Davis's case out of their own pockets. In short, the record unambiguously shows that counsel didn't hire a private investigator—even though Giddens readily admitted knowing that he could have done so.

18-14671          ROSENBAUM, J., Dissenting          31

rel[ies] upon the work of investigators."[16]

Seventh, Giddens testified that the only member of Davis's family whom counsel interviewed was Lillie, even though counsel's mitigation strategy at trial consisted of having Davis's family ask the jury for mercy and presenting Storey to say Davis had below-average intelligence—and nothing more. And even that interview of Lillie was perfunctory. Counsel's file contains precisely one page of sparse notes. Ironically, most of that page merely identifies other relatives of Davis. Yet counsel never interviewed these relatives.

The state Rule 32 trial court concluded that Davis's counsel also spoke to two of Davis's five sisters. *Davis*, No. CC-93-534.60, at *35 n.24. But since counsel's complete file includes no notes of such interviews, the state court based this conclusion on solely the most unreliable kind of multi-layered hearsay: Dr. Glen King, an expert in forensic psychology who evaluated Davis *after* his trial and sentencing, testified at the Rule 32 hearing that Davis had complained to him that counsel had spoken with only his mother and two sisters. But even assuming Davis wasn't confused as to the timing of the interviews and the interviewing attorneys (Rule 32

---

[16] The Concurring Opinion describes this discussion of investigators as a "red herring." Concurring Op. at 3–4 n.2. It once again misses the point. To be sure, the Rule 32 trial court stated it "[did] not recall" assistance by private investigators "being commonplace in 1993." But the point is that Davis's counsel had three options: they could have conducted a meaningful investigation themselves, they could have hired a private investigator to do that, or they could have done both. Instead, they did none of these things.

counsel versus trial counsel), there's no evidence to suggest that Davis had been in any meetings with his sisters—even assuming those meetings happened—to know for himself whether counsel interviewed two of his sisters.

Even so, for purposes of the analysis, I will assume that this hearsay is true. It still doesn't make the state courts' analysis reasonable under Supreme Court precedent.

Davis's adult sisters, Hortense and Mary, both testified at the Rule 32 hearing that Davis's trial counsel never spoke with them. That leaves his other three sisters, who were 13, 15, and 16 during Davis's trial. Even if we assume counsel talked to the 15- and 16-year-old sisters, they were at least seven years younger than Davis, so they would not have been able to provide information about at least his first ten or eleven years of life. And they would have been 11 and 12 years old, at the oldest, by the time Davis left the house. In any case, they were still living under the same roof as Lillie at the time of Davis's trial. So if there were home abuse to share, it would have been unreasonable to expect them to spill it for fear of retaliation—even if counsel interviewed them outside their mother's presence. In other words, interviewing only Lillie and the 15- and 16-year-old sisters to learn of Davis's family background would have been effectively the same thing as interviewing only Lillie.

And eighth, more generally, counsel did not spend an appropriate amount of time preparing for the penalty phase. Don't take my word for it—Giddens himself attempted to defend his lack

18-14671               ROSENBAUM, J., Dissenting               33

of preparation by testifying at the Rule 32 hearing that his strategy for the mitigation presentation "d[id]n't take a lot of preparation." And counsel's billing records (attached as an appendix to this dissent) show counsel didn't engage in much preparation.[17]

---

[17] The Concurring Opinion suggests that Davis's counsel prepared for the mitigation phase simultaneously with the guilt phase, based on Giddens's statement at the Rule 32 hearing that counsel has "to be prepared for" sentencing even during the guilt phase. Concurring Op. at 25 n.9. And it criticizes this Dissent for highlighting how little mitigation-specific preparation occurred. In support of its argument, the Concurring Opinion seems to suggest we cannot reliably distinguish between guilt-phase and mitigation-phase tasks, so we should construe *all* time entries as potentially involving mitigation-phase preparation. That reinvents the record here and defies counsel's own admission. Here's what Giddens actually said. He was asked directly whether he "started to prepare the guilt/innocence part of [Davis's] case . . . [at] the same time [he] began to prepare the mitigation case." And he responded, "Well, I mean, we had spoken with his mother sometime during that time and knew that she was going to be a witness in that event. And also got an order signed for a mental evaluation to use as mitigation if, you know, if it came out favorable . . . . I mean, during the time frame of preparing for the case, you have to prepare for the sentence hearing as well because it will be immediately after the trial." Far from suggesting counsel worked extensively on the mitigation case throughout the guilt-phase preparation, Giddens's actual answer confirms, again, that the entire mitigation case consisted of interviewing Lillie and conducting a mental evaluation. And not surprisingly, counsel's records support this statement. Before the guilt phase, which ran from December 6–10, 1993, the only entry from Adams's records I can identify as probably relating to counsel's mitigation investigation is "Conference with . . . client's mother," which occurred a week before the trial began. *See infra* at 34–36. Plus, as I've noted, the ABA Guidelines in place in 1993 directed counsel to conduct *"independent* investigations relating to the guilt/innocence phase and to the penalty phase

Indeed, based on his review of counsel's times sheets, John Mays, a qualified expert witness on defending capital cases, testified that counsel's time sheets show that they did not spend enough time preparing a mitigation case.

Even with all these failures to investigate, the state courts concluded they didn't matter because Davis did not call Adams to testify, and Adams may have done more than Giddens. In other words, the state courts found that, for the mitigation case, Davis failed to present enough evidence to overcome a presumption that, whatever Giddens may have failed to do, at least Adams acted reasonably. The Concurring Opinion echoes this. Concurring Op. at 23–27.

But that is an unreasonable application of *Strickland*. The record here starkly refutes any presumption that Adams acted reasonably. To start, the State stipulated that Adams's billing records represent the entirety of the time Adams spent substantively working on this case. So if it's not in the billing records, it didn't happen. And there is no indication Adams on his own conducted any of the investigatory tasks the Guidelines or Manual identify.

---

of a capital trial." ABA Guidelines for the Appointment and Performance of Def. Couns. in Death Penalty Cases guideline 11.4.1(A) (1989) (emphasis added). So they, along with counsel's time records, support any "line drawing" between preparation for the guilt phase and mitigation phase. Concurring Op. at 25 n.9. In short, while Giddens's testimony shows that meager mitigation-phase preparation may have occurred during the guilt-phase preparation period, it confirms counsel's lack of investigatory efforts.

18-14671               ROSENBAUM, J., Dissenting                35

Indeed, the billing records show that Adams did not interview witnesses or undertake meaningful preparations in advance of the penalty phase. For example, we know for certain that one of the two entries on Adams's billing records that lists "interviewed witnesses"—the entry for December 3, 1993 (three days before trial)—does not refer to any mitigation witnesses but rather, only guilt-phase witnesses. We know this because the billing records reflect that Adams was with Giddens for the entirety of this 12.5-hour entry,[18] and Giddens testified that counsel did not interview any mitigation witnesses other than Lillie (which did not occur on December 3, 1993).

---

[18] Giddens's and Adams's billing records for that day both begin with a notation that they were together and continue by listing all the places they went and the things they did in the exact same order. Both sets of records also attribute 12.5 hours to this block of time. More specifically, Giddens's billing records for December 3, 1993, contain an entry for 12.5 hours, accompanied by the following description: "Conference with co-counsel; trip to Channel 40; Anniston Star; **interviewed witnesses**; trip to crime scene; conference with judge; review evidence; conference with D.A.; trial preparation." (Emphasis added). Similarly, Adams's billing records for December 3, 1993, contain an entry for 12.5 hours, along with the following description: "Communication with co-counsel; trip to Channel 40; Anniston Star; **interviewed witnesses**; trip to crime scen[]e; communication with Judge; reviewed evidence at Anniston City Jail; reviewed video statements of co-defendant; conference with D.A.; trial preparation." (Emphasis added).

36            ROSENBAUM, J., Dissenting            18-14671

As for the only other entry in Adams's billing records that states "interviewed witnesses,"[19] that one is for December 1, 1993, for 11.5 hours and appears in the following list: "Investigated, interviewed witnesses; reviewed discovery; visited crime scene; neighborhood; secured map of Anniston; met with printing co. for defendant's Exhibit; Communication with co-counsel." It's clear from this list, which involved in-person trips to different locations to accomplish several of the identified tasks, Adams spent only a fraction of the 11.5 hours reported interviewing witnesses. And

---

[19] The only other possibly relevant time entry was on December 2, 1993, noting, among several other tasks, that Adams "Investiated [*sic*] witnesses." The reported 10-hour day also included within the block entry, "communication with co-counsel; conference with Judge; reviewed discovery; conference with Channel 40; trial preparation." Obviously, given these other tasks, Adams did not spend a significant amount investigating witnesses. Nor is this conclusion "speculation," as the Concurring Opinion asserts. *See* Concurring Op. at 24 n.9. Rather, it's the only rational conclusion that the evidence supports. And in any case, we've already established that counsel didn't interview any mitigation witnesses besides Lillie. Quite simply, that wasn't enough in a capital case. *See, e.g., Williams*, 542 F.3d at 1340 ("Here, despite the availability of several of Williams' family members, trial counsel sought mitigating evidence from only one person with firsthand knowledge of his background: his mother. By choosing to rely entirely on her account, trial counsel obtained an incomplete and misleading understanding of Williams' life history."); *Williams v. Alabama*, 73 F.4th 900, 907 (11th Cir. 2023) ("Williams testified that Funderburg asked him only general questions about his childhood, such as about family and school. Williams was never asked about his family background; whether he had been neglected; or whether he had been sexually, physically, or emotionally abused. These deficiencies were patently unreasonable."), *vacated on other grounds*, 144 S. Ct. 2627 (2024); *see also Cooper v. Sec'y, Dep't of Corr.*, 646 F.3d 1328, 1352 (11th Cir. 2011).

given that all the other tasks on this list had to do with the guilt phase of the trial, it's clear that the interviews also dealt with the witnesses for the guilt phase.

If that weren't enough, Giddens testified that he was unaware that anyone but Lillie was interviewed for the mitigation phase. And given that Giddens testified that he and Adams worked in concert on Davis's defense and that Adams wrote that he communicated with co-counsel on December 1, Giddens would have known if Adams had interviewed any mitigation witnesses that or any other day.

But more than that, we know that Adams did not interview any of Davis's adult family members who were the most likely to know about his upbringing—including those Lillie told counsel about during her interview. In fact, several family members testified at the Rule 32 hearing that counsel did not interview them: Davis's adult sisters who did not live with (and therefore were less beholden to) Lillie, Davis's cousin Andre Sigler, Davis's aunt Geneva, Davis's stepfather's niece Cynthia Denise Jacobs (who described herself as Davis's "cousin"), and Davis's step-father's sister Betty Jacobs. And Giddens admitted that they did not interview Davis's grandmother Alice Sigler.

In short, there is no reasonable basis upon which to entertain the idea—let alone to presume—that Adams, unbeknownst to Giddens, conducted his own stealth mitigation investigation that somehow brought Giddens's sub-par investigation up to the level of acceptable performance under *Strickland*. And while we don't

have testimony from Adams, the record includes his time sheets and entire case file, which speak volumes, contrary to the Concurring Opinion's unfair and inaccurate characterization of the record as containing an "absence of evidence related to Adams's involvement in the case." Concurring Op. at 27.

To summarize, then, in the best light, counsel's entire mitigation investigation consisted of interviewing Davis for a few hours about the crime to be tried, arranging for last-minute psychometric testing for Davis, and interviewing Davis's physical abuser and her two underage children who lived with her (without asking her or Davis about whether Davis ever experienced abuse). Counsel requested no discovery from the State; sought no "written records," including "school records, welfare department records, . . . and any other piece of paper you think may exist," Alabama Cap. Def. Trial Manual at 28, from anyone else; and interviewed no other mitigation witnesses.

This is about as close as counsel can get to failing to undertake a mitigation investigation at all. Yet the Supreme Court has warned that "defense counsel [cannot] simply ignore[] their obligation to find mitigating evidence." *Rompilla*, 545 U.S. at 381. Rather, defense counsel act deficiently when "their failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment." *Wiggins*, 539 U.S. at 526.

As I've noted, Giddens rationalized this meager excuse for an investigation by saying that "a plea for mercy," which was the mitigation strategy he had settled upon, "doesn't take a lot of

18-14671                ROSENBAUM, J., Dissenting                39

preparation." But settling on a strategy of little more than "a plea for mercy"[20] before a mitigation investigation is even conducted is the epitome of deficient performance. As the Supreme Court has explained, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91. And here, even less than "less than complete investigation" occurred before counsel decided not to investigate anything other than "a plea for mercy."

Even Giddens said that "[i]f [he] had obtained photographs of a defendant in a capital case showing that he had been abused as a child, [he] would [have] consider[ed] . . . put[ting] those into evidence in the mitigation phase."[21] In other words, counsel conceded that it was worth conducting at least some investigation of whether Davis had been abused. Yet they never did so at all.

Under Supreme Court precedent, this was clearly deficient performance. That's so because counsel's failure to find important mitigating evidence amounts to deficient performance if counsel has "not fulfilled their obligation to conduct a thorough investigation of the defendant's background." *See, e.g.*, *Wiggins*, 539 U.S. at 522 (cleaned up). That's exactly what happened here:

---

[20] The entire rest of the strategy involved arguing that Davis had low intelligence, based on the last-minute psychometric testing Storey performed.

[21] As it turns out, DHR had photographs showing Davis's back when he was ten years old, already heavily scarred from years of whipping.

counsel did not fulfill their obligation to conduct a thorough (or almost any) investigation of Davis's background.

### iii.  *The state courts' "conspiracy of silence" theory belies reality and common sense.*

Inexplicably, the state courts reached the opposite conclusion. Based solely on the fact that Davis and his abusive mother did not affirmatively volunteer that she had abused him, the state courts went so far as to accuse Davis of deliberately misleading trial counsel and participating in a "conspiracy of silence" with his mother and family to hide his abuse. *Davis*, 9 So. 3d at 554. In fact, the state courts said, "Davis is asking this Court to declare two competent trial lawyers incompetent due to the fact that they were manipulated by Lillie Bell-Davis, the Davis family, and Davis himself due to the family's conspiracy of silence." *Id.* at 556 (citation omitted). The courts then blamed Davis and his family for counsel's deficiency, remarking, "Quite simply, it is not trial counsel's fault, it is the fault of [Davis], of his mother, of Andre Sigler, and of the Davis family as a whole . . . ." *Id.*

The Concurring Opinion endorses this fiction, again blaming Davis, his abusive mother, and his family members whom counsel never questioned, and arguing that proper investigation would not necessarily have uncovered the abuse because the family

18-14671                ROSENBAUM, J., Dissenting                41

members had not reported it to anyone before the Rule 32 hearing. *See* Concurring Op. at 23.[22]

But this conspiracy theory is like something out of another universe. And the state courts' reliance on it to avoid applying *Wiggins*'s rule that counsel must conduct a thorough investigation of the defendant's background, or reasonably decide such an investigation is unnecessary, was unreasonable.

For starters, it should come as no surprise that no one volunteered the information about the abuse when (1) counsel didn't ask about it, and (2) the only people counsel interviewed were the abuser, the abuse victim, and *maybe*, at best, two minor

---

[22] The Alabama appellate court and the Concurring Opinion note that Lillie "consistently and repeatedly denied" abusing Davis in the past, contributing to the so-called "conspiracy of silence." Concurring Op. at 21. The Concurring Opinion then criticizes Davis for not calling Lillie as a witness during the Rule 32 proceedings, "despite her availability and his knowledge that the abuse inflicted by her was key to his mitigation case." *Id.* For starters, Lillie's absence from the Rule 32 proceedings is irrelevant. By then, once Davis knew the significance of the abuse evidence, Davis and his counsel had more than enough testimony to prove it without needing to call Lillie, Davis's abuser. And the state courts found "that Davis was abused by his mother." *Davis*, 9 So. 3d at 553. Nobody disputes that this is true. Plus, we also know that counsel never asked Lillie if Davis suffered abuse as a child. Not only that, but nobody disputes that counsel were unaware of the abuse, which means we know that Lillie did not voluntarily disclose it to counsel. Of course, that's anything but surprising. On the other hand, it is absurd to suggest, as the Alabama appellate court and the Concurring Opinion do, that Davis is somehow to blame for Lillie's failure to affirmatively volunteer the horrific abuse she inflicted upon Davis, especially because she denied it in the past to DHR officers.

children who still lived with the abuser and remained subject to her abuse.

Yet the state courts and the Concurring Opinion seem to think that the several other Davis family members and close friends should have, on their own, discerned that evidence about Lillie's abuse of Davis could be helpful to Davis's mitigation case. Then, after somehow divining this legal insight, the state courts and Concurring Opinion apparently believe Davis's family members should have taken action to identify and seek out Davis's counsel, and unsolicited, give them this information. The absurdity of this theory speaks for itself. And Davis's family members' failure to engage in this improbable series of realizations and actions does not somehow suggest that they all got together to keep this information from counsel who never bothered to interview them in the first place. This is hardly the stuff of a "conspiracy."

Even less convincing is the state courts' view that Sigler willingly took part in this alleged "conspiracy of silence." *See Davis*, 9 So. 3d at 556. Specifically, Sigler testified that "[Davis] wasn't given the opportunities that a lot of people are given coming up." Counsel asked, "When you say that, what do you mean[?]" And Sigler responded, "I think [Davis] was missing a lot as he was coming up. People to rely on . . . [and] people who could . . . help him out." The state courts suggest Sigler's answers purposely hid Davis's abuse. The state courts miss the point of counsel.

For starters, it was counsel's job to know what information Sigler possessed. But counsel didn't so much as speak with Sigler

until the day Sigler testified—and even then, counsel spoke to Sigler only during a brief trial recess. Plus, counsel never asked Sigler about any abuse. Nor did counsel even tell Sigler what he was going to ask before putting Sigler on the stand. So Sigler had no reason to mention Davis's abuse, and counsel could not ask thoughtful follow-up questions during Sigler's testimony. Second, Sigler is not an attorney, and it is unreasonable to expect Sigler to have known on his own to discuss Lillie's abuse of Davis when counsel never asked any question directly related to that type of testimony. In fact, Sigler's answer was directly responsive to the question counsel asked. And when Sigler testified that Davis "was missing . . . [p]eople to rely on" and people who could "help him," defense counsel asked no questions about why Lillie wasn't such a person to Davis.

But the state courts suggest it was the responsibility of Sigler, a non-lawyer whom counsel did not even prepare to testify, to know and then decide *while on the stand* that testifying about Davis's domestic abuse would be helpful to the mitigation case. Once again, the absurdity of this argument speaks for itself.

As for Davis, it's true that Giddens testified that Davis talked about only the facts of the crime and his defense to that crime in their meetings. But counsel met with Davis for a total of only a few hours. And counsel never asked Davis questions designed to reveal whether he had ever been abused. Nor is Davis an attorney. It wasn't Davis's job to know on his own that he even needed to discuss mitigation (as opposed to a defense to the crime he was on

trial for), let alone what might be relevant to mitigation.  That was counsel's job.  And that was especially so, given that Davis's IQ falls in the bottom 6% of the population.  Add to that the fact that Davis grew up with so much abuse that he may well not have even realized that there was anything unusual about it without direct questions, and it is astounding that the state courts and Concurring Opinion blame counsel's failure on Davis.

Apparently recognizing the unreasonableness of its position, the Concurring Opinion points to Davis and his family's failure *when Davis was a child* to report Lillie's abuse of Davis to try to bolster their baseless "conspiracy of silence" theory.  Concurring Op. at 22 ("[E]very single family member and friend that testified at the [Rule 32] evidentiary hearing stated that they never told anyone about the abuse and never reported the abuse to the authorities.").  First off, it's not clear who the Concurring Opinion thinks was in a position to report the abuse:  the minor Davis?  His minor sisters who were still subject to Lillie's abuse?  Davis's victimizing mother?  And second, Davis's family members' failures *when Davis was a child* to affirmatively report Davis's abuse do not somehow support the notion that his family members would have refused years later to discuss Davis's abuse if affirmatively asked about it when it might have resulted in a life-imprisonment sentence instead of a death sentence.

Even if I wore a tin-foil hat, I couldn't understand how the Concurring Opinion and state courts' conclusion that counsel's

performance wasn't deficient—based on an implausible and outlandish conspiracy theory—is not unreasonable.

The Concurring Opinion's reliance on *Newland v. Hall*, 527 F.3d 1662 (11th Cir. 2008), and *Stewart v. Secretary, Department of Corrections*, 476 F.3d 1193 (11th Cir. 2007), to support this unreasonable conclusion is misplaced, no matter how hard the Concurring Opinion tries to squeeze Davis's square peg of a case into *Newland* and *Stewart*'s round hole. The Concurring Opinion cites the cases for the ideas that "when a petitioner does not mention a history of physical abuse, a lawyer is not ineffective for failing to discover or to offer evidence of abuse as mitigation," *Newland*, 527 F.3d at 1202, and that counsel has no constitutional obligation to "scour a defendant's background for potential abuse given the defendant's . . . failure to mention the abuse," *Stewart*, 476 F.3d at 1211.

But no decision can hold anything beyond the facts of that case. *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1298 (11th Cir. 2010); *see also Nelson v. Tompkins*, 89 F.4th 1289, 1303 (11th Cir. 2024) (Ed Carnes, J., concurring) (collecting cases). And *Newland*'s and *Stewart*'s facts don't even bear a passing resemblance to this case. In *Newland*, the Court emphasized that the defendant did not provide counsel with so much as the names of family members; here, in contrast, counsel had the names of several family members available to them. Indeed, counsel's notes even listed family members. And in *Stewart*, counsel had "frequent interaction" with the defendant. But here, counsel met with Davis for only a few

hours total and spoke almost exclusively, if not exclusively, about the facts of the crime. Neither *Newland* nor *Stewart* stands for a broad proposition that any time counsel fails to investigate a defendant's background and the defendant, in turn, does not proactively disclose background information, counsel was not ineffective.

To the contrary, the Supreme Court has repeatedly ruled that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 690–91). And we've applied that rule to find deficient performance by attorneys in case after case. *See, e.g.*, *Williams v. Allen*, 542 F.3d 1326, 1340 (11th Cir. 2008) (collecting cases); *see also Williams v. Alabama*, 73 F.4th 900, 907 (11th Cir. 2023) ("Williams testified that [counsel] asked him only general questions about his childhood, such as about family and school. Williams was never asked about his family background; whether he had been neglected; or whether he had been sexually, physically, or emotionally abused. These deficiencies were patently unreasonable."), *vacated on other grounds*, 144 S. Ct. 2627 (2024). Counsel certainly did not fulfill their duty to perform a reasonable investigation or to make a reasonable decision that made any further investigation unnecessary here. And "a federal court may grant relief when a state court has misapplied a governing legal principle to a set of facts different from those of the case in which the principle was announced." *Wiggins*, 539 U.S. at 520 (cleaned up). The Alabama courts' conclusions as to the investigation here

18-14671            Rosenbaum, J., Dissenting            47

were contrary to clearly established Supreme Court precedent, for the reasons I've explained.

## II.    The state courts' determination that counsel's deficient performance did not prejudice Davis was "contrary to, [and] involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1).

The second prong of an ineffective-assistance claim requires a petitioner to show that counsel's deficient performance prejudiced him. *Wiggins*, 539 U.S. at 521. To establish prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.[23]

---

[23] Unlike for the performance prong, we afford AEDPA deference but not *double* deference to state courts' resolution of *Strickland*'s prejudice prong. *See Evans v. Sec'y, Dep't of Corr.*, 703 F.3d 1316, 1333–36 (11th Cir. 2013) (en banc) (Jordan, J., concurring). The Majority Opinion notes that other circuits have held double deference applies to the prejudice prong, too. *See Foust v. Houk*, 655 F.3d 524, 534 (6th Cir. 2011); *Anaya v. Lumpkin*, 976 F.3d 545, 554 (5th Cir. 2020). Most respectfully, I disagree with these courts. On the performance prong, we afford double deference because there are, in fact, two layers of deference. They are (1) *Strickland*'s instruction that "[j]udicial scrutiny of counsel's performance must be highly deferential," including a presumption of reasonable professional judgment, 466 U.S. at 689–90, and (2) AEDPA's deference requirements. *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011). The deference afforded under the first layer goes towards counsel's performance,

Here, the ineffective performance I've described changed the entire nature of Davis's mitigation case because it omitted both evidence that would have lessened the impact of the aggravating factors and evidence that would have increased the weight of the mitigating circumstances.  Had counsel's performance not been deficient in even one of these respects, a reasonable probability exists that the jury would have returned a penalty recommendation of life in prison instead of death.  And that's doubly so, had counsel performed appropriately with respect to both the aggravating and mitigating factors.

At trial, the State relied on two aggravating factors in seeking the death penalty:  (1) that the murder occurred during the course of a robbery, and (2) that Davis had previously been convicted of a crime involving violence or threat of violence.

---

not towards any prejudice caused by it.  And while *Strickland*'s prejudice standard has teeth—the petitioner must show a "reasonable probability" that the result of the case would have been different absent the errors, *Strickland*, 466 U.S. at 694—that does not equate to *deference* because, simply, there is nothing to defer to.  We don't defer to counsel's *conduct* when considering prejudice because prejudice concerns whether the *outcome* could have been different.  And we don't defer to the outcome itself beyond considering whether a reasonable probability exists that it would have been different.  In any event, even if we label our analysis "double deference" on the prejudice prong, it would not substantively change anything because, again, *Strickland* does not demand deference to anything on the prejudice prong, anyway.  No matter what we call it, on the prejudice prong, we're still applying AEDPA's deferential lens to the question of whether the state courts reasonably determined that Davis did not show a reasonable probability that the outcome of his case would have been different absent the errors.

18-14671          ROSENBAUM, J., Dissenting          49

Hearing that the facts of the only conviction supporting this second aggravating factor involved a pizza heist with no violence, no weapons, and no real threats, and no one was hurt would have severely undermined the aggravating nature of Davis's prior conviction. In fact, it's hard to imagine how a crime involving violence or threat of violence could be carried out with less violence than Davis's pizza heist. Who would think that a nonviolent robbery of this nature made him more deserving of the *death penalty*?

As the district court here recognized, "[c]ommon sense does suggest that testimony that Davis went along with a group of boys who ordered and then stole several pizzas and $35 from a delivery person, where no gun or weapon was involved and no one was injured, could have been more compelling to a jury than an argument by defense counsel that [Davis's] prior conviction and sentence were for the lowest degree of robbery in Alabama."[24] *Davis*, 2016 WL 3014784, at *59.

---

[24] The Majority Opinion criticizes this Dissent for "downplay[ing] the robbery" and evoking "images of juvenile pranks, and a 'boys will be boys' attitude." Maj. Op. at 44 n.20. But of course, I don't suggest that any robbery is good. *Cf. United States v. Perez*, 943 F.3d 1329, 1330 (11th Cir. 2019). Still, as the district court noted, it's common sense that there's a world of difference between a few young men, with one making a finger gun to steal some pizzas from a pizza-delivery man who said he didn't feel threatened, and a crime involving violence or a threat of violence that involves real guns, shooting, injuries, and death. And the second crime I've described provides a whole lot more justification for finding the violence-crime aggravator supports a death sentence.

50                    ROSENBAUM, J., Dissenting                    18-14671

And more importantly, *Rompilla* requires this same conclusion.[25] As I've explained, *see supra* at Section I.A, *Rompilla*'s facts were materially indistinguishable from counsel's failure here to learn the facts of the pizza-heist conviction. In both cases, counsel knew that the State intended to rely on the uninvestigated prior conviction to prove the aggravating factor that the defendant had previously been convicted of a crime of violence. *See Rompilla*, 545 U.S. at 383–84. In both cases, despite this knowledge, counsel didn't bother to learn the facts underlying the prior conviction, even though that information was readily available to counsel. *See*

---

[25] The Majority Opinion insists that "*Rompilla* does not aid us in assessing whether the [state courts] unreasonably determined that prejudice was lacking in this case" because *Rompilla* reviewed the prejudice prong *de novo*, rather than under AEDPA deference. Maj. Op. at 50. Two responses: first, as I explain below, *see infra* at 50, the state courts never expressly reached the prejudice prong as to the pizza heist, and so it is unlikely AEDPA deference even applies here. But second, even if AEDPA deference is appropriate when we consider Davis's argument that counsel's failure to investigate the pizza heist prejudiced Davis, the fact that *Rompilla* applied *de novo* review does not mean its holdings are *irrelevant* to our analysis. True, the Supreme Court has stated *Rompilla* "offer[s] no guidance with respect to whether a state court has *unreasonably* determined that prejudice is lacking." *Cullen*, 563 U.S. at 202. But that does not mean *Rompilla* offers no guidance as to whether the conduct *Rompilla* involves may cause prejudice. And that in turn bears on the analysis of whether a state court's prejudice decision was reasonable or not. As I've noted, *Rompilla* and Davis's case involve the same deficient attorney conduct. And "[b]ecause [*Rompilla*] illuminate[s] the kinds of mitigation evidence that suffice to establish prejudice under *Strickland*, [it] provide[s] useful, but not dispositive, guidance for courts to consider when determining whether a state court has unreasonably applied *Strickland*." *See id.* at 241 (Sotomayor, J., dissenting).

*id.* at 384–85.  In that situation, the Supreme Court concluded, "We may reasonably assume that the jury could give more relative weight to a prior violent felony aggravator where defense counsel missed an opportunity to argue that circumstances of the prior conviction were less damning than the prosecution's characterization of the conviction would suggest." *See id.* at 386 n.5.  And in Davis's case, the circumstances of the prior conviction were in fact significantly less damning than the prosecution's characterization of the conviction suggested.

The state courts disposed of Davis's first claim (that counsel were ineffective for failing to learn and present the facts of his pizza-heist conviction when they knew the State intended to use only the robbery conviction to support application of the prior-violent-conviction aggravating factor) on the deficient-performance prong.  They never expressly reached the prejudice prong as to the pizza heist.

The Majority Opinion acknowledges this fact, but it nonetheless reads deeply between the lines of the Alabama courts' decisions to conclude that they ruled that counsel's deficient performance did not prejudice Davis.  Maj. Op. at 42–43 n.19.  No matter.  Whether the Alabama courts made a prejudice ruling on counsel's failure to learn the facts of the pizza heist goes to only the standard we apply in reviewing the state courts' decisions: *de novo* review or AEDPA deference.  And here, under either standard, a conclusion of no prejudice just can't hold up.

To the extent we are willing to attribute the Alabama courts' deficient-performance analysis to a prejudice analysis, the Alabama courts concluded that counsel's failure to learn the pizza-heist facts was not prejudicial for three incorrect reasons: (1) the Alabama courts wrongly claimed that the state in *Rompilla* invoked only one aggravating factor, while the State here invoked two (in fact, *Rompilla* involved three aggravating factors, and the number of aggravating factors did not play a role in the Supreme Court's prejudice finding); (2) the Alabama courts excused counsel's failure to learn and present the facts of the pizza heist because counsel told the jury the far less compelling fact that third-degree robbery is the "lowest degree of robbery"; and (3) the Alabama courts thought that counsel's review of only the Alabama State Action Summary (which identified only the facts of conviction, date of conviction, original charges, and sentence, but not the facts underlying pizza-heist conviction) was good enough. *See supra* at Section I.A.

I've previously explained why each of these reasons presents an unreasonable basis for distinguishing *Rompilla*. *See id.* And the reasons don't somehow improve just because we consider them under the heading of prejudice.

Apparently recognizing the problems with the Alabama courts' efforts to distinguish *Rompilla*, which is directly on point here, the Majority Opinion attempts to give the Alabama courts an assist. In this regard, the Majority Opinion comes up with two reasons of its own why it says *Rompilla* doesn't demand a finding of prejudice in this case.

18-14671                ROSENBAUM, J., Dissenting                53

First, the Majority Opinion posits that the facts of the pizza heist may not have helped Davis's case. Rather, the Majority Opinion asserts, "it is equally plausible that the facts of the pizza robbery could have pointed to an escalating pattern of violence given that it was close in time to the 1993 murder, and the 1993 murder was also committed during a robbery." Maj. Op. at 51.

But that is nonsensical. The jury already heard that Davis had a third-degree robbery conviction and that the conviction supported the State's requested prior-violent-felony aggravator. It also knew that the pizza heist occurred close in time to the 1993 murder and that the 1993 murder happened during a robbery. So the non-violent facts of the pizza heist—the only prior conviction supporting the prior-felony aggravator—only would have minimized (or eradicated) any potential assumption of violence. Plus, as a practical matter, any time a person with any prior conviction is on trial for murder, if he hasn't previously committed murder, the current charges "point[] to an escalating pattern of violence." In sum, the Majority Opinion's suggestion that the jury may have used the facts of the pizza heist to find more of a reason to recommend death is unreasonable and defies reality.

Second, the Majority Opinion contends that "any appeal to the allegedly nonviolent nature of the pizza robbery would have potentially opened the door for the state to introduce as rebuttal evidence Davis's violent behavior during his incarceration for the pizza robbery." Maj. Op. at 51–52. I disagree.

Stating the facts of the pizza heist would have gone only to the weight (if any) that the jury should apply to the state's prior-violent-conviction aggravator. And a defendant's conduct in jail after his prior conviction does not make any fact that could have a bearing on the weight *owed to the prior conviction as an aggravating factor* more or less likely (the definition of "relevance," *see* Ala. R. Evid. 401). So evidence concerning Davis's conduct in jail was irrelevant and non-responsive to the facts of the pizza heist.

The cases the Majority Opinion cites are not to the contrary. Rather, consistent with my position, each requires that the admitted evidence have "probative value." Maj. Op. at 53–54 (citing *Lindsay v. State*, 326 So. 3d 1, 53 (Ala. Crim. App. 2019) and *Whatley v. State*, 146 So. 3d 437, 481–82 (Ala. Crim. App. 2010)).[26] As I've

---

[26] In *Lindsay*, the Alabama Court of Criminal Appeals affirmed the admission of the defendant's statements about prior bad acts. 326 So. 3d at 53. But there, the prior bad acts related directly to the defendant's motive in the offense at issue. The defendant confessed that he murdered his daughter because a religious deity told him to, and the statements about the prior bad acts related to why he began to follow that religion. *Id.* The court never implied that evidence about prior bad acts unrelated to the offense at issue would always be admissible in sentencing. *Whatley* helps the Majority Opinion no more. There, the Alabama Court of Criminal Appeals explained that evidence of future dangerousness can be admitted during the penalty phase. 146 So. 3d at 482. But it did so because the prosecution in that case had requested before sentencing to admit evidence of future dangerousness. Here, the prosecution did not argue future dangerousness. Not only that, but in *Whatley*, the defendant claimed he changed and was remorseful after committing the murder for which he was convicted. *Id.* Evidence of bad conduct while in jail was directly relevant to rebutting those arguments. *Id.* Again, the court never

18-14671            Rosenbaum, J., Dissenting            55

noted, evidence of behavior during incarceration sheds no light on how much weight the pizza heist itself should garner as an aggravating factor. Nor was that evidence relevant to *any* of the statutory aggravating circumstances in Alabama at the time. *See* Maj. Op. at 7 n.4.

Because the facts of the pizza heist would have diminished the impact of the prior-violent-conviction aggravator, the State would have been left with only one real aggravating factor. Plus, the court found a mitigating factor (Davis's age, which was 23 at the time of trial) against which that remaining aggravating factor would have had to have been balanced.

And we already know that, even with counsel's ineffective assistance in failing to learn and present the facts of Davis's pizza-heist conviction to the jury, the jury was five to seven in favor of life imprisonment two-thirds of the way through deliberations (and the ultimate verdict wasn't unanimous).

The Majority Opinion has two responses to this. First, it responds that the state court's failure to consider "the circumstances of the jury's decision . . . does not render [the state court's] decision objectively unreasonable under AEDPA," because "the Supreme Court has never held that a jury's hesitation in

---

suggested that evidence of bad acts committed while incarcerated for an unrelated crime— which is what the Majority Opinion suggests would have become admissible in Davis's case if the facts of the pizza heist were admitted—would be admissible, let alone probative of the weight the aggravator for having committed a prior violent crime should be given.

56                    ROSENBAUM, J., Dissenting                    18-14671

reaching a verdict is necessarily an indicator of prejudice or that such a factor must be considered or should weigh more heavily in the prejudice analysis under *Strickland*." *Id*. at 57. But the jury's split *is* significant to the determination of prejudice here. It is unreasonable, not just "incorrect," *id*. at 59, to conclude that there is *no* "reasonable probability that at least one juror would have struck a different balance" but for counsel's errors, given the seven-five split in deliberations that occurred even without these mitigating facts, *Wiggins*, 539 U.S. at 537.

Second, the Majority Opinion relies on the fact that the jury delivered its death verdict within an hour to suggest that the fact that five jurors favored life imprisonment carries little if any weight. Maj. Op. at 57–59 n.25. That completely misses the point. Even in the face of counsel's deficient performance, *five* jurors felt strongly enough that life was the more appropriate sentence that they sent a note to the judge saying so. At that point, only two more votes would have resulted in a recommendation by the jury for a life sentence. Had counsel reviewed and shared the mitigating facts of the pizza heist conviction—and given the sizeable chunk of the jury that favored life even with the powerful nature of counsel's deficiency—it is reasonably probable that at least two more of the remaining seven jurors would have agreed with the other five. Had they done so, the jury would have returned a recommendation for life imprisonment, not death.

18-14671          ROSENBAUM, J., Dissenting          57

Any other conclusion is contrary to *Rompilla*. For this reason alone, we should grant Davis's petition for a new penalty-phase trial.

But it's even worse than that. As I've explained, counsel were also deficient in their failure to conduct any real background investigation—an error that caused them not to learn of and then present (among other things) the horrific abuse Lillie inflicted on Davis when he was growing up. The Supreme Court has described mitigation evidence similar to this as "powerful." *Wiggins*, 539 U.S. at 534–35 (describing evidence that the petitioner had "experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother" and that he had "suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care"). And here, even the state courts found "that Davis was abused by his mother to an extent that would have rendered it relevant to the issue of the appropriate penalty determination." *Davis*, 9 So. 3d at 553.

Yet somehow the state courts found no prejudice stemming from counsel's failure to investigate Davis's background, including his abuse. In support of this conclusion, the state courts said that the abuse evidence was a "double-edged sword" because "some of the evidence indicated that Davis had good role models in his life" and Davis's violent behavior did not begin until after "he [was] away from his mother and her influence." *Id.* at 562–63. But that misunderstands the purpose of the mitigation evidence of abuse.

The state courts' no-prejudice finding fails to account for the fact that Davis grew up in a violent household, so he may have learned violence was a permissible way to deal with things. It also once again disregards evidence: specifically, two of the "good role models" that the state courts said were a double-edged sword died when Davis was 15 years old, within a week of one another, only adding to the instability and trauma of Davis's upbringing. No reasonable juror could have looked at the additional evidence of Davis's background and concluded he was not disadvantaged. And "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background may be less culpable than defendants who have no such excuse." *Johnson v. Sec'y, Dep't of Corr.*, 643 F.3d 907, 935–36 (11th Cir. 2011) (cleaned up).[27]

The state courts also concluded that "the facts of this crime and the two aggravating circumstances proven by the State far outweighed the one statutory mitigating factor and these non-

---

[27] "[T]he fact that [Davis's] siblings and his cousin had gone on to lead successful lives, despite experiencing the same physically abusive upbringing," Maj. Op. at 49, is also unavailing because it is based on a false premise—that Davis's siblings and cousin had to endure "the same physically abusive upbringing." In fact, Davis's older sister Hortense testified that Davis got the worst of the abuse. Not only was his abuse more severe, but Lillie beat Davis until he was much older than Hortense was when Lillie stopped. And Sigler testified that he witnessed Davis receive "real bad whippings," some that "lasted over five minutes" and consisted of "20 or more licks."

18-14671            ROSENBAUM, J., Dissenting            59

statutory mitigating factors."[28]  *Davis*, 9 So. 3d at 562.  But this reasoning didn't account for the actual facts of the only conviction the State relied on to support the violent-prior-crime aggravating factor—facts that severely undermined the factor's usefulness as an aggravating one warranting the death penalty.

Yet when we evaluate prejudice, we must consider "the totality of the available mitigation evidence . . . in reweighing it against the evidence in aggravation." *Williams*, 529 U.S. at 397–98. And especially when we consider counsel's failure to show the jury Lillie's abuse of Davis *and* counsel's failure to present the circumstances of Davis's prior conviction to the jury, the "evidence adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury." *Rompilla*, 545 U.S. at 393.

On top of that, again, the state courts failed to consider at all in their prejudice analysis that, at one point, five members of the jury favored life without parole and not the death penalty, and even at the verdict, the jury was not unanimous. But "when we have evaluated prejudice, we have frequently considered the circumstances of the jury's decision to assess whether there is 'a reasonable probability that at least one juror would have struck a

---

[28] The phrase "these non-statutory mitigating factors" in the sentence quoted above refers to (1) the abuse evidence and (2) Davis's "below-average intellect." *Davis*, 9 So. 3d at 562.  It does not encompass the evidence about the pizza heist.

60                    ROSENBAUM, J., Dissenting                    18-14671

different balance.'" *Sears v. Warden GDCP*, 73 F.4th 1269, 1299 (11th Cir. 2023) (per curiam) (quoting *Wiggins*, 539 U.S. at 537).

In *Sears*, like here, the jury made clear through notes to the court during deliberations that it was not yet unanimous in its verdict, and we granted the habeas petition acknowledging that "the jury still struggled to reach a consensus regarding a death sentence" even without the additional mitigation evidence at issue. *Id.* at 1299–1300. *See also Hardwick v. Sec'y, Fla. Dep't of Corr.*, 803 F.3d 541, 564 (11th Cir. 2015) (finding prejudice where, even without the compelling mitigation evidence that emerged in later stages, "the jury still came within a single vote of recommending life"); *Daniel v. Comm'r, Ala. Dep't of Corr.*, 822 F.3d 1248, 1276 (11th Cir. 2016) (finding prejudice partially because "if one more juror voted for a sentence of life without parole, there could have been no recommendation for death"); *Cave v. Singletary*, 971 F.2d 1513, 1519 (11th Cir. 1992) ("[D]espite the presentation of no mitigating circumstances, [petitioner] came within one vote of being spared execution."); *Blanco v. Singletary*, 943 F.2d 1477, 1505 (11th Cir. 1991) (finding that "there was a reasonable probability that [petitioner's] jury might have recommended a life sentence" "[g]iven that some members of [petitioner's] jury were inclined to mercy"); *Lawhorn v. Allen*, 519 F.3d 1272, 1297 (11th Cir. 2008) (finding prejudice after noting that "one juror voted to recommend life instead of death" so defendant "needed only to convince two other jurors to alter the outcome of the proceedings").

18-14671          ROSENBAUM, J., Dissenting          61

The Majority Opinion tries to sidestep these cases, arguing that we conducted *Sears*'s prejudice analysis under the *Brecht* standard, not under *Strickland*. *See* Maj. Op. at 58 n.25. But we've found juror splits relevant to the prejudice inquiry whether under *Brecht* or *Strickland* and whether pre-AEDPA or under AEDPA. *See, e.g., Lawhorn*, 519 F.3d at 1297–98.

Other circuits have also confronted cases in which the trial jury "initially reported a deadlock regarding [petitioner's] sentence," and concluded that "[e]ven a slightly more compelling case for mitigation . . . might have altered the outcome of the sentencing phase of [petitioner's] trial." *Mason v. Mitchell*, 543 F.3d 766, 780 (6th Cir. 2008). When considering prejudice, "[t]he jury's initial hesitance in reaching a verdict in the penalty phase . . . weighs towards a finding of prejudice," and "[a] jury note indicating hesitance in reaching a penalty phase verdict suggests that a death sentence for [petitioner] was not a foregone conclusion." *Sanders v. Davis*, 23 F.4th 966, 994–95 (9th Cir. 2022) (internal quotation marks and citation omitted) (alteration adopted); *see also Stankewitz v. Wong*, 698 F.3d 1163, 1175 (9th Cir. 2012) ("Another indicator of prejudice . . . is the difficult time the jury had reaching a unanimous verdict on death."); *Williams v. Stirling*, 914 F.3d 302, 318 (4th Cir. 2019) ("[P]ersuasive mitigating evidence for a jury—particularly a deadlocked one—considering the death penalty" could be "outcome-determinative[.]").

The state courts' failure to consider the effect of the evidence that counsel would have uncovered but for their deficient

62                    ROSENBAUM, J., Dissenting                    18-14671

performance, on a jury where five votes favored life without parole two-thirds of the way through deliberations and the ultimate death verdict was not unanimous, was also unreasonable.

In short, the state courts' conclusion that counsel's failure to learn and present the moderating details of the prior conviction that the State used to support one of two aggravating factors, and that counsel's failure to conduct any real mitigation investigation, including of Davis's abuse, was not prejudicial was contrary to federal law as clearly established by the Supreme Court—namely, in *Strickland*, *Rompilla*, and *Wiggins*.

Because the state courts' resolution of Davis's claims is contrary to and involves unreasonable applications of clearly established federal law, I would grant Davis's petition as it seeks a new penalty-phase trial. I therefore respectfully dissent from the Majority Opinion's decision not to do that.


## APPENDIX

(Counsel's Billing Records)

18-14671                 ROSENBAUM, J., Dissenting                 63

APPENDIX

·:e of Alabama
if. : Judicial System
m C-62A    10/1/90

**A. .ORNEY'S FEE DECLARATIC..**
**(Adult)**

Case Number

cc 9 31534

)ppropriate court:

Circuit Court of ___CALHOUN___ County    ☐ District Court of _____ County

Alabama Court of Criminal Appeals    ☐ Supreme Court of Alabama

yle of Case:    STATE OF ALABAMA VS. JIMMY DAVIS

iarge:    CAPITAL MURDER

impanion case numbers and charges or convictions: _____

The undersigned attorney declares that on (date) ___6-02-93___ , the Honorable
___MALCOLM STREET, JR.___ , judge, appointed the undersigned to
oresent the above-named defendant or appellant, and on (date) ___3-04-94; 1-20-94___
e case was disposed of by ___Found guilty of Capital Murder, sentenced to death___
___and attorney allowed to withdraw___
(plea or guilty, conviction, acquittal, affirmance, reversal, cert. denied)

| | | | |
|---|---|---|---|
| In Court Appearance | Total Hours 60.75 | x $40.00 = | $ 2,430.00 |
| Out of Court Preparation *Trial Level* | Total Hours 50.0 | x $20.00 = | $ 1,000.00 |
| Out of Court Preparation *Appellate Level* | Total Hours | x $40.00 = | $ |
| Extraordinary Expenses | Total Amount of Expenses | | $ 79.50 |
| (If approved in advance by court.) | TOTAL CLAIM OF ATTORNEY | | $ 3,509.00 |

)TICE TO ATTORNEY: Complete this form. Attach a copy of a complete itemization of (1) In Court Appearance; (2)
Court Preparation; and (3) Extraordinary Expenses reflecting the date of actions and amount of time involved
activity. Make a copy of same for the Court's record and a copy for your records.

The undersigned attorney further declares that the above claim is true and correct and represents the services
tually rendered by him/her as an attorney and said amount is due and payable. I further declare that the above claim
not a duplication of charges and expenses in any case (companion or otherwise).

Signature of Attorney

Name and Address of Attorney (please print)
JONATHAN L. ADAMS

vorn to and subscribed before me this    P O BOX 1176
iy of                19 94.    TALLADEGA AL 35160

SS No. or FEIN No.
raty Public    Telephone No.

I, the undersigned judge, hereby certify that the foregoing claim has been presented to me and I have reviewed
e same and believe the same to be true and correct. I am further of the opinion that said attorney is not duplicating
d charges and expenses in any case (companion or otherwise).
Based on the above, I hereby approve the declaration and claim in the amount of $ 3,509.00 .
one this ___12th___ day of
___April___ , 19 94 .

Judge's Signature

)TICE TO ATTORNEY AND JUDGE:    Sections 15-12-21 through 15-12-23, *Code of Alabama 1975*, provide for the
iyment of attorney fees and extraordinary expenses incurred by counsel appointed to represent indigent defendants
t the trial level, on appeal (including petition for writ of certiorari to the Alabama Supreme Court) and in post-
nviction proceedings.

) FORM MUST CONTAIN ORIGINAL SIGNATURES OF THE ATTORNEY AND THE JUDGE. THIS FORM WITH
IED ITEMIZATION MUST BE SUBMITTED TO THE TRIAL COURT JUDGE OR PRESIDING JUDGE OR CHIEF JUSTICE
: THE APPELLATE COURT FOR APPROVAL. AFTER APPROVAL, THE CLERK SHALL SUBMIT THE ORIGINAL
:CLARATION TO THE STATE COMPTROLLER FOR AUDIT AND ALLOWANCE. MAIL TO: *State Comptroller, Room 103
abama State House, Montgomery, Alabama 36130.*

Filed in the Clerk's Office on this    13

64                      ROSENBAUM, J., Dissenting                18-14671

SG200037

1647

ATTORNEY'S FEE DECLARATION

STATE OF ALABAMA VS. JIMMY DAVIS

Charge:         Capital murder

Case Number:    CC-93-534
Appointed:      MALCOMB STREET, JR.
Date:           06-02-93
Disposition:    Found guilty of capital murder, sentenced to
                death.  Attorney allowed to withdraw
Date:           03-04-94; 3-30-94

### IN COURT TIME

| DATE | DESCRIPTION | TIME |
|------|-------------|------|
| 03-04-94 | Sentence hearing | 2.5 |
| 02-14-94 | Sentence hearing (cont.) | 2.0 |
| 12-10-93 | Trial | 9.0 |
| 12-09-93 | Trial | 12.5 |
| 12-08-93 | Trial | 8.0 |
| 12-07-93 | Trial (striking jury) | 10.25 |
| 12-06-93 | Trial (striking jury) | 14.0 |
| 11-24-93 | Pre-trial | 2.5 |
| | | 60.75 |

### OUT OF COURT TIME

| DATE | DESCRIPTION | TIME |
|------|-------------|------|
| 04-01-94 | Reviewed Court's order | .1 |
| 03-29-94 | Conference with co-counsel; communication with Court | 1.0 |
| 03-08-94 | Conference with co-counsel; prepared Motion to Withdraw; Communication with Court | 1.5 |
| 03-03-94 | Sentence preparation; reviewed file; made notes | 1.5 |
| 02-14-94 | Sentence preparation | 1.0 |
| 02-10-94 | Sentence preparation; discussed case with co-counsel; reviewed file | 1.5 |
| 12-09-93 | Reviewed notes; prepared written jury instructions | 7.0 |

SG200037

18-14671          ROSENBAUM, J., Dissenting          65

SG200038

1648

| | | |
|---|---|---|
| 12-08-93 | Reviewed trial notes; trial preparation | 5.0 |
| 12-07-93 | Reviewed file for trial | 4.0 |
| 12-06-93 | Reviewed voir dire; file | 4.5 |
| 12-05-93 | Trial preparation | 5.0 |
| 12-04-93 | Trial preparation; conference with co-counsel | 6.5 |
| 12-03-93 | Communication with co-counsel; trip to Channel 40; Anniston Star; interviewed witnesses; trip to crime scence; communication with Judge; reviewed evidence at Anniston City Jail; reviewed video statements of co-defendant; conference with D.A.; trial preparation | 12.5 |
| 12-02-93 | Investigated witnesses; communication with co-counsel; conference with Judge; reviewed discovery; conference with Channel 40; trial preparation | 10.0 |
| 12-01-93 | Investigated, interviewed witnesses; reviewed discovery; visited crime scene; neighborhood; secured map of Anniston; met with printing co. for defendant's Exhibit; Communication with co-counsel | 11.5 |
| 11-30-93 | Reviewed discovery | 4.0 |
| 11-29-93 | Conference with client; client's mother; communication with co-counsel; reviewed file | 6.0 |
| 11-28-93 | Reviewed discovery; made notes | 2.0 |
| 11-26-93 | Reviewed discovery; made notes; legal research | 4.0 |
| 11-24-93 | Communication with co-counsel; conference with D.A.; investigated case file (scene) | 3.5 |
| | | 92.1 |

*290 or Calhoun - Cleburne Mental Health*

SG200038

66                        ROSENBAUM, J., Dissenting                    18-14671

State of Alabama
Unified Judicial System

**ATTORNEY'S FEE DECLARATION**
**(Adult)**

Form C-62A    10/1/90

Case Number
CC-93-534

**Mark appropriate court:**

☒ Circuit Court of _Calhoun_ County    ☐ District Court of _____ 0003 Cou.
☐ Alabama Court of Criminal Appeals    ☐ Supreme Court of Alabama

Style of Case: STATE OF ALABAMA VS. JIMMY DAVIS
Charge: Capital Murder
Companion case numbers and charges or convictions: _____

The undersigned attorney declares that on (date) _4-9-93_ , the Honora
_Gus Colvin_ , Judge, appointed the undersigned
represent the above-named defendant or appellant, and on (date) _3-4-94_
the case was disposed of by _sentencing after conviction and on 3-30-94 order_
_granting undersigned attorneys Motion to Withdraw_
(plea of guilty, conviction, acquittal, affirmance, reversal, cert. denied)

| | | | | |
|---|---|---|---|---|
| (1) In Court Appearance | Total Hours 65.25 | x | $40.00 = | $ 2,610.00 |
| (2) Out of Court Preparation *Trial Level* | Total Hours 50.00 | x | $20.00 = | $ 1,000.00 |
| (3) Out of Court Preparation *Appellate Level* | Total Hours | x | $40.00 = | $ |
| (4) Extraordinary Expenses | Total Amount of Expenses | | | $ 290.00 |
| (If approved in advance by court.) | TOTAL CLAIM OF ATTORNEY | | | $ 3,900.00 |

NOTICE TO ATTORNEY: Complete this form. Attach a copy of a complete itemization of (1) In Court Appearance;
Out of Court Preparation; and (3) Extraordinary Expenses reflecting the date of actions and amount of time involv
in each activity. Make a copy of same for the Court's record and a copy for your records.

The undersigned attorney further declares that the above claim is true and correct and represents the servic
actually rendered by him/her as an attorney and said amount is due and payable. I further declare that the above cla
is not a duplication of charges and expenses in any case (companion or otherwise).

Signature of Attorney
Name and Address of Attorney (please print)
Sworn to and subscribed before me this _16_     Steven D. Giddens
day of _____ , 19 __     P.O. Box 6052
_Talladega, Al._    35160
Notary Public    SS No. or FEIN No.
Telephone No.

I, the undersigned judge, hereby certify that the foregoing claim has been presented to me and I have review
the same and believe the same to be true and correct. I am further of the opinion that said attorney is not duplicati
said charges and expenses in any case (companion or otherwise).
Based on the above, I hereby approve the declaration and claim in the amount of $ 3,900 00 .

Done this _22nd_ day of
_June_ , 19 _94_ .    Judge's Signature

NOTICE TO ATTORNEY AND JUDGE:    Sections 15-12-21 through 15-12-23, Code of Alabama 1975, provide for
payment of attorney fees and extraordinary expenses incurred by counsel appointed to represent indigent defenda
on the trial level, on appeal (including petition for writ of certiorari to the Alabama Supreme Court) and in po
conviction proceedings.

THIS FORM MUST CONTAIN ORIGINAL SIGNATURES OF THE ATTORNEY AND THE JUDGE. THIS FORM WI
ATTACHED ITEMIZATION MUST BE SUBMITTED TO THE TRIAL COURT JUDGE OR PRESIDING JUDGE OR CHIEF JUSTI
OF THE APPELLATE COURT FOR APPROVAL. AFTER APPROVAL, THE CLERK SHALL SUBMIT THE ORIGIN
DECLARATION TO THE STATE COMPTROLLER FOR AUDIT AND ALLOWANCE. MAIL TO: State Comptroller, Room 1
Alabama State House, Montgomery, Alabama 36130.

Filed in the Clerk's Office on this _24th_
day of _June_ , 19 _94_

PETITIONER'S EXHIBIT    JD00232
#8

18-14671                ROSENBAUM, J., Dissenting                67

0004

ATTORNEY'S FEE DECLARATION

STATE OF ALABAMA VS. JIMMY DAVIS

Charge:         Capital Murder

Case Number:    CC-93-534
Appointed:      Gus Colvin
Date:           04-09-93
Disposition:    Found guilty of Capital Murder, sentenced to
                death.  Attorney allowed to withdraw
Date:           03-4-94; 03-30-94

### IN COURT TIME

| DATE | DESCRIPTION | TIME |
|------|-------------|------|
| 03-04-94 | Sentence Hearing | 2.5 |
| 02-14-94 | Sentence Hearing (cont.) | 2.0 |
| 12-10-93 | Trial | 9.0 |
| 12-09-93 | Trial | 12.5 |
| 12-08-93 | Trial | 8.0 |
| 12-07-93 | Trial (striking jury) | 10.25 |
| 12-06-93 | Trial (striking jury) | 14.0 |
| 11-24-93 | Pre-trial | 2.5 |
| 06-02-93 | Arraignment | 1.5 |
| 04-09-93 | Preliminary Hearing | 3.0 |
| | | 65.25 |

### OUT OF COURT TIME

| DATE | DESCRIPTION | TIME |
|------|-------------|------|
| 04-01-94 | Review Court's order | .1 |
| 03-29-94 | Conference with co-counsel | 1.0 |
| 03-08-94 | Conference with co-counsel; prepared Motion to Withdraw | 1.5 |
| 03-03-94 | Sentence preparation | 1.5 |
| 02-14-94 | Sentence preparation; conference with co-counsel | 1.0 |
| 02-10-94 | Sentence preparation; discussed case with co-counsel; reviewed file | 1.5 |
| 12-09-93 | Review file; prepared jury instructions | 7.0 |
| 12-08-93 | Reviewed trial notes; trial preparation | 5.0 |

SG20002

0005

| 12-07-93 | Review file | 4.0 |
| 12-06-93 | Review file, notes etc. | 4.5 |
| 12-05-93 | Trial preparation | 5.0 |
| 12-04-93 | Trial preparation; conference with co-counsel | 6.5 |
| 12-03-93 | Conference with co-counsel; trip to Channel 40; Anniston Star; interviewed witnesses; trip to crime scene; conference with judge; review evidence; conference with D.A.; trial preparation | 12.5 |
| 12-02-93 | Trial preparation; review file, evidence, etc. | 8.0 |
| 11-30-93 | Review discovery | 4.0 |
| 11-29-93 | Review discovery; conference with co-counsel | 2.0 |
| 11-24-93 | Conference with co-counsel; conference with D.A.; investigated case (scene) | 3.5 |
| 11-29-93 | Prepared motion | .5 |
| 11-19-93 | Filed motion | 1.2 |
| 11-29-93 | Call to Mental Health | .3 |
| 11-29-93 | Call to Mental Health | .3 |
| 11-19-93 | Call to Judge Street | .3 |
| 12-01-93 | Call to Mental Health | .3 |
| 12-01-93 | Call to Judge Street | .3 |
| 11-12-93 | Picked up discovery | 1.4 |
| 11-12-93 | Conference with client | 1.0 |
| 11-10-93 | Conference with D.A. | .5 |
| 08-10-93 | Review file | .3 |
| 07-11-93 | Review file | .3 |
| 06-11-93 | Conference with client | 1.0 |
| | | 76.3 * |

**EXTRAORDINARY EXPENSE**

Calhoun-Cleburn Mental Health; Mental examination    $290.00

*Only fifty (50) hours billed due to cap of One thousand ($1,000.00) dollars

SG200008